25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000001 of 000094

**COMMONWEALTH OF KENTUCKY**
**JEFFERSON CIRCUIT COURT**
**CIVIL BRANCH**
**DIVISION _____**

| | |
|---|---|
| LEXINGTON INSURANCE COMPANY, as Subrogee of INDEPENDENCE REALTY TRUST, LLC, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )     **COMPLAINT AND JURY DEMAND** |
| | ) |
| SOUTHERN SUPPLY COMPANY, LLC, d/b/a ALLEGHENY CONSTRUCTION SPECIALTIES, and d/b/a ELITE SPECIALTIES GROUP, | ) ) ) |
| | ) |
| Defendant. | ) |

---

## COMPLAINT

NOW COMES Plaintiff, LEXINGTON INSURANCE COMPANY, as subrogee of INDEPENDENCE REALTY TRUST, LLC, by and through its attorneys, Denenberg Tuffley, PLLC and Fowler Bell, PLLC and for its Complaint against Defendant SOUTHERN SUPPLY COMPANY, LLC, d/b/a ALLEGHENY CONSTRUCTION SPECIALTIES, d/b/a ELITE SPECIALTIES GROUP, states as follows:

## PARTIES

1.       Plaintiff, Lexington Insurance Company ("Plaintiff") is a Delaware Corporation authorized to write policies of insurance in the Commonwealth of Kentucky by the Kentucky Department of Insurance.

2.       At all relevant timeframes set forth herein, Plaintiff insured the real property of Independence Realty Trust, LLC ("IRT" or the "Insured"), the owner and operator of the

1

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000002 of 000094

Jamestown Apartment Complex, located at 5820 Prince William Street, City of Louisville, County of Jefferson, State of Kentucky (the "Complex").

3.      The Insured is a company authorized to engage in business in the state of Kentucky. At all relevant times, the Insured was the owner and operator of the Complex.

4.      At all relevant times herein, Plaintiff was obligated to and did reimburse the Insured for the damages it incurred as a result of the events discussed herein.

5.      Upon information and belief, Defendant Southern Supply Company LLC, d/b/a Allegheny Construction Specialties, and d/b/a Elite Specialties Group ("Defendant" or "Tenant") is a limited liability company with its principal place of business located at 2909A Brick Church Pike, Nashville, Tennessee 37207, and at all relevant timeframes set forth herein, leased apartment No. 8 (the "Unit") at the Complex from Plaintiff.  **(See Ex. 1, the Lease Agreement at p. 1, ¶ 1).**

## JURISDICTION AND VENUE

6.      Venue is proper in this Court pursuant to KRS § 452.400, in that the Complex was damaged by the wrongful acts and/or negligent conduct of the Defendant's employee in Louisville, Kentucky.

7.      The amount in controversy exceeds the jurisdictional limit of the Court exclusive of costs, interest and attorney fees.

## FACTUAL ALLEGATIONS

8.      This loss arises from a fire that occurred at the Complex on April 13, 2018 (the "Fire").

9.      Prior to the Fire, Defendant entered into a written lease agreement with the Insured to lease the Unit. (**Ex. 1**).

10.     Before the Fire, the Insured obtained insurance from Plaintiff under Policy No. 025032406 (the "Policy"). **(Ex. 2, the Insurance Policy).**

11.     On April 13, 2018, Tenant's employee, Mr. Jose Valdez (hereinafter the "Employee" or "Valdez") resided in or was present in the leased Unit at the Insured's Complex.

12.     On April 13, 2018, Valdez smoked a cigarette in the Unit, and while intoxicated, he fell asleep.

13.     Due to Valdez's failure to adequately attend to his cigarette, the Fire occurred, causing damage to the Unit.

14.     The Fire quickly spread engulfing the Complex, including six units, the roof, and entryways.

15.     Damages from the Fire totaled $350,902.23.

16.     As a result of the aforementioned damage, the Insured submitted a claim to Plaintiff, and under the terms of the Policy, Plaintiff was obligated to pay, and did pay the Insured for its claim.

17.     As such, to the extent of payments made, Plaintiff has become subrogated to the rights of the Insured against the Defendant.

<div align="center">

**COUNT I**

**BREACH OF CONTRACT**

</div>

18.     Plaintiff hereby re-alleges and incorporates by reference Paragraphs 1 through 17 of this Complaint, as though fully set forth therein.

19.     On April 13, 2018, Valdez resided in or was present in the Unit in the Complex.

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000003 of 000094

20.     At all pertinent times herein, Tenant and Valdez expressly and/or impliedly agreed to use reasonable care while leasing the premises so as to avoid damage to the Insured's real property.  **(Ex. 1)**

21.     Specifically, the Lease Agreement executed on August 21, 2017 between Insured and Defendant states, in part as follows:

> You must promptly reimburse us for loss, damage, government fines, or costs of repairs or service in the apartment community due to (1) violation of the Lease Contract or rules; (2)  improper use without regard to your negligence; or (3) the negligence of your guests or occupants.   (See **Ex. 1**, p. 2 of 7 at ¶ 11)**;** and that

> You'll be liable to us for damage caused by you or any guests or occupants.  (*See Id*., at p. 2 of 7 at ¶ 18).

22.     Defendant breached its duty to the Insured by one or more acts and/or omissions constituting breach of contract, including, but not limited to the following:

a.     Failing to promptly reimburse the Insured for the loss, damages, and costs of repairs incurred from the Fire;

b.     Failing to use reasonable care so as to avoid harm to third-parties;

c.     Failing to take all reasonable precautions to prevent the damage that resulted;

d.     Failing to keep and maintain the Unit in the same condition as that existing at the commencement of the lease agreement; and

e.     Any other acts and omissions that may become known during the course of discovery.

23.     As a direct and proximate result of the Defendant's breach of contract, the Fire occurred in the Unit, causing substantial damage to the Complex.

24.     Damages from the Fire totaled $350,902.23.

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000004 of 000094

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000005 of 000094

25. As a result of the aforementioned damage, the Insured submitted an insurance claim to Plaintiff to recover for the damages.

26. Pursuant to the terms of its policy, Plaintiff was obligated to and did issue insurance payments to the Insured as a result of the Fire.

27. To the extent of its payments, Plaintiff has become subrogated to the Insured's rights as against the Defendant.

**WHEREFORE**, Plaintiff respectfully demands judgment against the Defendant in an amount to be proven at trial, plus pre-judgment interest, post-judgment interest, costs and any other relief this Court deems appropriate.

## COUNT II

### VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

28. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 27, as if fully set forth herein.

29. On April 13, 2018, Tenant leased apartment units from the Insured at the Complex, including the Unit, to be used for temporary residential housing for Defendant's employees, like Valdez, during the course of their employment.

30. At all pertinent times herein, Valdez owed a duty to the Insured to use reasonable care so as to avoid damage to the Insured's real and personal property while residing in the Unit.

31. Valdez breached its duties to the Insured by one or more acts and/or omissions constituting negligence, including, but not limited to the following:

    a. Smoking a cigarette near combustible materials in the Unit while under the influence of alcohol and recreational drugs;

b.      Failing to adequately attend to a cigarette within the Unit so as to prevent the Fire;

c.      Failing to use reasonable care so as to avoid harm to third-parties;

d.      Failing to take all reasonable precautions to prevent the damage that resulted;

e.      Failing to keep and maintain the Unit in the same condition as that existing at the commencement of the lease agreement; and

f.      Any other acts and omissions that may become known during the course of discovery.

32.     As a direct and proximate result of Valdez's negligence, the Fire occurred in the Unit, causing substantial damage to the Complex.

33.     Upon information and belief, Valdez was employed by Defendant and was employed at the time of the Fire on April 13, 2018.

34.     Upon information and belief, at the time of the Fire, Valdez was present in or residing in the Unit as a required part of his employment with Defendant.

35.     Upon information and belief, the negligence, gross negligence and/or recklessness of Valdez caused the Fire which resulted in the damage to the Complex.

36.     As residing in the Complex was within the scope of Valdez's employment for Defendant, and a requirement thereof, Defendant is vicariously liable for the actions of Valdez.

37.     Damages from the Fire totaled $350,902.23.

38.     As a result of the aforementioned damage, the Insured submitted an insurance claim to Plaintiff to recover for the damages.

6

39.     Pursuant to the terms of its policy, Plaintiff was obligated to and did issue insurance payments to the Insured as a result of the Fire.

40.     To the extent of its payments, Plaintiff has become subrogated to the Insured's rights as against the Defendant.

**WHEREFORE**, Plaintiff respectfully demands judgment against the Defendant in an amount to be proven at trial, plus pre-judgment interest, post-judgment interest, costs and any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury for the above matter.

Dated: February 11, 2020

<div align="right">

Respectfully submitted,

*/s/Matthew D. Ellison*
Matthew D. Ellison
FOWLER BELL, PLLC
300 W Vine St #600,
Lexington, KY 40507
(859) 252-6700 Telephone
(859) 255-3735 Facsimile
MEllison@fowlerlaw.com

*-And-*

*/s/ Brandon T. Brown*
*Larry W. Jenkins
*Brandon T. Brown
DENENBERG TUFFLEY, PLLC
*Pro Hac Vice Applications to Be Submitted*
28411 Northwestern Hwy, Suite 600
Southfield, MI  48034
(248) 549-3900 Telephone
(248) 593-5808 Facsimile
LJenkins@Dt-law.com
bbrown@dt-law.com

</div>

4842-9462-8020, v. 1/9798.16

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000007 of 000094

# EXHIBIT 1

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000008 of 000094





# Protect Your Family From Lead in Your Home

 **EPA** United States Environmental Protection Agency

 United States Consumer Product Safety Commission

 United States Department of Housing and Urban Development

September 2013

## Are You Planning to Buy or Rent a Home Built Before 1978?

Did you know that many homes built before 1978 have **lead-based paint**? Lead from paint, chips, and dust can pose serious health hazards.

**Read this entire brochure to learn:**

- How lead gets into the body
- About health effects of lead
- What you can do to protect your family
- Where to go for more information

**Before renting or buying a pre-1978 home or apartment, federal law requires:**

- Sellers must disclose known information on lead-based paint or lead-based paint hazards before selling a house.
- Real estate sales contracts must include a specific warning statement about lead-based paint. Buyers have up to 10 days to check for lead.
- Landlords must disclose known information on lead-based paint and lead-based paint hazards before leases take effect. Leases must include a specific warning statement about lead-based paint.

**If undertaking renovations, repairs, or painting (RRP) projects in your pre-1978 home or apartment:**

- Read EPA's pamphlet, *The Lead-Safe Certified Guide to Renovate Right*, to learn about the lead-safe work practices that contractors are required to follow when working in your home (see page 12).



## Simple Steps to Protect Your Family from Lead Hazards

**If you think your home has lead-based paint:**

- Don't try to remove lead-based paint yourself.
- Always keep painted surfaces in good condition to minimize deterioration.
- Get your home checked for lead hazards. Find a certified inspector or risk assessor at epa.gov/lead.
- Talk to your landlord about fixing surfaces with peeling or chipping paint.
- Regularly clean floors, window sills, and other surfaces.
- Take precautions to avoid exposure to lead dust when remodeling.
- When renovating, repairing, or painting, hire only EPA- or state-approved Lead-Safe certified renovation firms.
- Before buying, renting, or renovating your home, have it checked for lead-based paint.
- Consult your health care provider about testing your children for lead. Your pediatrician can check for lead with a simple blood test.
- Wash children's hands, bottles, pacifiers, and toys often.
- Make sure children avoid fatty (or high fat) foods and eat nutritious meals high in iron and calcium.
- Remove shoes or wipe soil off shoes before entering your house.

## Lead Gets into the Body in Many Ways

**Adults and children can get lead into their bodies if they:**

- Breathe in lead dust (especially during activities such as renovations, repairs, or painting that disturb painted surfaces).
- Swallow lead dust that has settled on food, food preparation surfaces, and other places.
- Eat paint chips or soil that contains lead.

**Lead is especially dangerous to children under the age of 6.**

- At this age, children's brains and nervous systems are more sensitive to the damaging effects of lead.
- Children's growing bodies absorb more lead.
- Babies and young children often put their hands and other objects in their mouths. These objects can have lead dust on them.



**Women of childbearing age should know that lead is dangerous to a developing fetus.**

- Women with a high lead level in their system before or during pregnancy risk exposing the fetus to lead through the placenta during fetal development.

1

2

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000009 of 000094

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000010 of 000094

## Health Effects of Lead

**Lead affects the body in many ways.** It is important to know that even exposure to low levels of lead can severely harm children.

**In children, exposure to lead can cause:**



- Nervous system and kidney damage

- Learning disabilities, attention deficit disorder, and decreased intelligence

- Speech, language, and behavior problems

- Poor muscle coordination

- Decreased muscle and bone growth

- Hearing damage

While low-lead exposure is most common, exposure to high amounts of lead can have devastating effects on children, including seizures, unconsciousness, and, in some cases, death.

Although children are especially susceptible to lead exposure, lead can be dangerous for adults, too.

**In adults, exposure to lead can cause:**

- Harm to a developing fetus

- Increased chance of high blood pressure during pregnancy

- Fertility problems (in men and women)

- High blood pressure

- Digestive problems

- Nerve disorders

- Memory and concentration problems

- Muscle and joint pain

3

## Check Your Family for Lead

**Get your children and home tested if you think your home has lead.**

Children's blood lead levels tend to increase rapidly from 6 to 12 months of age, and tend to peak at 18 to 24 months of age.

Consult your doctor for advice on testing your children. A simple blood test can detect lead. Blood lead tests are usually recommended for:

- Children at ages 1 and 2

- Children or other family members who have been exposed to high levels of lead

- Children who should be tested under your state or local health screening plan

**Your doctor can explain what the test results mean and if more testing will be needed.**

4

## Where Lead-Based Paint Is Found

In general, the older your home or childcare facility, the more likely it has lead-based paint.[1]

**Many homes, including private, federally-assisted, federally-owned housing, and childcare facilities built before 1978 have lead-based paint.** In 1978, the federal government banned consumer uses of lead-containing paint.[2]

Learn how to determine if paint is lead-based paint on page 7.

**Lead can be found:**

- In homes and childcare facilities in the city, country, or suburbs,

- In private and public single-family homes and apartments,

- On surfaces inside and outside of the house, and

- In soil around a home. (Soil can pick up lead from exterior paint or other sources, such as past use of leaded gas in cars.)

Learn more about where lead is found at epa.gov/lead.

---

[1] "Lead-based paint" is currently defined by the federal government as paint with lead levels greater than or equal to 1.0 milligram per square centimeter (mg/cm), or more than 0.5% by weight.

[2] "Lead-containing paint" is currently defined by the federal government as lead in new dried paint in excess of 90 parts per million (ppm) by weight.

5

## Identifying Lead-Based Paint and Lead-Based Paint Hazards

**Deteriorating lead-based paint (peeling, chipping, chalking, cracking, or damaged paint)** is a hazard and needs immediate attention. **Lead-based paint** may also be a hazard when found on surfaces that children can chew or that get a lot of wear and tear, such as:

- On windows and window sills

- Doors and door frames

- Stairs, railings, banisters, and porches

**Lead-based paint is usually not a hazard if it is in good condition** and if it is not on an impact or friction surface like a window.

**Lead dust** can form when lead-based paint is scraped, sanded, or heated. Lead dust also forms when painted surfaces containing lead bump or rub together. Lead paint chips and dust can get on surfaces and objects that people touch. Settled lead dust can reenter the air when the home is vacuumed or swept, or when people walk through it. EPA currently defines the following levels of lead in dust as hazardous:

- 40 micrograms per square foot ($\mu$g/ft$^2$) and higher for floors, including carpeted floors

- 250 $\mu$g/ft$^2$ and higher for interior window sills

**Lead in soil** can be a hazard when children play in bare soil or when people bring soil into the house on their shoes. EPA currently defines the following levels of lead in soil as hazardous:

- 400 parts per million (ppm) and higher in play areas of bare soil

- 1,200 ppm (average) and higher in bare soil in the remainder of the yard

**Remember, lead from paint chips—which you can see—and lead dust—which you may not be able to see—both can be hazards.**

The only way to find out if paint, dust, or soil lead hazards exist is to test for them. The next page describes how to do this.

6

08212017093702KY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000011 of 000094

## Checking Your Home for Lead

You can get your home tested for lead in several different ways:

- A lead-based paint **inspection** tells you if your home has lead-based paint and where it is located. It won't tell you whether your home currently has lead hazards. A trained and certified testing professional, called a **lead-based paint** inspector, will conduct a paint inspection using methods, such as:

  - Portable x-ray fluorescence (XRF) machine

  - Lab tests of paint samples

- A **risk assessment** tells you if your home currently has any lead hazards from lead in paint, dust, or soil. It also tells you what actions to take to address any hazards. A trained and certified testing professional, called a risk assessor, will:

  - Sample paint that is deteriorated on doors, windows, floors, stairs, and walls

  - Sample dust near painted surfaces and sample bare soil in the yard

  - Get lab tests of paint, dust, and soil samples

- A combination inspection and risk assessment tells you if your home has any lead-based paint and if your home has any lead hazards, and where both are located.

Be sure to read the report provided to you after your inspection or risk assessment is completed, and ask questions about anything you do not understand.

## Checking Your Home for Lead, continued

In preparing for renovation, repair, or painting work in a pre-1978 home, Lead-Safe Certified renovators (see page 12) may:

- Take paint chip samples to determine if lead-based paint is present in the area planned for renovation and send them to an EPA-recognized lead lab for analysis. In housing receiving federal assistance, the person collecting these samples must be a certified lead-based paint inspector or risk assessor

- Use EPA-recognized tests kits to determine if lead-based paint is absent (but not in housing receiving federal assistance)

- Presume that lead-based paint is present and use lead-safe work practices

There are state and federal programs in place to ensure that testing is done safely, reliably, and effectively. Contact your state or local agency for more information, visit epa.gov/lead, or call **1-800-424-LEAD (5323)** for a list of contacts in your area.[3]

---

[3] Hearing- or speech-challenged individuals may access this number through TTY by calling the Federal Relay Service at 1-800-877-8399.

7

8

---

## What You Can Do Now to Protect Your Family

**If you suspect that your house has lead-based paint hazards, you can take some immediate steps to reduce your family's risk:**

- If you rent, notify your landlord of peeling or chipping paint.

- Keep painted surfaces clean and free of dust. Clean floors, window frames, window sills, and other surfaces weekly. Use a mop or sponge with warm water and a general all-purpose cleaner. (Remember: never mix ammonia and bleach products together because they can form a dangerous gas.)

- Carefully clean up paint chips immediately without creating dust.

- Thoroughly rinse sponges and mop heads often during cleaning of dirty or dusty areas, and again afterward.

- Wash your hands and your children's hands often, especially before they eat and before nap time and bed time.

- Keep play areas clean. Wash bottles, pacifiers, toys, and stuffed animals regularly.

- Keep children from chewing window sills or other painted surfaces, or eating soil.

- When renovating, repairing, or painting, hire only EPA- or state-approved Lead-Safe Certified renovation firms (see page 12).

- Clean or remove shoes before entering your home to avoid tracking in lead from soil.

- Make sure children avoid fatty (or high fat) foods and eat nutritious meals high in iron and calcium. Children with good diets absorb less lead.

## Reducing Lead Hazards

**Disturbing lead-based paint or removing lead improperly can increase the hazard to your family by spreading even more lead dust around the house.**



- In addition to day-to-day cleaning and good nutrition, you can **temporarily** reduce lead-based paint hazards by taking actions, such as repairing damaged painted surfaces and planting grass to cover lead-contaminated soil. These actions are not permanent solutions and will need ongoing attention.

- You can minimize exposure to lead when renovating, repairing, or painting by hiring an EPA- or state-certified renovator who is trained in the use of lead-safe work practices. If you are a do-it-yourselfer, learn how to use lead-safe work practices in your home.

- To remove lead hazards permanently, you should hire a certified lead abatement contractor. Abatement (or permanent hazard elimination) methods include removing, sealing, or enclosing lead-based paint with special materials. Just painting over the hazard with regular paint is not permanent control.

**Always use a certified contractor who is trained to address lead hazards safely.**

- Hire a Lead-Safe Certified firm (see page 12) to perform renovation, repair, or painting (RRP) projects that disturb painted surfaces.

- To correct lead hazards permanently, hire a certified lead abatement professional. This will ensure your contractor knows how to work safely and has the proper equipment to clean up thoroughly.

Certified contractors will employ qualified workers and follow strict safety rules as set by their state or by the federal government.

9

10

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000012 of 000094

## Reducing Lead Hazards, continued

**If your home has had lead abatement work done** or if the housing is receiving federal assistance, once the work is completed, dust cleanup activities must be conducted until clearance testing indicates that lead dust levels are below the following levels:

- 40 micrograms per square foot ($\mu g/ft^2$) for floors, including carpeted floors
- 250 $\mu g/ft^2$ for interior windows sills
- 400 $\mu g/ft^2$ for window troughs

For help in locating certified lead abatement professionals in your area, call your state or local agency (see pages 14 and 15), or visit epa.gov/lead, or call 1-800-424-LEAD.

## Renovating, Remodeling, or Repairing (RRP) a Home with Lead-Based Paint

**If you hire a contractor to conduct renovation, repair, or painting (RRP) projects in your pre-1978 home or childcare facility (such as pre-school and kindergarten), your contractor must:**

- Be a Lead-Safe Certified firm approved by EPA or an EPA-authorized state program



- Use qualified trained individuals (Lead-Safe Certified renovators) who follow specific lead-safe work practices to prevent lead contamination
- Provide a copy of EPA's lead hazard information document, *The Lead-Safe Certified Guide to Renovate Right*

**RRP contractors working in pre-1978 homes and childcare facilities must follow lead-safe work practices that:**

- **Contain the work area.** The area must be contained so that dust and debris do not escape from the work area. Warning signs must be put up, and plastic or other impermeable material and tape must be used.
- **Avoid renovation methods that generate large amounts of lead-contaminated dust.** Some methods generate so much lead-contaminated dust that their use is prohibited. They are:
  - Open-flame burning or torching
  - Sanding, grinding, planing, needle gunning, or blasting with power tools and equipment not equipped with a shroud and HEPA vacuum attachment and
  - Using a heat gun at temperatures greater than 1100°F
- **Clean up thoroughly.** The work area should be cleaned up daily. When all the work is done, the area must be cleaned up using special cleaning methods.
- **Dispose of waste properly.** Collect and seal waste in a heavy duty bag or sheeting. When transported, ensure that waste is contained to prevent release of dust and debris.

To learn more about EPA's requirements for RRP projects visit epa.gov/getleadsafe, or read *The Lead-Safe Certified Guide to Renovate Right.*

11                                                                 12

---

## Other Sources of Lead

**While paint, dust, and soil are the most common sources of lead, other lead sources also exist:**

- **Drinking water.** Your home might have plumbing with lead or lead solder. You cannot see, smell, or taste lead, and boiling your water will not get rid of lead. If you think your plumbing might contain lead:
  - Use only cold water for drinking and cooking.
  - Run water for 15 to 30 seconds before drinking it, especially if you have not used your water for a few hours.

  Call your local health department or water supplier to find out about testing your water, or visit epa.gov/lead for EPA's lead in drinking water information.
- **Lead smelters** or other industries that release lead into the air.
- **Your job.** If you work with lead, you could bring it home on your body or clothes. Shower and change clothes before coming home. Launder your work clothes separately from the rest of your family's clothes.
- **Hobbies** that use lead, such as making pottery or stained glass, or refinishing furniture. Call your local health department for information about hobbies that may use lead.
- Old **toys** and **furniture** may have been painted with lead-containing paint. Older toys and other children's products may have parts that contain lead.[4]
- Food and liquids cooked or stored in **lead crystal** or **lead-glazed pottery or porcelain** may contain lead.
- Folk remedies, such as "**greta**" and "**azarcon**," used to treat an upset stomach.

## For More Information

**The National Lead Information Center**
Learn how to protect children from lead poisoning and get other information about lead hazards on the Web at epa.gov/lead and hud.gov/lead, or call **1-800-424-LEAD (5323).**

**EPA's Safe Drinking Water Hotline**
For information about lead in drinking water, call **1-800-426-4791**, or visit epa.gov/lead for information about lead in drinking water.

**Consumer Product Safety Commission (CPSC) Hotline**
For information on lead in toys and other consumer products, or to report an unsafe consumer product or a product-related injury, call **1-800-638-2772,** or visit CPSC's website at cpsc.gov or saferproducts.gov.

**State and Local Health and Environmental Agencies**
Some states, tribes, and cities have their own rules related to lead-based paint. Check with your local agency to see which laws apply to you. Most agencies can also provide information on finding a lead abatement firm in your area, and on possible sources of financial aid for reducing lead hazards. Receive up-to-date address and phone information for your state or local contacts on the Web at epa.gov/lead, or contact the National Lead Information Center at **1-800-424-LEAD.**

Hearing- or speech-challenged individuals may access any of the phone numbers in this brochure through TTY by calling the toll-free Federal Relay Service at **1-800-877-8339.**

---

[4] In 1978, the federal government banned toys, other children's products, and furniture with lead-containing paint (16 CFR 1303). In 2008, the federal government banned lead in most children's products. The federal government currently bans lead in excess of 100 ppm by weight in most children's products (76 FR 44463).

13

08212017093704KY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

**U. S. Environmental Protection Agency (EPA) Regional Offices**

The mission of EPA is to protect human health and the environment. Your Regional EPA Office can provide further information regarding regulations and lead protection programs.

**Region 1** (Connecticut, Massachusetts, Maine, New Hampshire, Rhode Island, Vermont)
Regional Lead Contact
U.S. EPA Region 1
5 Post Office Square, Suite 100, OES 05-4
Boston, MA 02109-3912
(888) 372-7341

**Region 2** (New Jersey, New York, Puerto Rico, Virgin Islands)
Regional Lead Contact
U.S. EPA Region 2
2890 Woodbridge Avenue
Building 205, Mail Stop 225
Edison, NJ 08837-3679
(732) 321-6671

**Region 3** (Delaware, Maryland, Pennsylvania, Virginia, DC, West Virginia)
Regional Lead Contact
U.S. EPA Region 3
1650 Arch Street
Philadelphia, PA 19103
(215) 814-2088

**Region 4** (Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, Tennessee)
Regional Lead Contact
U.S. EPA Region 4
AFC Tower, 12th Floor, Air, Pesticides & Toxics
61 Forsyth Street, SW
Atlanta, GA 30303
(404) 562-8998

**Region 5** (Illinois, Indiana, Michigan, Minnesota, Ohio, Wisconsin)
Regional Lead Contact
U.S. EPA Region 5 (DT-8J)
77 West Jackson Boulevard
Chicago, IL 60604-3666
(312) 886-7836

**Region 6** (Arkansas, Louisiana, New Mexico, Oklahoma, Texas, and 66 Tribes)
Regional Lead Contact
U.S. EPA Region 6
1445 Ross Avenue, 12th Floor
Dallas, TX 75202-2733
(214) 665-2704

**Region 7** (Iowa, Kansas, Missouri, Nebraska)
Regional Lead Contact
U.S. EPA Region 7
11201 Renner Blvd.
WWPD/TOPE
Lenexa, KS 66219
(800) 223-0425

**Region 8** (Colorado, Montana, North Dakota, South Dakota, Utah, Wyoming)
Regional Lead Contact
U.S. EPA Region 8
1595 Wynkoop St.
Denver, CO 80202
(303) 312-6966

**Region 9** (Arizona, California, Hawaii, Nevada)
Regional Lead Contact
U.S. EPA Region 9 (CMD-4-2)
75 Hawthorne Street
San Francisco, CA 94105
(415) 947-4280

**Region 10** (Alaska, Idaho, Oregon, Washington)
Regional Lead Contact
U.S. EPA Region 10
Solid Waste & Toxics Unit (WCM-128)
1200 Sixth Avenue, Suite 900
Seattle, WA 98101
(206) 553-1200

15

**Consumer Product Safety Commission (CPSC)**

The CPSC protects the public against unreasonable risk of injury from consumer products through education, safety standards activities, and enforcement. Contact CPSC for further information regarding consumer product safety and regulations.

**CPSC**
4330 East West Highway
Bethesda, MD 20814-4421
1-800-638-2772
cpsc.gov or saferproducts.gov

**U. S. Department of Housing and Urban Development (HUD)**

HUD's mission is to create strong, sustainable, inclusive communities and quality affordable homes for all. Contact HUD's Office of Healthy Homes and Lead Hazard Control for further information regarding the Lead Safe Housing Rule, which protects families in pre-1978 assisted housing, and for the lead hazard control and research grant programs.

**HUD**
451 Seventh Street, SW, Room 8236
Washington, DC 20410-3000
(202) 402-7698
hud.gov/offices/lead/

This document is in the public domain. It may be produced by an individual or organization without permission. Information provided in this booklet is based upon current scientific and technical understanding of the issues presented and is reflective of the jurisdictional boundaries established by the statutes governing the co-authoring agencies. Following the advice given will not necessarily provide complete protection in all situations or against all health hazards that can be caused by lead exposure.

U. S. EPA Washington DC 20460                    EPA-747-K-12-001
U. S. CPSC Bethesda MD 20814                     September 2013
U. S. HUD Washington DC 20410

16



# IMPORTANT!

**Lead From Paint, Dust, and Soil in and Around Your Home Can Be Dangerous if Not Managed Properly**

- Children under 6 years old are most at risk for lead poisoning in your home.

- Lead exposure can harm young children and babies even before they are born.

- Homes, schools, and child care facilities built before 1978 are likely to contain lead-based paint.

- Even children who seem healthy may have dangerous levels of lead in their bodies.

- Disturbing surfaces with lead-based paint or removing lead-based paint improperly can increase the danger to your family.

- People can get lead into their bodies by breathing or swallowing lead dust, or by eating soil or paint chips containing lead.

- People have many options for reducing lead hazards. Generally, lead-based paint that is in good condition is not a hazard (see page 10).

0821201709370SKY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

## Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards

**Lead Warning Statement**

*Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.*

**Lessor's Disclosure**

(a) Presence of lead-based paint and/or lead-based paint hazards (*check (i) or (ii) below*):

    (i) ☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

    _____

    _____

    _____

    _____

    _____

    (ii) ☒ Lessor has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b) Records and reports available to the lessor (check (i) or (ii) below):

    (i) ☐ Lessor has provided the lessee with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

    _____

    _____

    _____

    _____

    _____

    (ii) ☒ Lessor has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Lessee's Acknowledgement** (*initial*)

(c) _____ Lessee has received copies of all information listed above.

(d) _____ Lessee has received the pamphlet Protect Your Family from Lead in Your Home.

**Agent's Acknowledgement** (*initial*)

(e) _____ Agent has informed the lessor of the lessor's obligations under 42 U.S.C. 4852d and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information they have provided is true and accurate.

Jamestown CRA- B1, LLC, 5820-8 Prince William Street #5820-8-P

| | Louisville |
|---|---|
| Apartment Name & unit number OR street address of dwelling | City |

| Lessee (Resident)    08/21/2017 Date | Lessee (Resident)    Date |
|---|---|

| Lessee (Resident)    Date | Lessee (Resident)    Date |
|---|---|

Jamestown CRA- B1, LLC

| Lessor (Owner) | Agent |
|---|---|

08/21/2017

Date    0821201709370 6KY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000014 of 000094



Kentucky
Apartment
Association

**Apartment Lease Contract**



NATIONAL
APARTMENT
ASSOCIATION

Date of Lease Contract: __August 21, 2017__
(when the Lease Contract is filled out)

*This is a binding contract. Read carefully before signing.*

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000015 of 000094

## Moving In — General Information

**1. PARTIES.** This Lease Contract (sometimes referred to as the "lease") is between you, the resident(s) *(list all people signing the Lease Contract)*:
__Allegheny Construction Specialties__

and us, the owner:
__Jamestown CRA- B1, LLC__

*(name of apartment community or title holder).* You've agreed to rent
Apartment No. __5820-8-P__, at __5820-8 Prince__
__William Street__                              *(street address)*
in __Louisville__                                *(city),* Kentucky
__40207__ *(zip code)* for use as a private residence only. The terms "you" and "your" refer to all residents listed above. The terms "we," "us," and "our" refer to the owner listed above (or any of owner's successors in interest or assigns). Written notice to or from our managers constitutes notice to or from us. If anyone else has guaranteed performance of this Lease Contract, a separate Lease Contract Guaranty is attached.

**2. OCCUPANTS.** The apartment will be occupied only by you and *(list all other persons not signing the Lease Contract):*
__Ruben Deluna, Joel Nussbaum, Jared Bobb__

No one else may occupy the apartment. Persons not listed above must not stay in the apartment for more than __14__ consecutive days without our prior written consent, and no more than twice that many days in one month. *If the previous space isn't filled in, two days per month is the limit.*

**3. LEASE TERM.** The initial term of the Lease Contract begins on the __21st__ day of __August__, __2017__, and ends at midnight the __20th__ day of __February__, __2018__. This Lease Contract will automatically renew month-to-month unless either party gives at least __60__ days written notice of termination or intent to move-out as required by paragraph 36. *If the number of days isn't filled in, at least 30 days (one calendar month) notice is required.*

**4. SECURITY DEPOSIT.** Unless modified by addenda, the total security deposit at the time of execution of this Lease Contract for all residents in the apartment is $ __0.00__ , due on or before the date this Lease Contract is signed. An animal deposit will be stated in any animal addendum, only if an animal is permitted. Your security deposit will be held in a financial institution escrow account as shown on page 6, until disposition. You acknowledge that you have received a list of any damages existing in the unit prior to move-in, and that you have had an opportunity to inspect the apartment to ascertain the accuracy of such listing prior to taking occupancy. You acknowledge that you have signed such list of existing damages, or signed an attached statement detailing your objections to such list. Your failure to sign such list or attach a statement detailing objections will be deemed a waiver by you.

**5. KEYS AND FURNITURE.** You will be provided __2__ apartment key(s), __1__ mailbox key(s), and __0__ other access devices for __N/A__ . Your apartment will be *[check one]:*
☐ furnished or ☒ unfurnished.

**6. RENT AND CHARGES.** Unless modified by addenda, you will pay $ __1065.00__ per month for rent, payable in advance and without demand:
☒ at the on-site manager's office, or
☒ at our online payment site, or
☒ at __Drop Box__

Prorated rent of $ __377.90__ is due for the remainder of *[check one]:*
☒ 1st month or ☐ 2nd month, on _____

*Otherwise, you must pay your rent on or before the 1st day of each month (due date) with no grace period. Cash is unacceptable without our prior written permission. You must not withhold or offset rent unless authorized, after proper statutory notice.* We may, at our option, require at any time that you pay all rent and other sums in cash, certified or cashier's check, money order, or one monthly check rather than multiple checks.

If you don't pay all rent on or before the __3rd__ day of the month, you'll pay additional rent of $ __75.00__ . You'll also pay a charge of $ __25.00__ for each returned check or rejected electronic payment, plus any additional rent (as set forth above) from due date until we receive acceptable payment. If you don't pay rent on time, you'll be delinquent and all remedies under this Lease Contract will be authorized. We'll have all other remedies for such violation.

If the following box is marked, you have received the following concessions listed below. Concessions are inducements for you to sign a lease for the particular apartment in this community:
☐ N/A

The total value of concessions you have received over the full term of your lease is $ __0.00__ . While we are happy to offer concessions to you,

concessions depend on your full and complete compliance with all of the terms of the Lease and that you remain a resident for the full term of your lease. Therefore, in the event you are determined to be in default of your lease agreement, or terminate your lease for any reason prior to the ending date provided in Paragraph 3 of this Lease, all future concessions are terminated and hereby held void. Any concessions received through the date of default or termination are hereby forfeited and are immediately due and payable to us.

**7. UTILITIES.** We'll pay for the following items, if checked:
☐ water ☐ gas ☐ electricity ☐ master antenna.
☐ wastewater ☐ trash ☐ cable TV ☐ other _____
You'll pay for all other utilities, related deposits, and any charges, fees, or services on such utilities. You must not allow utilities to be disconnected—including disconnection for not paying your bills—until the lease term or renewal period ends. Cable channels that are provided may be changed during the Lease Contract term if the change applies to all residents. Utilities may be used only for normal household purposes and must not be wasted. If your electricity is ever interrupted, you must use only battery-operated lighting. If the apartment is submetered or prorated by an allocation formula for utility billings, an addendum is attached to this Lease Contract in compliance with state agency rules.

**8. INSURANCE.** We do not maintain insurance to cover your personal property or personal injury. We are not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, hurricane, negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law.

We urge you to get your own insurance for losses to your personal property or injuries due to theft, fire, water damage, pipe leaks and the like. We remind you, the only insurance which covers loss or damage to your personal property (your contents) is insurance you purchase yourself. Contents insurance may be available as part of a liability insurance policy offered for purchase through our office.

Additionally *(Select one: If none is selected then "a" shall be deemed to be selected):*
☒ a)   You are required to purchase and maintain liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third parties (including damage to our property), in a minimum policy coverage amount of $ __100000.00__ from a carrier with an AM Best rating of a B+ or better, licensed to do business in Kentucky.

☐ b)   Not required to purchase liability insurance.

☐ c)   Personal liability insurance is force placed in an amount of $ _____ per incident $ _____ maximum and is included as either part of your rent or paid for by Owner to insure against your liability damage to the Apartment.

**\*\*NOTE:** Any liability insurance you buy additionally is strongly recommended and will act as primary insurance to our force placed coverage secondary. ANY LIABILITY INSURANCE WE REQUIRE YOU TO PURCHASE, UNDER (a) ABOVE, DOES NOT INCLUDE ANY COVERAGE FOR YOUR CONTENTS. CONTENTS COVERAGE IS STRONGLY RECOMMENDED AND YOU UNDERSTAND WE HAVE NOT PURCHASED INSURANCE FOR YOUR CONTENTS UNDER ANY OPTION IN THIS PROVISION. Any policy you purchase or that we purchase for you shall waive any rights of subrogation by you or your insurance company against us.

You acknowledge that no portion of the rent paid by you under this agreement will be applied to the owner's structural fire insurance and that you are in no way a co-insured under any such policy, and that, in order to reduce the cost of insurance, the Owner has chosen to purchase fire and extended coverage insurance for the property for which the above rental agreement applies, with a deductible in the amount of $ __25000.00__ . If you or any member of your household, guest or invitee causes damage to the Apartment or Community in an amount less than your personal insurance deductible you are responsible to us for the amount of such damage. In the event damage occurs and you have a liability policy with a deductible, you agree that you owe us, and agree to indemnify us, for the amount of the insurance coverage that you have purchased regardless of whether you have exceeded your limit of liability, the loss is from an excluded condition, or for your failure to purchase insurance with such specific coverage. It is recommended that you secure insurance to protect your interest in the event of such a loss.

**9. LOCKS AND LATCHES.** Unless otherwise noted in the Special Provisions Section, any lock using a key has been re-keyed prior to your moving in. We do not guarantee that the lock has not been used elsewhere in the Community prior to using it on the apartment for you.

You may at any time ask us to: (1) install one keyed deadbolt lock on an exterior door if it does not have one; (2) install a bar on each sliding glass door; (3) install one keyless deadbolt on each exterior door; (4) install one doorviewer on each exterior door; and (5) change or rekey locks or latches during the lease term. We must comply with those requests, but you must pay for them.

__Allegheny Construction Specialties__
© 2013, National Apartment Association, Inc. - 10/2013, Kentucky

☑ This document was executed via the NAA E-signature System - ID: 120571728

**What You Are Now Requesting.**  You now request the following to be installed at your expense (if one is not already installed):

- ☒ keyed deadbolt lock
- ☐ keyless deadbolt
- ☐ sliding door bar
- ☒ doorviewer
- ☐ sliding door pinlock

**Payment for Rekeying, Repairs, Etc.**  In addition to reimbursement for any damages for which you are liable under this Lease Contract, you must pay for all repairs arising from misuse or damage to devices by you or your family, occupants, or guests during your occupancy. You may be required to pay in advance if we notify you within a reasonable time after your request that you are more than 30 days delinquent in reimbursing us for repairing or replacing a device which was misused or damaged by you, your guest or an occupant; or if you have requested that we repair, install, change or rekey the same device during the 30 days preceding your request and we have complied with your request.

## Special Provisions and "What If" Clauses

**10. SPECIAL PROVISIONS.**  The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Lease Contract and will supersede any conflicting provisions of this printed Lease Contract form.

A $75 Late fee begins on the 4th of every
month and then $5 each additional day
until rent is paid in full.

See any additional special provisions.

**11. REIMBURSEMENT.**  You must promptly reimburse us for loss, damage, government fines, or cost of repairs or service in the apartment community due to violation of the Lease Contract or rules, improper use without regard to your negligence or the negligence of your guests or occupants. Unless the damage or wastewater stoppage is due to our negligence, we're not liable for—and you must pay for—repairs, replacement costs, and damage to the following if occurring during the lease term or renewal period: (1) damage to doors, windows, or screens;(2) damage from windows or doors left open; and (3) damage from wastewater stoppages caused by improper objects in lines exclusively serving your apartment. We may require payment at any time, including advance payment of repairs for which you're liable without regard for your negligence. Delay in demanding sums you owe is not a waiver.

**12. DISPOSITION OF PROPERTY LEFT IN YOUR APARTMENT AFTER SURRENDER, ABANDONMENT, OR EVICTION.**  Definition of Surrender And Abandonment of Apartment.   You have "surrendered" the apartment when: (1) the move-out date has passed and no one is living in the apartment in our reasonable judgment; or (2) all apartment keys and access devices listed in paragraph 5 have been turned in where rent is paid—whichever date occurs first.

You have "abandoned" the apartment when all of the following have occurred: (1) everyone appears to have moved out in our reasonable judgment; (2) clothes, furniture, and personal belongings have been substantially removed in our reasonable judgment; (3) you've been in default for nonpayment of rent for 7 consecutive days or water, gas, or electric service for the apartment not connected in our name has been disconnected or terminated; and (4) you've not responded for three days to our notice left on the inside of the main entry door, stating that we consider the apartment abandoned. An apartment is also "abandoned" 10 days after the death of a sole resident.

**Entry and Disposition of Your Property.**  Immediately after surrender, abandonment, or eviction, we may in accordance with law: enter and take possession of the apartment; remove, store, sell, or throw away property left in the apartment when authorized below; and exercise other rights under paragraph 41 relating to clean-up, repairs, and security deposit deductions.

**Removal of Your Property.**  All property left in the apartment or common areas by you or others after eviction or after surrender or abandonment of the apartment may be removed by us or (law officers), at your expense.

**Storage of Your Property.**  We may store but have no duty to store property removed after judicial eviction or after you have surrendered or abandoned the apartment. We're not liable for casualty loss, damage or theft of stored property. You must pay reasonable charges for our packing, removing, storing, selling, and disposing of such property.

**Redemption of Your Property.**  If we've stored property under this paragraph, you may redeem it prior to sale or disposition under the

following subparagraph by paying all sums you owe, including rent, late charges, storage, damages, attorney's fees, etc. You must pay reasonable charges for our packing, removing, and storing such property. We may require payment by cash, money order, or certified check. If you request in writing, we will provide you an accounting of amounts owed. We may return redeemed property at the place of storage, the management office, or the apartment (at our option).

**Disposition or Sale of Your Property.**  Immediately after removal, we may throw away or give to a charitable organization property removed by us under this paragraph (except for animals and property removed after a death of a sole resident). If we've stored property under this paragraph, we will sell it by sale which will be held no sooner than 30 days after written notice of date, time, and place of sale is sent by both regular mail and certified mail (return receipt requested) to your last known address. The notice will itemize the amounts you owe and the name, address, and phone number of the person to contact about the sale, the amount owed, and your right to redeem the property. Animals removed after surrender, abandonment, or judicial eviction will not be sold; but we may board them or turn them over to local authorities or humane societies. If property is sold: the sale may be public or private, may be subject to any third-party ownership or lien claims, must be to the highest bidder, and may be in bulk, in batches, or item-by-item.

**13. FAILING TO PAY FIRST MONTH'S RENT.**  If you don't pay the first month's rent when or before the Lease Contract begins, all future rent will be automatically accelerated without notice and immediately due; and we may end your right of occupancy and recover damages, future rent, court costs, and other lawful charges. Our rights and remedies under paragraph 31 apply to acceleration under this paragraph.

**14. RENT INCREASES AND LEASE CHANGES.**  No rent increases or lease changes are allowed before the initial lease term ends, except for changes allowed by any special provisions in paragraph 10, by any signed written addendum or amendment signed by you and us, or by reasonable changes of apartment rules allowed under paragraph 17. If, at least 5 days before the advance notice deadline referred to in paragraph 3, we give you written notice (via certified mail or hand delivery) of rent increases or lease changes effective when the lease term or renewal period ends, this Lease Contract will automatically continue month-to-month with the increased rent or lease changes. The new modified Lease Contract will begin on the date stated in the notice (without necessity of your signature) unless you give us written move-out notice under paragraph 36.

**15. DELAY OF OCCUPANCY.**  If occupancy is or will be delayed for construction, repairs, cleaning, or a previous resident's holding over, we're not responsible for the delay so long as the delay is not willful or in bad faith on our part. The Lease Contract will remain in force subject to: (1) abatement of rent on a daily basis during delay; and (2) your right to terminate as set forth below. Termination notice must be in writing upon at least 5 days notice and must be delivered to our place of business through which the rental agreement was made or to any place held out by us as the place for receipt of communications, or mailed by certified mail to the landlord to either of the two locations listed immediately above. After termination, you are entitled only to refund of deposit(s) and any rent and security deposit paid. Rent abatement or lease termination does not apply if delay is for cleaning or repairs that don't prevent you from occupying the apartment.

**16. DISCLOSURE RIGHTS.**  If someone requests information on you or your rental history for law-enforcement, governmental, business purposes, or by court order with a search warrant or by subpoena, we may provide it.

## While You're Living in the Apartment

**17. COMMUNITY POLICIES OR RULES.**  You and all guests and occupants must comply with any written apartment rules and community policies, including instructions for care of our property. Any rules are considered part of this Lease Contract. We may make reasonable changes to written rules, effective immediately, if distributed and applicable to all apartments in the apartment community and do not change dollar amounts on page 1 of this Lease Contract.

**18. LIMITATIONS ON CONDUCT.**  The apartment and other areas reserved for your private use must be kept clean. Trash must be disposed of at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used only for entry or exit. No living. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas must be used with care in accordance with apartment rules and posted signs. Glass containers are prohibited in or near pools and other common areas. You, your occupants, or guests may not anywhere in the apartment complex: use candles or use kerosene lamps or kerosene heaters without our prior written approval; store anything in closets having gas appliances; cook on balconies or outside; or solicit business or contributions. Conducting any kind of business (including child care services) in your apartment or in the apartment community is prohibited—except that any lawful business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and

delivery persons; and (3) recreational activities in common areas. You'll be liable to us for damage caused by you or any guests or occupants. No use of any grill is permitted on a balcony or patio (in the case of the patio unless there is 25 feet of clearance from any flammable structure). No storage of grills in or outside the apartment, any storage area, or the balcony/patio.

We may exclude from the apartment community guests or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules, or disturbing other residents, neighbors, visitors, or owner representatives. We may also exclude from any outside area or common area a person who refuses to show photo identification or refuses to identify himself or herself as a resident, occupant, or guest of a specific resident in the community. We may exclude persons who have been previously evicted or asked to move from the Community in lieu of an eviction. We may exclude anyone who has been given a written trespass notice from us.

You must notify us in writing of any anticipated extended absence from the apartments in excess of 7 days no later than the first day of the extended absence. You will be responsible for any damages incurred as a failure to so notify us.

You agree to notify us if you or any occupants are convicted of any felony, or misdemeanor involving a controlled substance, violence to another person or destruction of property or any other criminal activity or deferred adjudication which violates the written rental standards of the Community in place at the time of conviction. You also agree to notify us

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000016 of 000094

if you or any occupant registers as any level or type of sexually oriented offense in any state. Informing us of criminal convictions or sex offender registry does not waive our right to evict you.

**19. PROHIBITED CONDUCT.** You and your occupants or guests may not engage in the following activities: loud or obnoxious conduct; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; discharging a firearm in the apartment community; displaying or possessing a gun, knife, or other weapon in a way that may alarm others; tampering or interfering with utilities or telecommunications; bringing hazardous materials into the apartment community.

**20. PARKING.** We may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles by anyone. We may have unauthorized or illegally parked vehicles towed under an appropriate statute. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license or no current inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a resident or occupant who has surrendered or abandoned the apartment or been asked to vacate by any appropriate authority; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other resident(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster.

**21. RELEASE OF RESIDENT.** Unless you're entitled to terminate this Lease Contract under paragraphs 10, 15, 22, 30, or 36, you won't be released from this Lease Contract for any reason—including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of co-residents, loss of employment, bad health, or death.

**22. MILITARY PERSONNEL CLAUSE.** You may terminate the Lease Contract if you enlist or are drafted or commissioned and on active duty in the U.S. Armed Forces. You also may terminate the Lease Contract if:

(1) you are (i) a member of the U.S. Armed Forces or reserves on active duty or (ii) a member of the National Guard called to active duty for more than 30 days in response to a national emergency declared by the President; and
(2) you (i) receive orders for permanent change-of-station, (ii) receive orders to deploy with a military unit or as an individual in support of a military operation for 90 days or more, or (iii) are relieved or released from active duty.

After you deliver to us your written termination notice, the Lease Contract will be terminated under this military clause 30 days after the date on which your next rental payment is due. You must furnish us a copy of your military orders, such as permanent change-of-station orders, call-up orders, or deployment orders or written notification from your commanding officer. Military permission for base housing does not constitute change-of-station order. After you move out, we'll return your security deposit, less lawful deductions. For the purposes of this Lease Contract, orders described in (2) above will only release the resident who qualifies under (1) and (2) above and receives the orders during the Lease Contract term and such resident's spouse or legal dependents living in the resident's household. A co-resident who is not your spouse or dependent cannot terminate under this military clause. Unless you state otherwise in paragraph 10, you represent when signing this Lease Contract that: (1) you do not already have deployment or change-of-station orders; (2) you will not be retiring from the military during the Lease Contract term; and (3) the term of your enlistment or obligation will not end before the Lease Contract term ends. Even if you are entitled to terminate this Lease Contract under this paragraph, liquidated damages for making a false representation of the above will be the amount of unpaid rent for the remainder of the lease term when and if you move out, less rents from others received in mitigation under paragraph 31. You must immediately notify us if you are called to active duty or receive deployment or permanent change-of-station orders.

**23. RESIDENT SAFETY AND PROPERTY LOSS.** You and all occupants and guests must exercise due care for your own and others' safety and security, *especially in the use of smoke detectors, keyed deadbolt locks, keyless bolting devices, window latches, and other safety or security devices if they are installed in the apartment.* You agree to make every effort to follow the Security Guidelines in paragraph 35.

**Smoke Detectors.** We'll furnish smoke detectors as required by statute, and we'll test them and provide working batteries when you first take possession. After that, you must pay for and replace batteries as needed, unless the law provides otherwise. We may replace dead or missing batteries at your expense, without prior notice to you. You must immediately report smoke detector malfunctions to us. Neither you nor others may disable smoke detectors. If you disable or damage the smoke detector, or fail to replace a dead battery or report malfunctions to us, you will be liable to us and others for any loss, damage, or fines from fire, smoke, or water and in default under the Lease Contract.

**Casualty Loss.** We're not liable to any Resident, guest or occupant for personal injury, of any sort, up to and including death. For all these

reasons, second casualty loss-property we are not liable to any Resident, guest, or occupant for damage or loss of personal property from any cause, including but not limited to: fire, smoke, rain, flood, water and pipe leaks, hail, ice, snow, lightning, wind, explosions, earthquake, interruption of utilities, theft, or vandalism unless otherwise required by law. Unless we instruct otherwise, you must—for 24 hours a day during freezing weather—1) keep the apartment heated to at least 50 degrees; (2) keep cabinet and closet doors open; and (3) drip hot and cold water faucets. You'll be liable for damage to our and others' property if damage is caused by broken water pipes due to your violating these requirements.

**Temperature Control.** Unless we instruct otherwise, you must 24 hours a day, during freezing weather, keep the Apartment heated, etc., and at all other times, you must: (1) run the HVAC systems blower fan to circulate air to retard the potential for moisture, mold and mildew; (2) at all times when using any shower or other bathing device, run the exhaust fan if any, provided in the bathroom area; and (3) if you are maintaining other items in the Apartment which reduce moisture, such as an Aquarium, you must run the air conditioning (if provided) in the summer to keep the temperature below 85 degrees Fahrenheit in the Apartment during the months when the temperature outside exceeds 85 degrees.

**Crime or Emergency.** Dial 911 or immediately call local medical emergency, fire, or police personnel in case of accident, fire, smoke, or suspected criminal activity or other emergency. You should then contact our representative when it is safe to do so. To the extent we screen you and your co-occupants you will not rely on screening for purposes of assessing the security of the Community or your individual security in the apartment or premises, etc. You won't treat any of our security measures as an express or implied warranty of security or as a guarantee against crime or of reduced risk of crime. Unless otherwise provided by law, we're not liable to you or any guests or occupants for injury, damage, or loss to person or property caused by criminal conduct of other persons, including theft, burglary, assault, vandalism, or other crimes. We're not obliged to furnish security personnel, security lighting, security gates or fences, or other forms of security unless required by statute. We're not responsible for obtaining criminal-history checks on any residents, occupants, guests, or contractors in the apartment community. If you or any occupant or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You must also furnish us with the law-enforcement agency's incident report number upon request.

**24. CONDITION OF THE APARTMENTS AND ALTERATIONS.** You accept the apartment, fixtures, and furniture as is, except for conditions materially affecting the health or safety of ordinary persons. We disclaim all implied warranties. You have received a list of damages existing in the apartment prior to move-in, and you have had an opportunity to inspect the apartment to check the accuracy of such listing. You must either sign the list or sign an attached statement detailing your objections to the list, and must return a copy to us. (See also paragraph 4). Otherwise, everything will be considered to be in a clean, safe, and good working condition.

You must use customary diligence in maintaining the apartment and not damaging or littering the common areas. Unless authorized by statute or by us in writing, you must not perform any repairs, painting, wallpapering, carpeting, electrical changes, or otherwise alter our property. No holes or stickers are allowed inside or outside the apartment. But we'll permit a reasonable number of small nail holes for hanging pictures on sheetrock walls and in grooves of wood-paneled walls, unless our rules state otherwise. No water furniture, additional phone or TV-cable outlets, washing machines, alarm systems, or locks changes, additions, or rekeying is permitted unless it is statutorily allowed or we've consented in writing. You may install a satellite dish or antenna provided you sign our satellite dish or antenna lease addendum which complies with reasonable restrictions allowed by federal law. You agree not to alter, damage, or remove our property, including alarm systems, smoke detectors, furniture, telephone and cable TV wiring, screens, locks, and security devices. When you move in, we'll supply light bulbs for fixtures we furnish, including exterior fixtures operated from inside the apartment; after that, you'll replace them at your expense with bulbs of the same type and wattage. Your improvements to the apartment (whether or not we consent) become ours unless we agree otherwise in writing.

**25. REQUESTS, REPAIRS, AND MALFUNCTIONS.** IF YOU OR ANY DISCLOSED OCCUPANT NEEDS TO SEND A NOTICE OR REQUEST— FOR EXAMPLE, FOR REPAIRS, INSTALLATIONS, SERVICES, OR SECURITY-RELATED MATTERS—IT MUST BE SIGNED AND IN WRITING TO OUR DESIGNATED REPRESENTATIVE (except in case of fire, smoke, gas, explosion, overflowing sewage, uncontrollable running water, electrical shorts, or crime in progress). Our written notes on your oral request do not constitute a written request from you.

Our complying with or responding to any oral request regarding security or non-security matters doesn't waive the strict requirement for written notices under this Lease Contract. You must promptly notify us in writing of: water leaks; electrical problems; malfunctioning lights; broken or missing locks or latches; and other conditions that pose a hazard to property, health, or safety. We may change or install utility lines or equipment serving the apartment if the work or desired improvement is done reasonably without substantially increasing your utility costs. We may turn off equipment and interrupt utilities as needed to avoid property damage or to perform work. If utilities malfunction or are damaged by fire, water, or similar cause, you must notify our representative immediately. Air conditioning problems are not emergencies. If air conditioning or other equipment malfunctions, you must notify our representative as soon as possible on a business day. We'll act with customary diligence to make repairs and reconnections. Rent will not abate in whole or in part.

If we believe that fire or catastrophic damage is substantial, or that performance of needed repairs poses a danger to you, we may terminate this Lease Contract within a reasonable time by giving you written notice. If the Lease Contract is so terminated, we'll refund prorated rent and all

0821201709370 9KY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000017 of 000094

deposits, less lawful deductions unless such damage was caused by the actions (or inactions) of you, your guests, or occupants, without regard to their/your negligence.

26. **ANIMALS.** No animals (including mammals, reptiles, birds, fish, and insects) are allowed, even temporarily, anywhere in the apartment or apartment community unless we've so authorized in writing. If we allow an animal, you must sign a separate animal addendum, which may require additional deposits, rents, fees or other charges. An animal deposit is considered a general security deposit. You must remove an illegal animal within 24 hours of notice from us, or you will be considered in default of this Lease Contract. We will authorize a support animal for a disabled (handicapped) person. We may require a written statement from a qualified professional, verifying the need for the support animal. You must not feed stray or wild animals.

If you or any guest or occupant violates animal restrictions (with or without your knowledge), you'll be subject to charges, damages, eviction, and other remedies provided in this Lease Contract. If an animal has been in the apartment at any time during your term of occupancy (with or without our consent), we'll charge you for defleaing, deodorizing, and shampooing if required in our sole discretion. You will also owe us animal damages and deposits listed in the Rules and Regulations or in any Animal Addendum. Initial and daily animal-violation charges and animal-removal charges are liquidated damages for our time, inconvenience, and overhead (except for attorney's fees and litigation costs) in enforcing animal restrictions and rules. We may remove an unauthorized animal by (1) leaving, in a conspicuous place in the apartment, 24 hours written notice of intent to remove the animal, and (2) following the procedures of paragraph 27. Prior notice of entry in paragraph 27 is waived for these purposes. We may keep or kennel the animal or turn it over to a humane society or local authority. When keeping or kenneling an animal, we won't be liable for loss, harm, sickness, or death of the animal unless due to our negligence. We'll return the animal to you upon request if it has not already been turned over to a humane society or local authority and you agree not to return the animal to the apartment. You must pay for the animal's reasonable care and kenneling charges. We have no lien on the animal for any purpose.

27. **WHEN WE MAY ENTER.** If you or any guest or occupant is present,

then repairers, servicers, contractors, our representatives or other persons listed in (2) below may peaceably enter the apartment at reasonable times for the purposes listed in (2) below. If nobody is in the apartment, such persons may enter peacefully and at reasonable times by duplicate or master key (or by breaking a window or other means when necessary in emergencies) if:

(1) written notice of the entry is left in a conspicuous place in the apartment immediately after the entry; *and*

(2) entry is for: responding to your request; making repairs or replacements; estimating repair or refurbishing costs; performing pest control; doing preventive maintenance; changing filters; testing or replacing smoke-detector batteries; retrieving unreturned tools, equipment or appliances; leaving notices; delivering, installing, reconnecting, or replacing appliances, furniture, equipment, or security devices; removing health or safety hazards (including hazardous materials), or items prohibited under our rules; removing perishable foodstuffs if your electricity is disconnected; removing unauthorized animals; inspecting when immediate danger to person or property is reasonably suspected; allowing persons to enter as you authorized in your rental application (if you die, are incarcerated, etc.); allowing entry by a law officer with a search or arrest warrant, or in hot pursuit; showing apartment to prospective residents (after move-out or vacate notice has been given); or showing apartment to government inspectors for the limited purpose of determining housing and fire ordinance compliance and to lenders, appraisers, contractors, prospective buyers, or insurance agents.

28. **MULTIPLE RESIDENTS OR OCCUPANTS.** Each resident is jointly and severally liable for all lease obligations. If you or any guest or occupant violates the Lease Contract or rules, all residents are considered to have violated the Lease Contract. Our requests and notices (including sale notices) to any resident constitute notice to all residents and occupants. Notices and requests from any resident or occupant (including notices of lease termination, repair requests, lease renewals and non-renewals, and entry permissions) constitute notice from all residents. In eviction suits, each resident is considered the agent of all other residents in the apartment for service of process. Security deposit refunds and deduction itemizations of multiple residents will comply with paragraph 41.

---

## Replacements

29. **REPLACEMENTS AND SUBLETTING.** Replacing a resident, sub-letting, or assignment is allowed *only when we consent in writing*. If departing or remaining residents procure a replacement resident acceptable to us before moving out and we expressly consent to the replacement or subletting, then:

(1) a reasonable administrative (paperwork) and/or transfer fee will be due, and a rekeying fee will be due if rekeying is requested or required; *and*

(2) you *will* remain liable for all lease obligations for the rest of the original lease term.

Procedures for Replacement. If we approve a replacement resident, then, at our option: (1) the replacement resident must sign this Lease Contract with or without an increase in the total security deposit; or (2) the remaining and replacement residents must sign an entirely new Lease Contract. Unless we agree otherwise in writing, your security deposit will automatically transfer to the replacement resident as of the date we approve. The departing resident will no longer have a right of occupancy or security-deposit refund, but will remain liable for the remainder of the original lease term unless we agree otherwise in writing—even if a new Lease Contract is signed. The departing resident will no longer be granted access to the apartment for any reason.

---

## Responsibilities of Owner and Resident

30. **RESPONSIBILITIES OF OWNER.** We'll act with customary diligence to:

(1) keep common areas reasonably clean, subject to paragraph 24;
(2) maintain fixtures, furniture, hot water, heating and A/C equipment; if provided
(3) substantially comply with applicable federal, state, and local laws regarding safety, sanitation, and fair housing;
(4) make all reasonable repairs, subject to your obligation to pay for damages for which you are liable; and
(5) address after hours service calls.

If we violate any of the above, you may terminate this Lease Contract and exercise other remedies under the law only as follows: (a) you must deliver to us written notice specifying the acts and omissions constituting the breach, stating that the rental agreement will terminate upon a date not less than 30 days after receipt of the notice if the breach is not remedied in 30 days from the date of receipt of the notice; (b) if the breach is remediable by repairs, the payment of damages or otherwise and we adequately remedy the breach before the date specified in the notice, the rental agreement shall not terminate by reason of the breach. If substantially the same act or omission which constituted a prior noncompliance covered by subsection (a) above for which notice was given recurs within 6 months, then you may terminate the rental agreement upon at least 30 days written notice specifying the breach and the date of termination of the rental agreement. You may not terminate for a condition caused by the deliberate or negligent act or omission of you, a resident of your unit, or any guest. Security deposits and prorated rent will be refunded as required by law.

You shall be liable for Our costs, including trip charges for any maintenance work performed after normal business hours that is either (a) called in as an emergency and is not an emergency, or (b) an emergency caused by Your action(s) or inaction(s) of Your family, guests, or invitees.

31. **DEFAULT BY RESIDENT.** You'll be in default if you or any guest or occupant violates any terms of this Lease Contract including but not limited to the following violations: (1) you don't pay rent or other amounts that you owe when due; (2) you or any guest or occupant violates the apartment rules, or fire, safety, health, or criminal laws, regardless of whether or where arrest or conviction occurs; (3) you abandon the apartment; (4) you violate your statutory obligations under Kentucky law and do not cure within the time described in notice to you; (5) you give incorrect or false answers in a rental application; (6) you or any occupant is arrested, convicted, or given deferred adjudication for a felony offense involving actual or potential physical harm to a person, or involving possession, manufacture, or delivery of a controlled substance, marijuana, or drug paraphernalia as defined in KRS 218A.500; (7) any illegal drugs

or paraphernalia are found in your apartment; (8) you or any guest or occupant engages in any of the prohibited conduct described in Paragraph 19; or (9) you or any occupant, in bad faith, make an invalid complaint to an official or employee of a utility company or the government.

Lease Termination for Nonpayment of Rent. If your default is for nonpayment of rent, we may give you written notice that your Lease Contract will terminate 7 days after you receive the notice if the rent is not paid in full by the end of those 7 days, and, if applicable, you waive 30 days notice of default that may otherwise be required under Kentucky law. If rent is not paid in full by the end of this 7-day period, your Lease Contract will terminate automatically (on the 8th day) without further notice. At our option, our written notice may give you a longer period in which to pay your rent.

Lease Termination for Other Reasons. If the reason for your default is for other reason(s), we may deliver to you a written notice specifying the acts and omissions constituting the default and stating that your Lease Contract will terminate 14 days after your receipt of the notice if the default is not remedied by the end of those 14 days, and, if applicable, you waive 30 days notice of default that may otherwise be required by Kentucky law. If the default has not been remedied by the end of this 14-day period, or if the default cannot be remedied, your Lease Contract will terminate automatically (on the 15th day) without further notice. At our option, our written notice may give you a longer period in which to remedy your default. If substantially the same act or omission which constituted a prior default for which notice was given to you recurs within 6 months of that previous default, we may terminate the Lease Contract upon 14 or more days written notice to you, specifying the default and the date of termination of your Lease Contract.

Delivery of any of the above notices may be by: (1) certified mail, return receipt requested; and/or (2) personal delivery to any resident; and/or (3) personal delivery at the apartment to any occupant over 16 years old; and/or (4) by delivery to the front door of the apartment (either by attaching a copy to the door, placing the notice between the closed door and the door jamb, under or through the door into the apartment, or by leaving the notice between any screen/storm door and the front door of the apartment). If notice is mailed, you are deemed to be in receipt of it two days after it is mailed. Termination of your possession rights or subsequent reletting doesn't release you from liability for future rent. After giving notice of default, notice to vacate, notice of lease termination, or filing an eviction suit, we may still accept rent or other sums due. Such filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right except when you have in a timely manner cured a default after notice. Accepting money at any time doesn't waive our right to damages, past or future rent, or other sums.

0821201709371OKY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000018 of 000094

**Acceleration.** All monthly rent for the rest of the lease term or renewal period will be accelerated automatically without notice or demand (before or after acceleration) and will be immediately due and delinquent if, without our written consent: (1) you move out, remove property in preparing to move out, or give oral or written notice (by you or any occupant) of intent to move out before the lease term or renewal period ends; and (2) you've not paid all rent for the entire lease term or renewal period. Such conduct is considered a default for which we need not give you notice. Remaining rent will also be accelerated if you're judicially evicted or move out when we demand because you've defaulted. Acceleration is subject to our mitigation obligations under paragraph 31.

**Forfeiture of Concessions.** Concessions are made as an incentive to you to lease the apartment and are dependent upon your full and faithful completion of obligations imposed on you by this lease during the term. In the event of default, all concessions you have received are considered forfeited and immediately due and payable to us. Any concessions that would otherwise be entitled to from and after the date of default are hereby considered void.

**Holdover.** You or any occupant, invitee, or guest must not hold over beyond the date contained in your move-out notice or our notice to vacate (or beyond a different move-out date agreed to by both parties in writing). If a holdover occurs, then: (1) you must pay holdover rent in advance on a daily basis and such rent will be delinquent without notice or demand; (2) your rent for the holdover period will be increased by 25% over the then-existing rent, without notice; (3) you'll be liable to us for all rent for the full term of the previously signed Lease Contract of a new resident who can't occupy because of the holdover; and (4) at our option, we may extend the lease term  for up to one month from the date of notice of lease extension  by delivering written notice to you or your apartment while you continue to hold over. We may also file suit for possession and recover up to three months periodic rent or threefold the damages

sustained by us, whichever greater, plus attorney's fees.

**Eviction.** If you default, we may end your right of occupancy by giving you notice as described above. Notice may be made by the notice procedure specified in subparagraph (b) above. After giving notice to vacate or filing an eviction suit, we may still accept rent or other sums due; the filing or acceptance doesn't waive or diminish our right of eviction or any other contractual or statutory right. Accepting money at any time doesn't waive our right to damages, past or future rent, or other sums, or to file or continue with eviction proceedings.

**Other Remedies.** We may report unpaid amounts to credit agencies. Upon your default and early move-out, you will pay us any amounts stated to be rental discounts or concessions in paragraph 10, in addition to other sums due. Upon your default, we will have all other legal remedies, including suit for lease termination, possession, damages, rent, and all other monies due. Unless a party is seeking exemplary, punitive, sentimental, or personal-injury damages, the prevailing party may recover, to the extent allowed by statute, from the nonprevailing party attorney's fees and all other litigation costs. Late charges are liquidated damages for our time, inconvenience, and overhead in collecting late rent (but are not for attorney's fees and litigation costs). All unpaid amounts bear the highest lawful rate of interest (no less than 12%) per year from due date, compounded annually. You must pay all collection-agency fees if you fail to pay all sums due within 10 days after we mail you a letter demanding payment and stating that collection agency fees will be added if you don't pay all sums by that deadline. We may turn any returned checks over to law enforcement officials for prosecution according to law.

**Mitigation of Damages.** If you move out early, you'll be subject to the damages listed in Paragraph 31. We'll exercise customary diligence to relet and minimize damages. We'll credit all subsequent rent that we actually receive from subsequent residents against your liability for past-due and future rent and other sums due.

---

## General Clauses

**32. MISCELLANEOUS.** Neither we nor any of our representatives have made any oral promises, representations, or agreements. This Lease Contract is the entire agreement between you and us. Our representatives (including management personnel, employees, and agents) have no authority to waive, amend, or terminate this Lease Contract or any part of it unless in writing, and no authority to make promises, representations, or agreements that impose security duties or other obligations on us or our representatives unless in writing. Our representatives must give you a written release when this Lease Contract entitles you to a release. No action or omission of our representative will be considered a waiver of any subsequent violation, default, or time or place of performance. Our not enforcing or belatedly enforcing written-notice requirements, rental due dates, acceleration, or other rights isn't a waiver under any circumstances. Written notice to or from our managers constitutes notice to or from us. Any person giving a notice under this Lease Contract should retain a copy of the memo, letter or fax that was given. Fax signatures are binding. All notices must be signed.

Exercising one remedy won't constitute an action or waiver of other remedies. Unless prohibited by law or the respective insurance policies, insurance subrogation is waived by all parties. All remedies are cumulative. No employee, agent, or management company is personally liable for any of our contractual, statutory, or other obligations merely by virtue of acting on our behalf. This Lease Contract binds subsequent owners. Neither an invalid clause nor the omission of initials on any page invalidates this Lease Contract. All notices and documents may be in English and, at our option, in any language that you read or speak. All provisions regarding our nonliability and nonduty apply to our employees, agents, and management companies. This Lease Contract is subordinate or superior to existing and future recorded mortgages, at lender's option. All lease obligations must be performed in the county where the apartment is located. All provisions of KRS Chapter 383 relating to residential leases shall apply to this Lease Contract.

**WAIVER OF JURY TRIAL.** To minimize legal expenses and, to the extent allowed by law, you and we agree that a trial of any lawsuit based on statute common law, and/or related to this Lease Contract shall be based on a

judge and not a jury.

All discretionary rights reserved for us within this Lease Contract or any accompanying addenda are at our sole and absolute discretion.

**Obligation to Vacate.** Resident shall vacate the Premises and remove all of Resident's personal property therefrom at the expiration of the lease term without further notice or demand from Owner.

**FORCE MAJEURE.** If we are prevented from completing performances of any obligations hereunder by an act of God, strikes, epidemics, war, acts of terrorism, riots, flood, fire, hurricane, tornado, sabotage, or other occurrence which is beyond the control of the parties, then we shall be excused from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

Furthermore, if such an event damages the property to materially affect its habitability by some or all residents, we reserve the right to vacate any and all leases and you agree to excuse us from any further performance of obligations and undertakings hereunder, to the full extent allowed under applicable law.

**33. PAYMENTS.** Payment of all sums is an independent covenant. At our option and without notice, we may apply money received (other than sale proceeds under paragraph 12 or utility payments subject to governmental regulations) first to any of your unpaid obligations, then to current rent—regardless of notations on checks or money orders and regardless of when the obligations arose. All sums other than rent (which is due on the first) are due upon our demand. After the due date and any required demand notice, we do not have to accept the rent or any other payments except as provided in the lease termination provisions of paragraph 31.

**34. ASSOCIATION MEMBERSHIP.** We represent that either: (1) we or; (2) the management company that represents us, is at the time of signing this Lease Contract or a renewal of this Lease Contract, a member of both the National Apartment Association and any affiliated state and local apartment (multi-housing) associations for the area where the apartment is located.

---

## Security Guidelines for Residents

**35. SECURITY GUIDELINES.** In cooperation with the National Apartment Association, we'd like to give you some important safety guidelines. We recommend you follow these guidelines and use common sense in practicing safe conduct. Inform all other occupants in your dwelling, including any children you may have, about these guidelines.

**PERSONAL SECURITY—WHILE INSIDE YOUR APARTMENT**

1. Lock your doors and windows—even while you're inside.
2. Engage the keyless deadbolts on all doors while you're inside.
3. When answering the door, see who is there by looking through a window or peephole. If you don't know the person, first talk with him or her without opening the door. Don't open the door if you have any doubts.
4. If young children (who are old enough to take care of themselves) are left alone in your apartment, instruct them to engage the keyless deadbolt and not let anyone in when you are gone—regardless of whether they are total strangers or apartment maintenance or management personnel.
5. Don't put your name, address, or phone number on your key ring.
6. If you're concerned because you've lost your key or because someone you distrust has a key, ask the management to rekey the locks.
7. Dial 911 for emergencies. If the 911 number does not operate in your area, keep phone numbers handy for the police, fire, and emergency medical services. If an emergency arises, call the appropriate governmental authorities first, then call the management.
8. Check your smoke detector monthly for dead batteries or malfunctions.
9. Check your doorlocks, window latches, and other devices regularly to be sure they are working properly.

10. If your doors or windows are unsecure due to break-ins or malfunctioning locks or latches, stay with friends or neighbors until the problem is fixed.
11. Immediately report to management—in writing, dated and signed—any needed repairs of locks, latches, doors, windows, smoke detectors, and alarm systems.
12. Immediately report to management—in writing, dated and signed—any malfunction of other safety devices outside your apartment, such as broken gate locks, burned-out lights in stairwells and parking lots, blocked passages, broken railings, etc.
13. Close curtains, blinds, and window shades at night.
14. Mark or engrave your driver's license number or other identification on valuable personal property.

**PERSONAL SECURITY—WHILE OUTSIDE YOUR APARTMENT**

15. Lock your doors while you're gone. Lock any door handle lock, keyed deadbolt lock, sliding door pin lock, sliding door handle latch, and sliding door bar that you have.
16. Leave a radio or TV playing softly while you're gone.
17. Close and latch your windows while you're gone, particularly when you're on vacation.
18. Tell your roommate or spouse where you're going and when you'll be back.
19. Don't walk alone at night. Don't allow your family to do so.
20. Don't hide a key under the doormat or a nearby flowerpot. These are the first places a burglar will look.
21. Don't give entry keys, codes, or electronic gate cards to anyone unless absolutely necessary.
22. Use lamp timers when you go out in the evening or go away

☑ This document was executed via the NAA E-signature System - ID: 120571728

on vacation. They can be purchased at most hardware stores.

23. Let the manager and your friends know if you'll be gone for an extended time. Ask your neighbors to watch your dwelling since the management cannot assume that responsibility.

24. While on vacation, temporarily stop your newspaper and mail delivery, or have your mail and newspaper picked up daily by a friend.

25. Carry your door key in your hand, whether it is daylight or dark, when walking to your entry door. You are more vulnerable when looking for your keys at the door.

**PERSONAL SECURITY—WHILE USING YOUR CAR**

26. Lock your car doors while driving. Lock your car doors and roll up the windows when leaving your car parked.

27. Don't leave exposed items in your car, such as cassette tapes, wrapped packages, briefcases, or purses.

28. Don't leave your keys in the car.

29. Carry your key ring in your hand while walking to your car—whether it is daylight or dark and whether you are at home, school, work, or on vacation.

30. Always park in a well-lighted area. If possible, try to park your car in an off-street parking area rather than on the street.

31. Check the backseat before getting into your car.

32. Be careful when stopping at gas stations or automatic-teller machines at night—or anytime when you suspect danger.

**PERSONAL SECURITY AWARENESS**
No security system is failsafe. Even the best system can't prevent crime. Always proceed as if security systems don't exist since they are subject to malfunction, tampering, and human error. We disclaim any express or implied warranties of security. The best safety measures are the ones you perform as a matter of common sense and habit.

## When Moving Out

**36. MOVE-OUT NOTICE.** Before moving out, you must give our representative advance written move-out notice as provided below. Your move-out notice will not release you from liability for the full term of the Lease Contract or renewal term. You will still be liable for the entire Lease Contract term if you move out early (paragraph 21) except under the military clause (paragraph 22). YOUR MOVE-OUT NOTICE MUST COMPLY WITH EACH OF THE FOLLOWING:

- We must receive advance written notice of your move-out date. The advance notice must be at least the number of days of notice required in paragraph 3. Oral move-out notice will not be accepted and will not terminate your Lease Contract.

- Your move-out notice must not terminate the Lease Contract sooner than the end of the Lease Contract term or renewal period.

YOUR NOTICE IS NOT ACCEPTABLE IF IT DOES NOT COMPLY WITH ALL OF THE ABOVE. Please use our written move-out form. You must obtain from our representative written acknowledgment that we received your move-out notice. If we terminate the Lease Contract, we must give you the same advance notice—unless you are in default.

**37. MOVE-OUT PROCEDURES.** The move-out date can't be changed unless we and you both agree in writing. You won't move out before the lease term or renewal period ends unless all rent for the entire lease term or renewal period is paid in full. Early move-out may result in acceleration of future rent under Paragraph 31 and forfeiture of concessions, if any. You're prohibited from applying any security deposit to rent. You won't stay beyond the date you are supposed to move out. If you leave owing rent, concessions or other monies other than for damages, we may, in the event you do not demand return of the deposit within 30 days after you vacate the apartment, remove any excess deposit from the escrow account and apply such excess to any other debt owing to us. You must give us and the U.S. Postal Service, in writing, each resident's forwarding address.

**38. CLEANING.** You must thoroughly clean the apartment, including doors, windows, furniture, bathrooms, kitchen appliances, patios, balconies, garages, carports, and storage rooms. You must follow move-out cleaning instructions if they have been provided. If you don't clean adequately, you'll be liable for reasonable cleaning charges.

**39. MOVE-OUT INSPECTION.** You should meet with our representative for a move-out inspection. Our representative has no authority to bind or limit us regarding deductions for repairs, damages, or charges. Any statements or estimates by us or our representative are subject to our correction, modification, or disapproval before final refunding or accounting.

**40. SECURITY DEPOSIT DEDUCTIONS AND OTHER CHARGES.** You'll be liable for the following charges, if applicable: unpaid rent; unpaid utilities; unreimbursed service charges; repairs or damages caused by negligence, carelessness, accident, or abuse, including stickers, scratches, tears, burns, stains, or unapproved holes; replacement cost of our property that was in or attached to the apartment and is missing;

replacing dead or missing smoke-detector batteries; utilities for repairs or cleaning; trips to let in company representatives to remove your telephone or TV cable services or rental items (if you so request or have moved out); trips to open the apartment when you or any guest or occupant is missing a key; unreturned keys; missing or burned-out light bulbs; removing or rekeying unauthorized security devices or alarm systems; packing, removing, or storing property removed or stored under paragraph 12; removing illegally parked vehicles; special trips for trash removal caused by parked vehicles blocking dumpsters; false security-alarm charges unless due to our negligence; animal-related charges under paragraph 26; government fines or fees against us for violation (by you, your occupant, or guest) of local ordinances relating to smoke detectors, false alarms, recycling, or other matters; late-payment and returned-check charges; a charge (not to exceed $100) for our time and inconvenience in our lawful removal of an animal or in any valid eviction proceeding against you, and, if allowed by statute, attorney's fees, court costs, and filing fees actually paid; and other sums due under this Lease Contract and these charges may be deducted from any deposit.

You'll be liable to us for: (1) charges for replacing all keys and access devices referenced in paragraph 5 if you fail to return them on or before your actual move-out date; and (2) accelerated rent if you have violated paragraph 31.

**41. DEPOSIT RETURN** At the termination of occupancy, we'll inspect the apartment and compile a listing of any damage to the apartment which is the basis for any charge against the security deposit. We and you shall then sign the listing, which signatures shall be conclusive evidence of the accuracy of such listing. If you refuse to sign such listing, you must state specifically in writing to which items on the list you dissent, and then sign such statement of dissent. If you dispute the accuracy of our final damage listing and choose to bring a claim against us for your security deposit, your claim is, by statute, limited to those items to which you specifically dissented, and if you fail to sign the listing or specifically dissent in accordance with this provision, you are not entitled to recover any damages under this Section. You have the right to inspect the apartment to ascertain the accuracy of such listing. If no rent is due at the time of move-out, surrender or abandonment, we will mail you such list. You will have 60 days from the post mark date to contact us to receive your refund. If we have not received a response from you within 60 days of the postmark of our notification to you, we may remove the deposit from the account into which it was originally put, and retain it free from any claim by you or any person claiming it on your behalf.

*Surrender and abandonment* are defined in paragraph 12. Surrender, abandonment, and eviction ends your right of possession for all purposes and gives us the immediate right to: clean up, make repairs in, and relet the apartment; determine any security deposit deductions; and remove property left in the apartment. Surrender, abandonment, or eviction doesn't affect our duty to give you prorated credit for rent later received from others during the remainder of your lease term or renewal period. See also paragraph 12 relating to our rights regarding personal property left in the apartment.

## Signatures, Originals and Attachments

**42. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, each with original signatures—one for you and one or more for us. Our rules and community policies, if any, will be attached to the Lease Contract and given to you at signing. When an Inventory and Condition form is completed, both you and we should retain a copy. The items checked below are attached to this Lease Contract and are binding even if not initialed or signed.

- ☒ Animal Addendum
- ☒ Inventory and Condition Form
- ☒ Mold Addendum
- ☐ Enclosed Garage Addendum
- ☐ Community Policies Addendum
- ☐ Lease Contract Guaranty (_____ guaranties, if more than one)
- ☒ Notice of Intent to Move Out Form
- ☐ Parking Permit or Sticker (quantity: _____)
- ☒ Satellite Dish or Antenna Addendum
- ☒ Asbestos Addendum (if asbestos is present)
- ☒ Lead Hazard Information and Disclosure Addendum (federal)
- ☒ Utility Addendum
- ☐ Remote Control, Card or Code Access Gate Addendum
- ☒ Lease Contract Buy-Out Agreement
- ☐ Intrusion Alarm Addendum
- ☐ Other_____
- ☐ Other_____

Name, address, and account number of financial institution in which security deposit will be deposited *(must be filled out)*

CitiBank

New York, NY

_____

_____

Name and address of locator service (if applicable)

_____

_____

_____

Person authorized to manage the premises

JoAnna DiCarlo

Address and phone number of owner's representative for notice purposes

902 Milford Lane

Louisville, KY. 40204

(502) 893-2541

_____

0821201709371 2KY11081850

Allegheny Construction Specialties

© 2013, National Apartment Association, Inc - 10/2013, Kentucky

Page 6 of 7

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000020 of 000094

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000021 of 000094

> *You are legally bound by this document.*
> *Read it carefully before signing.*

Date form is filled out *(same as on top of page 1)*   08/21/2017

If this document is being executed electronically, I agree that I have previously consented to conducting this transaction by electronic means as defined by KRS§ 369.105(2) and that by affixing my digital signature or consenting to the document by pressing "I accept" that this electronic signature will have the same binding and controlling effect as if I had signed the paper document by my own hand.

**Owner or Owner's Representative** *(signing on behalf of owner)*

*JaMara Alcindo*

**Resident or Residents** *(all sign below)*

*Grant Seely*

SPECIAL PROVISIONS (CONTINUED FROM PAGE 2).

IRT Management, LLC
Allegheny Construction Specialties

08212017093713KY11081850

© 2013, National Apartment Association, Inc      Kentucky/National Apartment Association Official Form A-13, October 2013      Page 7 of 7

☑ This document was executed via the NAA E-signature System - ID: 120571728



**KAA** Kentucky Apartment Association

## Animal Addendum
*Becomes part of Lease Contract*

Date: __August 21, 2017__
(when this Addendum is filled out)



**NATIONAL APARTMENT ASSOCIATION.**

> *Please note: We consider animals a serious responsibility and a risk to each resident in the dwelling. If you do not properly control and care for an animal, you'll be held liable if it causes any damage or disturbs other residents.*

*In this document, the terms "you" and "your" refer to all residents listed below and all occupants or guests; and the terms "we," "us," and "our" refer to the owner named in the Lease Contract (not the property manager or anyone else).*

1. **DWELLING UNIT DESCRIPTION.** Unit No. __5820-8-P__ , at __5820-8 Prince William Street__, *(street address)* in __Louisville__ *(city)*, Kentucky, __40207__ *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: __August 21, 2017__
Owner's name: __Jamestown CRA- B1, LLC__

Residents *(list all residents)*: __Allegheny Construction Specialties__

The Lease Contract is referred to in this Addendum as the "Lease Contract."

3. **CONDITIONAL AUTHORIZATION FOR ANIMAL.** You may keep the animal that is described below in the dwelling until the Lease Contract expires, unless we terminate the Animal Addendum. We may terminate this authorization sooner if your right of occupancy is lawfully terminated or if in our judgment you and your animal, your guests, or any occupant violates any of the rules in this Addendum. See paragraph 12.

4. **ANIMAL DEPOSIT.** An animal deposit of $ __0.00__ will be charged. We *[check one]* ☐ will consider, or ☒ will not consider this additional security deposit the general security deposit for all purposes. The security deposit amount in Provision 4 of the Lease Contract *[check one]* ☐ does, or ☒ *does not include* this additional deposit amount. Refund of the animal deposit will be subject to the terms and conditions set forth in the Lease Contract regardless of whether it is considered part of the general security deposit.

5. **ADDITIONAL MONTHLY RENT.** Your total monthly rent (as stated in the Lease Contract) will be increased by $ __30.00__ . The monthly rent amount in Provision 6 of the Lease Contract *[check one]* ☐ includes ☒ does not include this additional animal rent.

6. **ADDITIONAL FEE.** You must also pay a one-time fee of $ __225.00__ for having the animal in the dwelling unit. It is our policy to not charge a deposit for support animals.

7. **LIABILITY NOT LIMITED.** The additional monthly rent and additional security deposit under this Animal Addendum do not limit residents' liability for property damages, cleaning, deodorization, defleaing, replacements, or personal injuries.

8. **DESCRIPTION OF ANIMAL(S).** You may keep only the animal(s) described below. You may not substitute any other animal(s). Neither you nor your guests or occupants may bring any other animal(s)-mammal, reptile, bird, amphibian, fish, rodent, arachnid, or insect-into the dwelling or apartment community.

Animal's name: __No Pets__
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license : _____
License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

Animal's name: _____
Type: _____
Breed: _____
Color: _____
Weight: _____ Age: _____
City of license: _____

License no.: _____
Date of last rabies shot: _____
Housebroken? _____
Animal owner's name: _____

9. **INSURANCE.** Prior to allowing the animal(s) identified herein to reside in or around the dwelling unit, if the approved animal is a dog, you agree that you shall provide us proof that you have obtained personal liability insurance in a minimum policy coverage amount of $100,000.00 per occurrence, per dog approved, from a carrier with an AM Best rating of a B+ or better, licensed to do business in Kentucky.

We shall be named as an additional insured on the policy. You must provide proof that we have been named as an additional insured before bringing the animal to the dwelling unit. Failure to obtain and maintain a liability policy as described above, in force and effect at all times during the Lease Agreement, as required by this Addendum shall constitute a breach of the Lease Agreement and Addendum and shall result in our exercising any or all of the following rights and remedies: 1) We may require that you promptly remove the animal from the dwelling unit with 14 days written notice and not return the animal to the dwelling unit; 2) We may elect to declare a default and terminate your tenancy; or 3) We may obtain liability insurance, solely in our name with the Community as the only named insured, at your expense and such premium (charged for the one year lump sum) shall become additional rent due and payable with the next installment of rent.

10. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form: __***Pet One-Time Fee of $200.00 is for one pet and $300.00 for 2 pets. Monthly pet fee is $30 for 1 pet, $40 for 2 pets. Jamestown only allows 2 pets per unit. No VISITING pets are allowed. All animals are to be registered with the office and all fees must be paid at the time the animal arrives and is approved. The following breed restrictions apply: Rottweiler, Pit Bulls, Mastiffs, Chow-Chows, Dobermans, Akitas, Presa Canarios, German Shepherds or any variation of these breeds are not permitted. Failure to abide by the Animal Rules (Paragraph 11) is a violation of your lease and will result in a fine of $75 per pile.__

11. **EMERGENCY.** In an emergency involving an accident or injury to your animal, we have the right, but not a duty, to take the animal to the following veterinarian for treatment, at your expense.
Doctor: _____
Address: _____
City/State/Zip: _____
Phone: _____

12. **TERMINATION OF ANIMAL ADDENDUM.** We may at any time with reasonable notice (depending on the reason for notice but no more than thirty (30) days) terminate your right to keep the animal listed in this Addendum if we determine, in our sole discretion, that the animal(s) is not coexisting well in the Community or if you fail to follow our animal rules and policies. If we terminate the right to keep the animal you agree to promptly remove the animal and not allow it to return to the Community or apartment. We may, at our sole option, offer to terminate your lease with us at the same time as the animal must leave, but we do not have to do so.

13. **ANIMAL RULES.** You are responsible for the animal's actions at all times. You agree to abide by these rules:

08212017093714KY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000022 of 000094

- The animal must not disturb the neighbors or other residents, regardless of whether the animal is inside or outside the dwelling.

- Dogs, cats, and support animals must be housebroken. All other animals must be caged at all times. No animal offspring are allowed.

- Inside, the animal may urinate or defecate *only* in these designated areas: **Litter Box**

- Outside, the animal may urinate or defecate *only* in these designated areas: **Perimeter of property. Bag & dispose of all feces**

- Animals may not be tied to any fixed object anywhere outside the dwelling units, except in fenced yards (if any) for your exclusive use.

- You must not let an animal other than support animals into swimming-pool areas, laundry rooms, offices, clubrooms, other recreational facilities, or other dwelling units.

- Your animal must be fed and watered inside the dwelling unit. Don't leave animal food or water outside the dwelling unit at any time, except in fenced yards (if any) for your exclusive use.

- You must keep the animal on a leash and under your supervision when outside the dwelling or any private fenced area. We or our representative may pick up unleashed animals and/or report them to the proper authorities. We may impose reasonable charges for picking up and/or keeping unleashed animals.

- Unless we have designated a particular area in your dwelling unit or on the grounds for animal defecation and urination, you are prohibited from letting an animal defecate or urinate *anywhere* on our property. You must take the animal off our property for that purpose. If we allow animal defecation inside the dwelling unit in this Addendum, you must ensure that it's done in a litter box with a kitty litter-type mix. If the animal defecates anywhere on our property (including in a fenced yard for your exclusive use), you'll be responsible for immediately removing the waste and repairing any damage. Despite anything this Addendum says, you must comply with all local ordinances regarding animal defecation.

**14. ADDITIONAL RULES.** We have the right to make reasonable changes to the animal rules from time to time if we distribute a written copy of any changes to every resident who is allowed to have animals.

**15. VIOLATION OF RULES.** If you, your guest, or any occupant violates any rule or provision of this Animal Addendum (based upon our judgment) and we give you written notice, you must remove the animal immediately and permanently from the premises. We also have all other rights and remedies set forth in the Lease Contract, including damages, eviction, and attorney's fees to the extent allowed by law.

**16. COMPLAINTS ABOUT ANIMAL.** You must immediately and permanently remove the animal from the premises if we receive a reasonable complaint from a neighbor or other resident or if we, in our sole discretion, determine that the animal has disturbed neighbors or other residents.

**17. YOUR REMOVAL OF THE ANIMAL.** As we may be responsible if your animal bites another person or animal, you agree the animal must be immediately and permanently removed if we see or receive any complaint that the animal is exhibiting any vicious tendency.

**18. OUR REMOVAL OF ANIMAL.** In some circumstances, we may enter the dwelling unit and remove the animal with one day's notice left in a conspicuous place. We can do this if, in our sole judgment, you have:
- abandoned the animal;
- left the animal in the dwelling unit for an extended period of time without food or water;
- failed to care for a sick animal;
- violated our animals rules; or
- let the animal defecate or urinate where it's not supposed to.

In doing this, we must follow the procedures of the Lease Contract, and we may board the animal or turn the animal over to a humane society or local authority. We'll return the animal to you upon request if we haven't already turned it over to a humane society or local authority. We don't have a lien on the animal for any purpose, but you must pay for reasonable care and kenneling charges for the animal. If you don't pick up the animal within 5 days after we remove it, it will be considered abandoned.

**19. LIABILITY FOR DAMAGES, INJURIES, CLEANING, ETC.** You and all co-residents will be jointly and severally liable for the entire amount of all damages caused by the animal, including all cleaning, defleaing, and deodorizing. This provision applies to all parts of the dwelling unit, including carpets, doors, walls, drapes, wallpaper, windows, screens, furniture, appliances, as well as landscaping and other outside improvements. If items cannot be satisfactorily cleaned or repaired, you must pay for us to replace them completely. Payment for damages, repairs, cleaning, replacements, etc. are due immediately upon demand.

As owner of the animal, you're strictly liable for the entire amount of any injury that the animal causes to a person or anyone's property. You'll indemnify us for all costs of litigation, any judgment rendered against us, and attorney's fees resulting from any such damage.

**20. MOVE-OUT.** When you move out, you'll pay for defleaing, deodorizing, and shampooing to protect future residents from possible health hazards, regardless of how long the animal was there. We—not you—will arrange for these services.

**21. MULTIPLE RESIDENTS.** Each resident who signed the Lease Contract must sign this Animal Addendum. You, your guests, and any occupants must follow all animal rules. Each resident is jointly and severally liable for damages and all other obligations set forth in this Animal Addendum, even if the resident does not own the animal.

**22. GENERAL.** You acknowledge that no other oral or written agreement exists regarding animals. Except for written rule changes under paragraph 14 above, our representative has no authority to modify this Animal Addendum or the animal rules except in writing. This Animal Addendum and the animal rules are considered part of the Lease Contract described above. It has been executed in multiple originals, one for you and one or more for us.

**This is a binding legal document. Read it carefully before signing.**

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| *(All resident's must sign)* | *(Signs below)* |
| *GuestOnly* | *JoAnna Bizatto* |

0821201709371SKY11081850

Allegheny Construction Specialties

© 2015, National Apartment Association, Inc. Page 2 of 2     Kentucky/National Apartment Association Official Form, C-13, April 2015



☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000023 of 000094

# UTILITY AND SERVICES ADDENDUM



NATIONAL
APARTMENT
ASSOCIATION.

This Utility Addendum is incorporated into the Lease Contract (referred to in this addendum as "Lease Contract" or "Lease") dated
__August 21, 2017__ between __Jamestown CRA- B1, LLC__
("We" and/or "we" and/or "us") and

__Allegheny Construction Specialties__
("You" and/or "you") of Unit No. ___5820-8-P___
located at __5820-8 Prince William Street__ (street address) in
__Louisville, KY 40207__ and is in addition to all terms and conditions in the Lease.
To the extent that the terms of this Utility Addendum conflict with those of the Lease, this Utility Addendum shall control.

1. Responsibility for payment of utilities, and the method of metering or otherwise measuring the cost of the utility, will be as indicated below.

   a) **Water** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☒ water bills will be billed by the service provider to us and then allocated to you based on the following formula: ___4___
         - ☒ If flat rate is selected, the current flat rate is $_____65.00_____ per month.
         - ☐ 3rd party billing company if applicable _____

   b) **Sewer** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ sewer bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

   c) **Gas** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☒ gas bills will be billed by the service provider to us and then allocated to you based on the following formula: ___7___
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable __Gas will be due with your rent monthly.__

   d) **Trash** service to your dwelling will be paid by you either:
      - ☐ directly to the service provider; or
      - ☒ trash bills will be billed by the service provider to us and then charged to you based on the following formula: ___4___
         - ☒ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

   e) **Electric** service to your dwelling will be paid by you either:
      - ☒ directly to the utility service provider; or
      - ☐ electric bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

   f) **Stormwater** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ stormwater bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

   g) **Cable TV** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ cable TV bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

   h) **Master Antenna** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ master antenna bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

   i) **Internet** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ internet bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

   j) **Pest Control** service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☒ pest control bills will be billed by the service provider to us and then charged to you based on the following formula: ___4___
         - ☒ If flat rate is selected, the current flat rate is $_____2.00_____ per month.
         - ☐ 3rd party billing company if applicable _____

   k) **(Other)**_____ service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

   l) **(Other)**_____ service to your dwelling will be paid by you either:
      - ☐ directly to the utility service provider; or
      - ☐ bills will be billed by the service provider to us and then allocated to you based on the following formula: _____
         - ☐ If flat rate is selected, the current flat rate is $_____ per month.
         - ☐ 3rd party billing company if applicable _____

METERING/ ALLOCATION METHOD KEY
"1" - Sub-metering of all of your water/gas/electric use
"2" - Calculation of your total water use based on sub-metering of hot water
"3" - Calculation of your total water use based on sub-metering of cold water
"4" - Flat rate per month
"5" - Allocation based on the number of persons residing in your dwelling unit
"6" - Allocation based on the number of persons residing in your dwelling unit using a ratio occupancy formula
"7" - Allocation based on square footage of your dwelling unit
"8" - Allocation based on a combination of square footage of your dwelling unit and the number of persons residing in your dwelling unit

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000024 of 000094

    "9"  - Allocation based on the number of bedrooms in your dwelling unit
    "10" - Allocation based on a lawful formula not listed here
       (Note: if method "10" is selected, a separate sheet will be attached describing the formula used)

2. If an allocation method is used, we or our billing company will calculate your allocated share of the utilities and services provided and all costs in accordance with state and local statutes and regulations. Under any allocation method we will, as possible, avoid including in the utility billing, any portion of common area usage, we may include other residential units as well as administrative fees in the billing. Both Resident and Owner agree that using a calculation or allocation formula as a basis for estimating total utility consumption is fair and reasonable, while recognizing that the allocation method may or may not accurately reflect actual total utility consumption for Resident. Where lawful, we may change the above methods of determining your allocated share of utilities and services and all other billing methods, in our sole discretion, and after providing written notice to you. More detailed descriptions of billing methods, calculations and allocation formulas will be provided upon request.

    If a flat fee method for trash or other utility service is used, Resident and Owner agree that the charges indicated in this Agreement (as may be amended with written notice as specified above) represent a fair and reasonable amount for the service(s) provided and that the amount billed is not based on a monthly per unit cost.

3. When billed by us directly or through our billing company, you must pay utility bills within _____ 5 _____ days of the date when the utility bill is issued at the place indicated on your bill, or the payment will be late. If a payment is late, you will be responsible for a late fee as indicated below. The late payment of a bill or failure to pay any utility bill is a material and substantial breach of the Lease and we will exercise all remedies available under the Lease, up to and including eviction for nonpayment. To the extent there are new account, monthly administrative, late or final bill fees, you shall pay such fees as indicated below.

    New Account Fee:             $ _____ 10.00 _____ (not to exceed $ _____ 10.00 _____)
    Monthly Administrative Billing Fee:   $ _____ 3.99 _____ (not to exceed $ _____ 4.00 _____)
    Late Fee:                $ _____ (not to exceed $ _____)
    Final Bill Fee:           $ _____ 1.95 _____ (not to exceed $ _____ 5.00 _____)
    If allowed by state law, we at our sole discretion may amend these fees, with written notice to you.

4. You will be charged for the full period of time that you were living in, occupying, or responsible for payment of rent or utility charges on the dwelling. If you breach the Lease, you will be responsible for utility charges for the time period you were obliged to pay the charges under the Lease, subject to our mitigation of damages. In the event you fail to timely establish utility services, we may charge you for any utility service billed to us for your dwelling and may charge a reasonable administration fee for billing for the utility service in the amount of $ _____ 50.00 _____.

5. When you move out, you will receive a final bill which may be estimated based on your prior utility usage. This bill must be paid at the time you move out or it will be deducted from the security deposit.

6. We are not liable for any losses or damages you incur as a result of outages, interruptions, or fluctuations in utility services provided to the dwelling unless such loss or damage was the direct result of negligence by us or our employees. You release us from any and all such claims and waive any claims for offset or reduction of rent or diminished rental value of the dwelling due to such outages, interruptions, or fluctuations.

7. You agree not to tamper with, adjust, or disconnect any utility sub-metering system or device. Violation of this provision is a material breach of your Lease and may subject you to eviction or other remedies available to us under your Lease, this Utility Addendum and at law.

8. Where lawful, all utilities, charges and fees of any kind under this lease shall be considered additional rent, and if partial payments are accepted by the Owner, they will be allocated first to non-rent charges and to rent last.

9. You represent that all occupants that will be residing in the Unit are accurately identified in the Lease. You agree to promptly notify Owner of any change in such number of occupants.

10. You agree that you may, upon thirty (30) days prior written notice from Owner to you, begin receiving a bill for additional utilities and services, at which time such additional utilities and services shall for all purposes be included in the term Utilities.

11. This Addendum is designed for use in multiple jurisdictions, and no billing method, charge, or fee mentioned herein will be used in any jurisdiction where such use would be unlawful. If any provision of this addendum or the Lease is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this addendum or the Lease. Except as specifically stated herein, all other terms and conditions of the Lease shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease, the terms of this Addendum shall control.

12. The following special provisions and any addenda or written rules furnished to you at or before signing will become a part of this Utility Addendum and will supersede any conflicting provisions of this printed Utility Addendum and/or the Lease Contract. Water, sewer, and trash is billed at a flat rate of $55.00 for a 1 BR, $60.00 for a 2 BR, and $65.00 for a 3 BR. Gas charges are in addition to your rent monthly. LG&E is for your personal electric, only.  X The utilities must be maintained in the residents name throughout the term of the lease, if not an administrative fee of $50.00 will be charged, per bill received plus the cost of the usage.

Resident Signature _Grant Scully_____     Date _08/21/2017_____
Resident Signature _____     Date _____
Resident Signature _____     Date _____
Resident Signature _____     Date _____
Management _JoAnna Bizallo_____     Date _08/21/2017_____

08212017093717KY11081850
© 2015, National Apartment Association, Inc. - 4/2015, Kentucky

Allegheny Construction Specialties

☑ This document was executed via the NAA E-signature System - ID: 120571728



**Bed Bug Addendum**

Date: _____**August 21, 2017**_____
(when this Addendum is filled out)



**NATIONAL APARTMENT ASSOCIATION**

*Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize the potential for any bed bugs in your dwelling or surrounding dwellings. This addendum contains important information that outlines your responsibility and potential liability with regard to bed bugs.*

1. **DWELLING UNIT DESCRIPTION.** Unit No. **5820-8-P**,
**5820-8 Prince William Street** *(street address)*
in _____**Louisville**_____ *(city)*,
Kentucky, _____**40207**_____ *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: **August 21, 2017**
Owner's name: **Jamestown CRA- B1, LLC**

   Residents *(list all residents):* **Allegheny Construction Specialties**

3. **PURPOSE.** This Addendum modifies the Lease Contract and addresses situations related to bed bugs *(cimex lectularius)* which may be discovered infesting the dwelling or personal property in the dwelling. You understand that we relied on your representations to us in this Addendum.

4. **INSPECTION.** You agree that you: *(Check one)*
   ❑ have inspected the dwelling prior to move-in and that you did not observe any evidence of bed bugs or bed bug infestation; OR

   ❑ will inspect the dwelling within 48 hours after move-in/renewal and notify us of any bed bugs or bed bug infestation.

5. **INFESTATIONS.**
You agree that you have read all of the information on this addendum about bed bugs and:
*(Check one)*
   ❑ you are not aware of any infestation or presence of bed bugs in your current or previous apartments, home or dwelling. You agree that you are not aware of any bed bug infestation or presence in any of your furniture, clothing, personal property or possessions. You agree that you have not been subjected to conditions in which there was any bed bug infestation or presence. OR

   ❑ you agree that if you previously lived anywhere that had a bed bug infestation that all of your personal property (including furniture, clothing and other belongings) has been treated by a licensed pest control professional. You agree that such items are free of further infestation. If you disclose a previous experience of bed bug infestation, we can review documentation of the treatment and inspect your personal property and possessions to confirm the absence of bed bugs. You agree that any previous bed bug infestation which you may have experienced is disclosed here:

   _____
   _____
   _____
   _____

6. **ACCESS FOR INSPECTION AND PEST TREATMENT.** You must allow us and our pest control agents access to the dwelling at reasonable times to inspect for or treat bed bugs as allowed by law. You and your family members, occupants, guests, and invitees must cooperate and will not interfere with inspections or treatments. We have the right to select any licensed pest control professional to treat the

dwelling and building. We can select the method of treating the dwelling, building and common areas for bed bugs. We can also inspect and treat adjacent or neighboring dwellings to the infestation even if those dwellings are not the source or cause of the known infestation. You are responsible for and must, at your own expense, have your own personal property, furniture, clothing and possessions treated according to accepted treatment methods established by a licensed pest control firm that we approve. You must do so as close as possible to the time we treated the dwelling. If you fail to do so, you will be in default, and we will have the right to terminate your right of occupancy and exercise all rights and remedies under the Lease Contract. You agree not to treat the dwelling for a bed bug infestation on your own.

7. **NOTIFICATION.** You must promptly notify us:
   • of any known or suspected bed bug infestation or presence in the dwelling, or in any of your clothing, furniture or personal property.

   • of any recurring or unexplained bites, stings, irritations, or sores of the skin or body which you believe is caused by bed bugs, or by any condition or pest you believe is in the dwelling.

   • if you discover any condition or evidence that might indicate the presence or infestation of bed bugs, or of any confirmation of bed bug presence by a licensed pest control professional or other authoritative source.

8. **COOPERATION.** While we are responsible for making reasonable provisions for the extermination of roaches, ants, wood destroying organisms, and other treatable insects such as bed bugs, we may not be responsible for paying for treatment for bed bugs in the dwelling under certain circumstances described below (Provision 10). In order to deter bed bugs from entering or spreading to the dwelling, you agree that all times during this Lease agreement that you shall: 1) Keep all mattresses, used or stored in the dwelling, wrapped or sealed in a mattress cover made of vinyl, plastic, or other impervious material that must remain sealed or completely closed at all times, there must be no tears or rips in the covering of the mattress; and 2) Not to place anything in the dwelling, especially used furniture, unless it thoroughly inspected by you, prior to placing it in the dwelling. Further, you must cooperate with us and our licensed pest control agents to treat and eliminate the presence of any bed bugs. You agree: 1) To follow any pretreatment instructions provided by us or our pest control operator to prepare the dwelling for treatment; 2) Have the dwelling prepared on the day of treatment, this may include putting away food and personal care items, movement of furniture and, if so instructed, vacating and staying out of the dwelling for a period of hours during that period of treatment described in the pretreatment instructions; 3) Following all post-treatment directives and instructions including the disposal of property that cannot be treated, and regular vacuuming; and 4) maintaining certain items in sealed containers as much as practically possible between treatments. You further agree that you will not treat for any live bed bug activity yourself with any chemical or treatment commonly available at hardware or home improvement stores. Only chemicals used by our licensed pest control operators may be used to treat for bed bugs. Additionally, you agree to report any sign of bed bugs, live or dead activity, to our office immediately.

**08212017093718KY11081850**

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000026 of 000094

9. **TEMPORARY RELOCATION.** Infestations from such pests, including bed bugs in the dwelling and / or adjoining dwelling, may necessitate you vacating the dwelling either temporarily or permanently in order for us to eradicate the infestation. If you are relocated or the lease is terminated then we shall be released from all other obligations under this Lease Agreement. If we terminate your Lease Agreement and infestation is not caused or worsened by your actions or inactions and you vacate according to this Provision then you shall be released for the balance of your financial responsibilities under the Lease Agreement except for physical damages, beyond ordinary wear and tear, to the dwelling. If the infestation is caused by you, your family, your guests, or your invitees then we shall not be liable for the costs of such relocation and we do not have to offer you another dwelling in the Community or another dwelling owned by our company. In the event of such relocation or termination of your lease, you may still be liable and we may still charge you for extermination charges as listed in Provision 10 below.

10. **RESPONSIBILITIES.** You agree to avoid creating any condition which would cause or promote the presence of bugs, including bed bugs. You will be required to pay for a portion or all of any treatment to eradicate bed bugs in the dwelling if any infestation from your dwelling spreads to other adjoining dwellings above, below, or next to your dwelling and you have failed to follow Provision 8 (Cooperation) requirements above. Further, you will be responsible for the cost of treatment if we determine that: 1) Your actions or inactions contribute to or result in a bed bug infestation; 2) Your mattresses are not encased as required by this Addendum; 3) If you fail to report a bed bug condition immediately upon the time that you notice live or dead activity; 4) If you try to "self treat" the infestation as prohibited by Provision 8 of this Addendum; or 5) If you fail to prepare or fail to cooperate with the treatment described in the Cooperation Provision of this Addendum, including denying access for treatment on any scheduled date or otherwise hinder our treatment of the dwelling. Any invoice submitted to you for the cost of extermination of any bed bug infestation shall become Additional Rent due and payable with the next monthly Rent payment and, your refusal to pay any Additional Rent charged with the next monthly Rent payment may be considered as a partial Rent payment by you and may be refused by us.

You will be responsible for the costs of moving other residents in order to treat adjoining or neighboring dwellings, to your dwelling and you may be responsible for the costs of our lost rental income and expenses incurred in relocating neighboring residents to perform pest control treatments or eradicate infestations in dwellings adjacent to yours. If you fail to pay us any of the costs you are liable for, you will be in default and we will have the right to terminate your right of occupancy and exercise all the rights and remedies under the Lease Agreement and obtain immediate possession of the dwelling. If you move out after your right of occupancy has been properly terminated, you will be liable for all lost rent under the Lease Agreement.

**You are legally bound by this document. Please read it carefully.**

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| *(All residents must sign)* | *(Signs below)* |
| *GrantSoely* | *JoAnn Busato* |

Date of Signing Addendum

08/21/2017

08212017093719KY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000027 of 000094

## BED BUGS — A Guide for Rental Housing Residents

Bed bugs, with a typical lifespan of 6 to 12 months, are wingless, flat, broadly oval-shaped insects. Capable of reaching the size of an apple seed at full growth, bed bugs are distinguishable by their reddish-brown color, although after feeding on the blood of humans and warm-blooded animals—their sole food source—the bugs assume a distinctly blood-red hue until digestion is complete.

### Bed bugs don't discriminate

Bed bugs increased presence across the United States in recent decades can be attributed largely to a surge in international travel and trade. It's no surprise then that bed bugs have been found time and time again to have taken up residence in some of the fanciest hotels and apartment buildings in some of the nation's most expensive neighborhoods.

Nonetheless, false claims that associate bed bugs presence with poor hygiene and uncleanliness have caused rental housing residents, out of shame, to avoid notifying owners of their presence. This serves only to enable the spread of bed bugs.

While bed bugs are, by their very nature, more attracted to clutter, they're certainly not discouraged by cleanliness.

Bottom line: bed bugs know no social and economic bounds; claims to the contrary are false.

### Bed bugs don't transmit disease

There exists no scientific evidence that bed bugs transmit disease. In fact, federal agencies tasked with addressing pest of public health concern, namely the U.S. Environmental Protection Agency and the Centers for Disease Control and Prevention, have refused to elevate bed bugs to the threat level posed by disease transmitting pests. Again, claims associating bed bugs with disease are false.

### Identifying bed bugs

*Bed bugs can often be found in, around and between:*

- Bedding
- Bed frames
- Mattress seams
- Upholstered furniture, especially under cushions and along seams
- Around, behind and under wood furniture, especially along areas where drawers slide
- Curtains and draperies
- Along window and door frames
- Ceiling and wall junctions
- Crown moldings
- Behind and around wall hangings and loose wallpaper
- Between carpeting and walls (carpet can be pulled away from the wall and tack strip)
- Cracks and crevices in walls and floors
- Inside electronic devices, such as smoke and carbon monoxide detectors
- Because bed bugs leave some persons with itchy welts strikingly similar to those caused by fleas and mosquitoes, the origination of such markings often go misdiagnosed. However, welts caused by bed bugs often times appear in succession and on exposed areas of skin, such as the face, neck and arms. In some cases, an individual may not experience any visible reaction resulting from direct contact with bed bugs.
- While bed bugs typically prefer to act at night, they often do not succeed in returning to their hiding spots without

leaving traces of their presence through fecal markings of a red to dark brown color, visible on or near beds. Blood stains tend also to appear when the bugs have been squashed, usually by an unsuspecting host in their sleep. And, because they shed, it's not uncommon for skin casts to be left behind in areas typically frequented by bed bugs.

### Preventing bed bug encounters when traveling

Because humans serve as bed bugs' main mode of transportation, it is extremely important to be mindful of bed bugs when away from home. Experts agree that the spread of bed bugs across all regions of the United States is largely attributed to an increase in international travel and trade. Travelers are therefore encouraged to take a few minutes upon arriving to their temporary destination to thoroughly inspect their accommodations, so as to ensure that any uninvited guests are detected before the decision is made to unpack.

Because bed bugs can easily travel from one room to another, it is also recommended that travelers thoroughly inspect their luggage and belongings for bed bugs before departing for home.

### Bed bug do's and don'ts

- **Do not bring used furniture from unknown sources into your dwelling.** Countless bed bug infestations have stemmed directly from the introduction into a resident's unit of second-hand and abandoned furniture. Unless the determination can be made with absolute certainty that a piece of second-hand furniture is bed bug-free, residents should assume that the reason a seemingly nice looking leather couch, for example, is sitting curbside, waiting to be hauled off to the landfill, may very well be due to the fact that it's teeming with bed bugs.
- **Do address bed bug sightings immediately.** Rental housing residents who suspect the presence of bed bugs in their unit must immediately notify the owner.
- **Do not attempt to treat bed bug infestations.** Under no circumstance should you attempt to eradicate bed bugs. Health hazards associated with the misapplication of traditional and non-traditional, chemical-based insecticides and pesticides poses too great a risk to you and your neighbors.
- **Do comply with eradication protocol.** If the determination is made that your unit is indeed playing host to bed bugs, you must comply with the bed bug eradication protocol set forth by both your owner and their designated pest management company.

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000028 of 000094

☑ This document was executed via the NAA E-signature System - ID: 120571728

 

## Mold Information and Prevention Addendum

*Please note: It is our goal to maintain a quality living environment for our residents. To help achieve this goal, it is important to work together to minimize any mold growth in your dwelling. That is why this addendum contains important information for you, and responsibilities for both you and us.*

1. **DWELLING UNIT DESCRIPTION.** Unit No. 5820-8-P ,
5820-8 Prince William Street *(street address)*
in Louisville *(city),*
Kentucky, 40207 *(zip code).*

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: August 21, 2017
Owner's name: Jamestown CRA- B1, LLC

Residents *(list all residents):* Allegheny Construction Specialties

3. **ABOUT MOLD.** Mold is found virtually everywhere in our environment—both indoors and outdoors and in both new and old structures. Molds are naturally occurring microscopic organisms which reproduce by spores and have existed practically from the beginning of time. All of us have lived with mold spores all our lives. Without molds we would all be struggling with large amounts of dead organic matter.

Mold breaks down organic matter in the environment and uses the end product for its food. Mold spores (like plant pollen) spread through the air and are commonly transported by shoes, clothing and other materials. When excess moisture is present inside a dwelling, mold can grow. A 2004 Federal Centers for Disease Control and Prevention study found that there is currently no scientific evidence that the accumulation of mold causes any significant health risks for person with normally functioning immune systems. Nonetheless, appropriate precautions need to be taken.

4. **PREVENTING MOLD BEGINS WITH YOU.** In order to minimize the potential for mold growth in your dwelling, you must do the following:

- Keep your dwelling clean—particularly the kitchen, the bathroom(s), carpets and floors. Regular vacuuming, mopping and using a household cleaner to clean hard surfaces is important to remove the household dirt and debris that harbor mold or food for mold. Immediately throw away moldy food.

- Remove visible moisture accumulation on windows, walls, ceilings, floors and other surfaces as soon as reasonably possible. Look for leaks in washing machine hoses and discharge lines—especially if the leak is large enough for water to infiltrate nearby walls. Turn on any exhaust fans in the bathroom and kitchen *before* you start showering or cooking with open pots. When showering, be sure to keep the shower curtain *inside* the tub or fully close the shower doors. Also, the experts recommend that after taking a shower or bath, you: (1) wipe moisture off of shower walls, shower doors, the bathtub and the bathroom floor; (2) leave the bathroom door open until all moisture on the mirrors and bathroom walls and tile surfaces has dissipated; and (3) hang up your towels and bath mats so they will completely dry out.

- Promptly notify us in writing about any air conditioning or heating system problems you discover. Follow our rules, if any, regarding replacement of air filters. Also, it is recommended that you periodically open windows and doors on days when the outdoor weather is dry (i.e., humidity is below 50 percent) to help humid areas of your dwelling dry out.

- Promptly notify us in writing about any signs of water leaks, water infiltration or mold. We will respond in accordance with state law and the Lease Contract to repair or remedy the situation, as necessary.

- Keep the thermostat set to automatically circulate air in the event temperatures rise to or above 80 degrees Fahrenheit.

5. **IN ORDER TO AVOID MOLD GROWTH,** it is important to prevent excessive moisture buildup in your dwelling. Failure to promptly pay attention to leaks and moisture that might accumulate on dwelling surfaces or that might get inside walls or ceilings can encourage mold growth. Prolonged moisture can result from a wide variety of sources, such as:

- rainwater leaking from roofs, windows, doors and outside walls, as well as flood waters rising above floor level;

- overflows from showers, bathtubs, toilets, lavatories, sinks, washing machines, dehumidifiers, refrigerator or A/C drip pans or clogged up A/C condensation lines;

- leaks from plumbing lines or fixtures, and leaks into walls from bad or missing grouting/caulking around showers, tubs or sinks;

- washing machine hose leaks, plant watering overflows, pet urine, cooking spills, beverage spills and steam from excessive open-pot cooking;

- leaks from clothes dryer discharge vents (which can put lots of moisture into the air); and

- insufficient drying of carpets, carpet pads, shower walls and bathroom floors.

6. **IF SMALL AREAS OF MOLD HAVE ALREADY OCCURRED ON** *NON-POROUS* **SURFACES** (such as ceramic tile, formica, vinyl flooring, metal, wood or plastic), the federal Environmental Protection Agency (EPA) recommends that you first clean the areas with soap (or detergent) and water, let the surface dry, and then within 24 hours apply a pre-mixed, spray-on-type household biocide, such as Lysol Disinfectant®, Pine-Sol Disinfectant® (original pine-scented), Tilex Mildew Remover® or Clorox Cleanup®. (Note: Only a few of the common household cleaners will actually kill mold.) Tilex® and Clorox® contain bleach which can discolor or stain. Be sure to follow the instructions on the container. Applying biocides without first cleaning away the dirt and oils from the surface is like painting over old paint without first cleaning and preparing the surface.

Always clean and apply a biocide to an area 5 or 6 times larger than any visible mold because mold may be adjacent in quantities not yet visible to the naked eye. A vacuum cleaner with a high-efficiency particulate air (HEPA) filter can be used to help remove non-visible mold products from *porous* items, such as fibers in sofas, chairs, drapes and carpets—provided the fibers are completely dry. Machine washing or dry cleaning will remove mold from clothes.

7. **DO NOT CLEAN OR APPLY BIOCIDES TO:** (1) visible mold on *porous surfaces,* such as sheetrock walls or ceilings, or (2) *large areas* of visible mold on *non-porous* surfaces. Instead, notify us in writing, and we will take appropriate action.

8. **COMPLIANCE.** Complying with this addendum will help prevent mold growth in your dwelling, and both you and we will be able to respond correctly if problems develop that could lead to mold growth. If you have questions regarding this addendum, please contact us at the management office or at the phone number shown in your Lease Contract.

If you fail to comply with this Addendum, you can be held responsible for property damage to the dwelling and any health problems that may result. We can't fix problems in your dwelling unless we know about them.

9. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

Resident or Residents
*(All residents must sign here)*

Owner or Owner's Representative
*(Signs here)*

Date of Lease Contract

August 21, 2017

08212017093721KY11081850

Allegheny Construction Specialties

Kentucky/National Apartment Association Official Form F-13, February 2013
© 2013, National Apartment Association, Inc.

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000029 of 000094



**Asbestos Addendum**



Date: __August 21, 2017__
(when this Addendum is filled out)

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000030 of 000094

**1. DWELLING UNIT DESCRIPTION.** Unit No. __5820-8-P__, __5820-8 Prince William Street__ (street address) in __Louisville__ (city), Kentucky, __40207__ (zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: __August 21, 2017__
Owner's name: __Jamestown CRA- B1, LLC__

Residents (list all residents): __Allegheny__
__Construction Specialties__

**3. ASBESTOS.** In most dwellings which were built prior to 1981 and in some built after that, asbestos was commonly used as a construction material. In various parts of your dwelling, asbestos materials may have been used in the original construction or in renovations prior to the enactment of federal laws which limit asbestos in certain construction materials.

**4. FEDERAL RECOMMENDATIONS.** The United States Environmental Protection Agency (EPA) has determined that the mere presence of asbestos materials does not pose a health risk to residents and that such materials are safe so long as they are not dislodged or disturbed in a manner that causes the asbestos fibers to be released. Disturbances include sanding, scraping, pounding, or other techniques that produce dust and cause the asbestos particles to become airborne. The EPA does not require that intact asbestos materials be removed. Instead, the law simply requires that we take reasonable precautions to minimize the chance of damage or disturbance of those materials.

**5. COMMUNITY POLICIES AND RULES.** You, your families, other occupants, and guests must not disturb or attach anything to the walls, ceilings, floor tiles, or insulation behind the walls or ceilings in your dwelling unless specifically allowed in owner's rules or community policies that are separately attached to this Lease Contract. The foregoing prevails over other provisions of the Lease Contract to the contrary. Please report any ceiling leaks to management promptly so that pieces of acoustical ceiling material or ceiling tiles do not fall to the floor and get disturbed by people walking on the fallen material.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

**Resident(s)**
(All residents must sign)

_JquestStudy_

**Date of Signing Addendum**

08/21/2017

**Owner or Owner's Representative**

_JoAnna Bizale_

**Date of Signing Addendum**

08/21/2017

08212017093722KY11081850

Allegheny Construction Specialties

Kentucky/National Apartment Association Official Form 13-Y, February 2013
© 2013, National Apartment Association, Inc.


☑ This document was executed via the NAA E-signature System - ID: 120571726



**LEASE CONTRACT BUY-OUT AGREEMENT**



25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000031 of 000094

1. **Dwelling Unit Description.** Unit No. __5820-8-P__ , __5820-8 Prince William Street__ (street address) in __Louisville__ (city), Kentucky, __40207__ (zip code).

2. **Lease Contract Description.**
Lease Contract date: __August 21, 2017__
Owner's name: __Jamestown CRA- B1, LLC__

   Residents (list all residents): __Allegheny Construction Specialties__

3. The purpose of this Buy-Out Agreement is to give you the right to buy out of your Lease Contract early—subject to any special provisions in paragraph 9 below. In order to buy out early, your notice must be signed by all residents listed in paragraph 1 of the Lease Contract and you must comply with all provisions of this Buy-Out Agreement.

4. **Buy-Out Procedures.** You may buy out of the Lease Contract prior to the end of the lease term and cut off all liability for paying rent for the remainder of the lease term *if all of the following occur:*

   (a) you give us written notice of buy-out at least ___60___ days prior to the new termination date (i.e., your new move-out date), which *(check one)* ☒ must be the last day of a month or ☐ may be during a month;

   (b) you specify the new termination date in the notice, i.e., the date by which you'll move out;

   (c) you are not in default under the Lease Contract on the date you give us the notice of buy-out;

   (d) you are not in default under the Lease Contract on the new termination date (move-out date);

   (e) you move out on or before the new termination date and do not hold over;

   (f) you pay us a buy-out fee (consideration) of $ __2130.00__ ;

   (g) you pay us the amount of any concessions you received when signing the Lease Contract; and

   (h) you comply with any special provisions in paragraph 9 below.

5. **When payable.** The buy-out fee in paragraph 4(f) is due and payable no later than ___7___ days after you give us your buy-out notice. The total dollar amount of any concessions regarding rent or other monetary lease obligations for the entire lease term is $ _____ and is due payable on the same day as the buy-out fee, subject to any special provisions in paragraph 9 regarding the amount, calculation method, or payment date.

6. **Showing unit to prospective residents.** After you give us notice of buy-out, the Lease Contract gives us the right to begin showing your unit to prospective residents and telling them it will be available immediately after your new termination date.

7. **Compliance essential.** Our deposit of all amounts due under paragraphs 4(f) and 4(g) constitutes our approval of the new termination date stated in your notice of buy-out. If you fail to comply with any of the procedures or requirements in this agreement after we deposit such monies, your buy-out right and this agreement will be voided automatically; and (1) any amounts you have paid under this agreement will become part of your security deposit, and (2) the lease will continue without buy-out. Then, if you move out early, you are subject to all lease remedies, including reletting fees and liability for all rents for the remainder of the original lease term.

8. **Miscellaneous.** If moving out by the new termination date becomes a problem for you, contact us. An extension may be possible if we have not already relet the dwelling unit to a successor resident. We and any successor residents who may be leasing your unit will be relying on your moving out on or before the new termination date. Therefore, you may not hold over beyond such date without our written consent—even if it means you have to make plans for temporary lodging elsewhere. "Default" as used in paragraphs 4(c) and 4(d) of this agreement means default as defined in the Lease Contract. You will continue to be liable for any damages and any sums accruing and unpaid prior to the new termination date.

9. **Special provisions.** Your right of buy-out *(check one)* ☐ is or ☒ is not limited to a particular fact situation. If limited, buy-out may be exercised only if the following facts (see below) occur and any described documents are furnished to us. Any special provisions below will supersede any conflicting provision of this printed agreement. Any false statements or documents presented to us regarding buy-out will automatically void your right to buy-out of the Lease Contract. The special provisions are:

   __Buyout fee is equal to two months of__ __rent. All concessions must be repaid upon__ __early termination.__

---

| Resident or Residents | Owner or Owner's Representative |
|---|---|
| *(All residents must sign)* | *(signs below)* |
| *GrantBrady* | *JoAnna Bicolo* |
| | |
| | **Date of Lease Contract** |
| | **August 21, 2017** |

© 2013, National Apartment Association, Inc. - 2/2013, Kentucky

Allegheny Construction Specialties

☑ This document was executed via the NAA E-signature System - ID: 120571728



**COMMUNITY POLICIES, RULES AND REGULATIONS
ADDENDUM**



*This addendum is incorporated into the Lease Contract (the "Lease") identified below and is in addition to all the terms and conditions contained in the Lease. If any terms of this Addendum conflict with the Lease, the terms of this Addendum shall be controlling.*

| | |
|---|---|
| *Property Owner:* | Jamestown CRA- B1, LLC |
| *Resident(s):* | Allegheny Construction Specialties |
| *Unit No/Address:* | #5820-8-P, 5820-8 Prince William Street |
| *Lease Date:* | 08/21/2017 |

### I. GENERAL CONDITIONS FOR USE OF DWELLING PROPERTY AND RECREATIONAL FACILITIES.

Resident(s) permission for use of all common areas, Resident amenities, and recreational facilities (together, "Amenities") located at the Dwelling Community is a privilege and license granted by Owner, and not a contractual right except as otherwise provided for in the Lease. Such permission is expressly conditioned upon Resident's adherence to the terms of the Lease, this Addendum, and the Community rules and regulations ("Rules") in effect at any given time, and such permission may be revoked by Owner at any time for any lawful reason. In all cases, the most strict terms of either the Lease, this Addendum, or the Community Rules shall control. Owner reserves the right to set the days and hours of use for all Amenities and to change the character of or close any Amenity based upon the needs of Owner and in Owner's sole and absolute discretion, without notice, obligation or recompense of any nature to Resident. Owner and management may make changes to the Rules for use of any Amenity at any time.

**You expressly agree to assume all risks of every type, including but not limited to risks of personal injury or death, related to residents use of amenities at the Community. Additionally, You agree to assume all risks of every type, including loss or damage to personal property owned by Residents, their family, guests and invitees related to the use of any of the amenities at the Community. You release and hold Us harmless and waive any and all claims, allegations, actions, damages, losses, or liabilities of every type whether or not foreseeable, that You may have against Us, and that are in any way related to or arise from such use of the amenities of the Community. These provisions for personal injury/death and loss or damage to property shall be enforceable to the fullest extent of the law in the state in which the Community is located.**

**THE TERMS OF THIS ADDENDUM SHALL ALSO APPLY TO RESIDENT(S)' OCCUPANTS, AGENTS AND INVITEES, TOGETHER WITH THE HEIRS, ASSIGNS, ESTATES AND LEGAL REPRESENTATIVES OF THEM ALL, AND RESIDENT(S) SHALL BE SOLELY RESPONSIBLE FOR THE COMPLIANCE OF SUCH PERSONS WITH THE LEASE, THIS ADDENDUM, AND COMMUNITY RULES AND REGULATIONS, AND RESIDENT(S) INTEND TO AND SHALL INDEMNIFY AND HOLD OWNER HARMLESS FROM ALL CLAIMS OF SUCH PERSONS AS DESCRIBED IN THE PRECEDING PARAGRAPH. The term "Owner" shall include the Management, officers, partners, employees, agents, assigns, Owners, subsidiaries and affiliates of Owner.**

### II. POOL. This Community ☒ DOES; ☐ DOES NOT have a pool. When using the pool, Resident(s) agrees to the following:

- Residents and guests will adhere to the rules and regulations posted in the pool area and Management policies.
- All Swimmers swim at their own risk. Owner is not responsible for accidents or injuries.
- For their safety, Residents should not swim alone.
- Pool hours are posted at the pool.
- No glass, pets, or alcoholic beverages are permitted in the pool area. Use paper or plastic containers only.
- Proper swimming attire is required at all times and a swimsuit "cover up" should be worn to and from the pool.
- No running or rough activities are allowed in the pool area. Respect others by minimizing noise, covering pool furniture with a towel when using suntan oils, leaving pool furniture in pool areas, disposing of trash, and keeping pool gates closed.
- Resident(s) must accompany their guests.
- Resident(s) must notify Owner any time there is a problem or safety hazard at the pool.

### IN CASE OF EMERGENCY DIAL 911

### III. FITNESS CENTER. This Community ☒ DOES; ☐ DOES NOT have a fitness center. When using the fitness center, Resident agrees to the following:

- Residents and guests will adhere to the rules and regulations posted in the fitness center and Management policies.
- The Fitness Center is not supervised. Resident(s) are solely responsible for their own appropriate use of equipment.
- Resident(s) shall carefully inspect each piece of equipment prior to Resident's use and shall refrain from using any equipment that may be functioning improperly or that may be damaged or dangerous.
- Resident(s) shall immediately report to Management any equipment that is not functioning properly, is damaged or appears dangerous, as well any other person's use that appears to be dangerous or in violation of Management Rules and Policies.
- Resident(s) shall consult a physician before using any equipment in the Fitness Center and before participating in any aerobics or exercise class, and will refrain from such use or participation unless approved by Resident's physician.
- Resident(s) will keep Fitness Center locked at all times during Resident's visit to the Fitness Center.
- Resident(s) will not admit any person to the Fitness Center who has not registered with the Management Office.
- Resident(s) must accompany guests, and no glass, smoking, eating, alcoholic beverages, pets, or black sole shoes are permitted in the Fitness Center.
- Any card lost, damaged, stolen, or not returned shall incur a charge of $ _____ which, if You are still living in the Dwelling, shall be paid before the card is repaired or replaced and, if You have moved out shall be charged against the security deposit or shall be a charge against You if the security deposit funds are not sufficient to cover the costs of replacement.

Card # issued:  (1)_____  (2)_____  (3)_____  (4)_____

### IV. PACKAGE RELEASE. This Community ☒ DOES; ☐ DOES NOT accept packages on behalf of Residents.

*For communities that do accept packages on behalf of its Residents:*
By Your signature on this Lease Agreement, You hereby give Us authorization to accept delivery and sign on Your behalf for any packages, letters or other parcels addressed to You. You expressly release Us from any and all liability of any kind whatsoever relating to the above authorization and You agree that We shall have no liability or obligation with respect to any delivery which We receive on Your behalf. This Provision and the receipt of packages and deliveries as a result thereof shall not be deemed to be an actual, constructive, or involuntary bailment and We shall not be deemed to have accepted, received or held any time "in trust" for You. You expressly assume all risks associated with the authorization granted to Us herein and acknowledge and agree that We shall not be liable for any failure to inform You when or if a package or delivery has been made or received by Us. We have the express right to (a) not accept a package or delivery on Your behalf at any time and for any reason in Our sole and absolute discretion; and (b) to return any package or delivery to sender in Our sole and absolute discretion. We shall not be liable for giving Your packages or other deliveries to an individual other than You, and You expressly release Us from any liability in this regard. Additionally, You release Us from all liability or responsibility for lost or damaged packages or deliveries in Our possession.

### V. BUSINESS CENTER. This Community ☒ DOES; ☐ DOES NOT have a business center.

Resident(s) agrees to use the business center at Resident's sole risk and according to the Rules and Regulations posted in the business center and Management policies. Owner is not responsible for data, files, programs or any other information lost or damaged on Business Center computers or in the Business Center for any reason. No software may be loaded on Business Center computers without the written approval of Community Management. No inappropriate, offensive, or pornographic images or files (in the sole judgment of Owner) will be viewed or loaded onto the Business Center computers at any time. Residents will limit time on computers to _____ minutes

☑ This document was executed via the NAA E-signature System - ID: 120571728

if others are waiting to use them. Smoking, eating, alcoholic beverages, pets, and any disturbing behavior are prohibited in the business center. You agree you will not use our Business Center computers to send, receive, or load any computer viruses, booby traps, time bombs, other programming designed to interfere with any other user of the Business Center's computers or any other end user's equipment, programs, or data.

**VI.** **AUTOMOBILES/BOATS/RECREATIONAL VEHICLES.** The following policies are in addition to those in the Lease, and may be modified by the additional rules in effect at the Community at any given time:
- Only __2__ vehicle per licensed Resident is allowed.
- All vehicles must be registered at the Management office.
- Any vehicle(s) not registered, considered abandoned, or violating the Lease, this Addendum, or the Community Rules, in the sole judgment of Management, will be towed at the vehicle owner's expense after a __24__ hour notice is placed on the vehicle.
- Notwithstanding this, any vehicle illegally parked in a fire lane, designated no parking space or handicapped space, or blocking an entrance, exit, driveway, dumpster, or parked illegally in a designated parking space, will immediately be towed, without notice, at the vehicle owner's expense.
- The washing of vehicles is not permitted on the property unless specifically allowed in designated area.
- Any on property repairs and/or maintenance of any vehicle must be with the prior written permission of the Management.
- Recreational vehicles, boats or trailers may only be parked on the property with Management's permission (in Management's sole discretion), and must be registered with the Management Office and parked in the area(s) designated by Management. If so parked, wheels must be chocked, all stands must be in blocks to avoid damage to asphalt.

**VII.** **FIRE HAZARDS.** In order to minimize fire hazards and comply with city ordinances, Resident shall comply with the following:
- Residents and guests will adhere to the Community rules and regulations other Management policies concerning fire hazards, which may be revised from time to time.
- No person shall knowingly maintain a fire hazard.
- **Grills, Barbeques, and any other outdoor cooking or open flame devices will be used only on the ground level and will be placed a minimum of __30__ feet from any building.** Such devices will not be used close to combustible materials, tall grass or weeds, on exterior walls or on roofs, indoors, on balconies or patios, or in other locations which may cause fires.
- **Fireplaces:** Only firewood is permitted in the fireplace. No artificial substances, such as Duraflame® logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold.
- Flammable or combustible liquids and fuels shall not be used or stored (including stock for sale) in dwellings, near exits, stairways breezeways, or areas normally used for the ingress and egress of people. This includes motorcycles and any apparatus or engine using flammable or combustible liquid as fuel.
- No storage of propane gas in the dwelling or storage rooms.
- No person shall block or obstruct any exit, aisle, passageway, hallway or stairway leading to or from any structure.
- Resident(s) are solely responsible for fines or penalties caused by their actions in violation of local fire protection codes, including those imposed on the dwelling community or Owner for actions or failure to act by Resident(s).

**VIII.** **EXTERMINATING.** Unless prohibited by statute or otherwise stated in the Lease, Owner may conduct extermination operations in Residents' dwelling several times a year and as needed to prevent insect infestation. Owner will notify Residents in advance of extermination in Residents' Dwelling, and give Resident instructions for the preparation of the Dwelling and safe contact with insecticides. Residents will be responsible to prepare the Dwelling for extermination in accordance with Owner's instructions. If Residents are unprepared for a scheduled treatment date Owner may prepare Residents' dwelling and charge Residents accordingly or declare Resident(s) to be in default. Residents must request extermination treatments in addition to those regularly provided by Owner in writing. **Residents agree to perform the tasks required by Owner on the day of interior extermination to ensure the safety and effectiveness of the extermination. These tasks will include, but are not limited to, the following:**
- Clean in all cabinets, drawers and closets in kitchen and pantry.
- If roaches have been seen in closets, remove contents from shelves and floor.
- Remove infants and young children from the dwelling.
- Remove pets or place them in bedrooms, and notify Owner of such placement.
- Remove chain locks or other types of obstruction on day of service.
- Cover fish tanks and turn off their air pumps.
- Do not wipe out cabinets after treatment.

In the case of suspected or confirmed bed bug infestation, resident will agree to the following:
- Resident will wash all clothing, bed sheets, draperies, towels, etc. in extremely hot water.
- Resident will thoroughly clean, off premises, all luggage, handbags, shoes and clothes hanging containers.
- Resident will cooperate with Owner's cleaning efforts for all mattresses and seat cushions or other upholstered furniture, and will dispose of same if requested.

Resident may have executed a separate Bed Bug/Extermination Addendum which may provide additional or different requirements for bed bug treatment. In such case, the terms of the Bed Bug/Extermination Addendum shall control in the event of a conflict between this Addendum and the Bed Bug/Extermination Addendum.

<u>RESIDENTS ARE SOLELY RESPONSIBLE TO NOTIFY OWNER IN WRITING PRIOR TO EXTERMINATION OF ANY ANTICIPATED HEALTH OR SAFETY CONCERNS RELATED TO EXTERMINATION AND THE USE OF INSECTICIDES</u>

**IX.** **DRAPES AND SHADES.** Drapes or shades installed by Resident, when allowed, must be lined in white and present a uniform exterior appearance.

**X.** **SIGNS.** Resident shall not display any signs, exterior lights or markings on dwelling. No awnings or other projections shall be attached to the outside of the building of which dwelling is a part.

**XI.** **WAIVER/SEVERABILITY CLAUSE.** No waiver of any provision herein, or in any Community rules and regulations, shall be effective unless granted by the Owner in a signed and dated writing. If any court of competent jurisdiction finds that any clause, phrase, or provision of this Part is invalid for any reason whatsoever, this finding shall not effect the validity of the remaining portions of this addendum, the Lease Contract or any other addenda to the Lease Contract.

**XII.** **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
<u>Fire laws and renter's insurance requirements prohibit the use of grills, barbeques, etc. on the residential premises. There will be a $75 fine, per occurrence, for trash being left outside your apartment home, unless in an approved receptacle; for not picking up pet waste as well as unapproved items or trash on your patio or balcony. If the lease term expires, and there is not a signed renewal lease, you will automatically convert to a Month-to-Month lease at market rent plus a $200.00 month-to-month fee.</u>

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000033 of 000094

I have read, understand and agree to comply with the preceding provisions.

_Grant Seely_                                    08/21/2017
_____          _____
Resident                         Date        Resident                         Date


_____          _____
Resident                         Date        Resident                         Date

_JoAnna Bizado_                              08/21/2017
_____          _____
Owner Representative                         Date

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000034 of 000094

08212017093725KY11081850

**Allegheny Construction Specialties**
© 2016, National Apartment Association, Inc. - 12/2016, Kentucky                                    Page 3 of 3

☑ This document was executed via the NAA E-signature System - ID: 120571728



## Surety Bond Addendum
*Becomes part of Lease Contract*

Date: _____**August 21, 2017**_____
(when this Addendum is filled out)

We require that you provide us with a security deposit to protect us from any damage or other losses that may occur during the time you lease the Apartment. You may choose to reduce or eliminate the security deposit by purchasing a surety bond from another company licensed to provide such bonds within the Commonwealth of Kentucky. If you purchase a surety bond, the bond will be available to us for recovery of any damage or other loss. Also, if you choose the surety bond, the agreement between you and the surety company will not be part of this lease agreement.

THE MONEY YOU PAY THE SURETY COMPANY IS NOT A SECURITY DEPOSIT AND IS NOT REFUNDABLE. FURTHERMORE, EVEN IF WE MAKE NO CLAIM AGAINST THE SURETY BOND, YOU WILL NOT BE ENTITLED TO ANY REFUND OF THE SURETY BOND PREMIUM AT THE END OF THE LEASE TERM.

If you purchase a surety bond, you will have obligations to the surety that are separate and independent from the duties you have to us under this Lease Contract. YOU WILL NOT BE RELEASED FROM YOUR OBLIGATIONS TO US, EXCEPT TO THE EXTENT THAT WE RECEIVE PAYMENTS FROM THE SURETY WHICH SATISFY YOUR OBLIGATIONS TO US. Specifically, if the surety does not pay the total amount of damage or other loss that we experience (including legal fees), you will be required to pay us for the remaining amount.

| **Resident or Residents**<br>*(All residents must sign here)* | **Owner or Owner's Representative**<br>*(signs here)* |
|---|---|
| *Grant Sealy* | *JoAnne Bizarro* |
| | **Date of Lease Contract** |
| | **August 21, 2017** |

Allegheny Construction Specialties

08212017093726KY11081850

© 2015 National Apartment Association, Inc. - 4/2015, Kentucky   

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000035 of 000094



Kentucky
Apartment
Association



NATIONAL
APARTMENT
ASSOCIATION.

**LEASE ADDENDUM FOR RENT CONCESSION OR OTHER RENT DISCOUNT**

1. **Dwelling Unit Description.** Unit No. __5820-8-P__,
   __5820-8 Prince William Street__ *(street address)*
   in __Louisville__ *(city)*,
   Kentucky, __40207__ *(zip code)*.

2. **Lease Contract Description.**
   Lease Contract date: __August 21, 2017__
   Owner's name: __Jamestown CRA- B1, LLC__

   Residents (list all residents): __Allegheny Construction Specialties__

3. **Concession/Discount Agreement.** As consideration for your agreement to remain in your dwelling and to fulfill your Lease obligations throughout the full term of your Lease, you will receive the following rent Concession and or Discount.

   *(Check all that apply)*

   ☐ **One-Time Concession.** You will receive a One-Time Concession off the rent indicated in Paragraph 6 of the Lease Contract in the total amount of $ ___0.00___ . This Concession will be credited to your rent due for the month(s) of:_____
   _____
   _____.

   ☐ **Monthly Discount/Concession.** The rent indicated in Paragraph 6 of the Lease Contract includes a Monthly Discount of $ ___0.00___ per month off of the suggested rental rate for your dwelling.

   ☐ **Other Discount/Concession.** You will receive the following discount off the rent indicated in Paragraph 6 of the Lease Contract:
   __No Concession Given__
   _____
   _____
   _____

4. **Concession Cancellation and Charge-Back.** The concession and discounts indicated above are provided to you as an incentive and with the understanding that you will fulfill your obligations under the Lease Contract through the entire term of your Lease and are forfeited as described in this Addendum.

If your lease is terminated early due to your default (for example, if you abandon the premises without paying rent or are evicted), this Concession/Discount shall be deemed breached along with the Lease Contract and you will forfeit to the Owner the amounts of all *(Check all that apply)*

☒ Concessions
☒ Discounts

that you have actually received for the months you resided in the Premises, and without further notice from us. Once the concession period is over you resume paying market rent. In the event you cure the default, the rent from the date of breach escalates to market rent and any previously offered concession or discount if forfeited for the balance of the term.

5. **Market Rent.** The market rent for this dwelling is the rent stated in the NAA Lease Contract. You acknowledge that the market rent is a fair representation of what the specific dwelling would actually rent for at the time the Lease Contract was negotiated and executed, and is reflective of the rent for a similar dwelling at comparable properties.

6. **Special Provisions.** The following special provisions control over any conflicting provisions of this printed Addendum form or the Lease Contract.
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

**Resident or Residents**
*(All residents must sign)*

*GrantSealy*
_____
_____
_____

**Owner or Owner's Representative**
*(signs here)*

*JoAnna Biado*
_____

**Date of Lease Contract**

__August 21, 2017__

Allegheny Construction Specialties

© 2013, National Apartment Association, Inc. - 2/2013, Kentucky

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000036 of 000094

 

**CRIME/DRUG FREE HOUSING ADDENDUM**

1. **Dwelling Unit Description.**  Unit. No.  5820-8-P ,
   5820-8 Prince William Street (street address)
   in Louisville (city),
   Kentucky, 40207 (zip code).

2. **Lease Contract Description.**
   Lease Contract date:  August 21, 2017
   Owner's name: Jamestown CRA- B1, LLC

   Residents (list all residents): Allegheny
   Construction Specialties

3. **ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned by or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

4. **CRIME/DRUG FREE HOUSING.** Resident, members of the Resident's household, Resident's guests, and all other persons affiliated with the Resident:

   A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

      1. Engaging in any act intended to facilitate any type of criminal activity.

      2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging in such activity is a member of the household, or a guest.

      3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not

limited to the State of Kentucky and/or the Federal Controlled Substances Act.

   4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)

   5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.

   6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Residents, or involving imminent, actual or substantial property damage.

   7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Resident's application due to criminal conduct.

   8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

   B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for termination of the Lease Contract. Notwithstanding the foregoing comments, Owner may terminate Resident's tenancy for any lawful reason, and by any lawful method, with or without good cause.

5. **CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise provided by law, proof of violation of any criminal law shall not require a criminal conviction.

| Resident or Residents (sign here) | Date of Signing Addendum |
|---|---|
| *GrantSrady* | 08/21/2017 |
| | |
| | |

| Owner or Owner's Representative (signs here) | Date of Signing Addendum |
|---|---|
| *JoAnna Bicalo* | 08/21/2017 |

Allegheny Construction Specialties

0821201709372727KY11081850

© 2016, National Apartment Association, Inc. - 7/2016, Kentucky   

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000037 of 000094



**ADDENDUM PROHIBITING
SHORT-TERM SUBLETTING OR RENTAL**



**1. DWELLING UNIT DESCRIPTION.** Unit No. 5820-8-P ,
5820-8 Prince William Street  *(street address)*
in _____Louisville_____ *(city),*
Kentucky, _____40207_____ *(zip code).*

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: August 21, 2017
Owner's name: Jamestown CRA- B1, LLC
_____
_____
_____

Residents *(list all residents):* Allegheny
Construction Specialties
_____
_____

This document shall serve as an addendum ("the
Addendum") to the Apartment Lease Contract (the "Lease")
between Resident and Owner. **Where the terms of the
Lease and this Addendum may conflict, the terms of this
Addendum shall control.**

**3. SHORT TERM SUBLEASE OR RENTING PROHIBITED.**
Without limiting the prohibition in the Lease on subletting
and assignment and without limiting any of our rights or
remedies, this Addendum to the Lease further supplements
and defines the requirements and prohibitions contained
in the Lease Contract between you and us. You are hereby
strictly prohibited from subletting or renting to any third
party, or allowing occupancy by any third party, of all or
any portion of the dwelling, whether for an overnight use
or duration of any length, without our prior written consent
in each instance. This prohibition applies to overnight stays
or any other stays arranged on Airbnb.com or other similar
internet sites.

**4. PROHIBITION ON LISTING OR ADVERTISING
DWELLING ON OVERNIGHT SUBLETTING OR
RENTING WEBSITES.** You agree not to list or advertise
the dwelling as being available for short term subletting
or rental or occupancy by others on Airbnb.com or similar
internet websites. You agree that listing or advertising the
dwelling on Airbnb.com or similar internet websites shall
be a violation of this Addendum and a breach of your Lease
Contract.

**5. VIOLATION OF LEASE AGREEMENT.** Your Lease
Contract allows for use of your dwelling as a private
residence only and strictly prohibits conducting any kind
of business in, from, or involving your dwelling unless
expressly permitted by law. Separately, your Lease Contract
prohibits subletting or occupancy by others of the dwelling
for any period of time without our prior written consent.
Permitting your dwelling to be used for any subletting or
rental or occupancy by others (including, without limitation,
for a short term), regardless of the value of consideration
received or if no consideration is received, is a violation
and breach of this Addendum and your Lease Contract.

**6. REMEDY FOR VIOLATION.** Any violation of this
Addendum constitutes a material violation of the Lease
Contract, and as such we may exercise any default remedies
permitted in the Lease Contract, including termination of
your tenancy, in accordance with local law. This clause shall
not be interpreted to restrict our rights to terminate your
tenancy for any lawful reason, or by any lawful method.

**7. RESIDENT LIABILITY.** You are responsible for and shall
be held liable for any and all losses, damages, and/or fines
that we incur as a result of your violations of the terms of
this Addendum or the Lease Contract. Further, you agree
you are responsible for and shall be held liable for any
and all actions of any person(s) who occupy your dwelling
in violation of the terms of this Addendum or the Lease
Contract, including, but not limited to, property damage,
disturbance of other residents, and violence or attempted
violence to another person. In accordance with applicable
law, without limiting your liability you agree we shall have
the right to collect against any renter's or liability insurance
policy maintained by you for any losses or damages that
we incur as the result of any violation of the terms of this
Addendum.

**8. SEVERABILITY.** If any provision of this Addendum or
the Lease Contract is invalid or unenforceable under
applicable law, such provision shall be ineffective to the
extent of such invalidity or unenforceability only without
invalidating or otherwise affecting the remainder of this
Addendum or the Lease Contract. The court shall interpret
the lease and provisions herein in a manner such as to uphold
the valid portions of this Addendum while preserving the
intent of the parties.

**9. SPECIAL PROVISIONS.** The following special
provisions control over conflicting provisions of this printed
form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
*(All residents must sign)*

*GrantSondy*
_____

_____

_____

**Owner or Owner's Representative**
*(Signs below)*

*JoAnna Beards*
_____

**Date of Signing Addendum**
08/21/2017

Allegheny Construction Specialties

08212017093728KY11081850

© 2016, National Apartment Association, Inc. - 7/2016, Kentucky

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000038 of 000094

 **PACKAGE ACCEPTANCE ADDENDUM** 

1. **DWELLING UNIT DESCRIPTION.** Unit No. <u>5820-8-P</u>, <u>5820-8 Prince William Street</u> (*street address*) in <u>Louisville</u> (*city*), Kentucky, <u>40207</u> (*zip code*).

2. **LEASE CONTRACT DESCRIPTION.**
Lease Contract date: <u>August 21, 2017</u>
Owner's name: <u>Jamestown CRA- B1, LLC</u>

Residents (*list all residents*): <u>Allegheny Construction Specialties</u>

This document shall serve as an addendum ("the Addendum") that is hereby incorporated into and made part of the Apartment Lease Contract (the "Lease") between Resident and Owner. **Where the terms of the Lease and this Addendum may conflict, the terms of this Addendum shall control.**

3. **PURPOSE OF ADDENDUM.** By signing this Addendum, you wish for us to sign for, and to accept, U.S. mail and privately-delivered packages or other items on your behalf, subject to the terms and conditions set forth herein.

4. **PACKAGE ACCEPTANCE.**

**A. Generally.** You hereby authorize us and our agent to accept, on your behalf, any package or item delivered to our on-site management office during disclosed business hours, including but not limited to any package delivered by the U.S. Postal Service or by any private courier service or individual. You also specifically authorize us to sign on your behalf if the person or entity delivering said package or item requires an adult signature prior to delivery, including but not limited to the delivery of certified or registered mail. A photo I.D. is required before any packages will be released. Packages will only be released to verified Residents or approved representatives.

**B. Limitations.** You understand and agree that we may refuse to accept any package for any reason or no reason at all, at any time. We are also not obligated to open the on-site management office, or keep the on-site management office open, even during regularly scheduled office hours to accept any packages you may be expecting.

5. **TIME LIMITATION.** Due to limited storage space, we must ask that you pick up your package as soon as possible. You also agree that we shall have no duty whatsoever to hold or store any package for more than _____ days after receipt (accordingly, you should notify the management office if you are going to be away from the apartment home and expect to be receiving a package(s)). After said time, you agree that any such package is deemed abandoned and you authorize us to return the package to its original sender.

6. **DUTY OF CARE, INDEMNIFICATION, ASSUMPTION OF RISKS AND WAIVER.** As to any package for which

we sign and/or receive on your behalf, you understand and agree that we have no duty to notify you of our receipt of such package, nor do we have any duty to maintain, protect, or deliver said package to you, nor do we have any duty to make said package available to you outside disclosed business hours. Any packages or personal property delivered to us or stored by us shall be at your sole risk, and you assume all risks whatsoever associated with any loss or damage to your packages and personal property. To the extent provided by law, you, your guests, family, invitees, and agents hereby waive any and all claims against us or our agents of any nature regarding or relating to any package or item received by us, including but not limited to, claims for theft, misplacing or damaging any such package, except in the event of our or our agent's gross negligence or willful misconduct. You also agree, to the maximum extent provided by law, to defend and indemnify us and our agents and hold us both harmless from any and all claims that may be brought by any third party relating to any injury sustained relating to or arising from any package that we received on your behalf. You also agree, to the maximum extent provided by law, to indemnify us and our agents and hold us harmless from any damage caused to us or our agents by any package received by us for you. You also authorize us to throw away or otherwise dispose of any package that we, in our sole discretion, deem to be dangerous, noxious, or in the case of packaged food, spoiled, and waive any claim whatsoever resulting from such disposal.

7. **SEVERABILITY.** If any provision of this Addendum or the Lease Contract is illegal, invalid or unenforceable under any applicable law, then it is the intention of the parties that (a) such provision shall be ineffective to the extent of such invalidity or unenforceability only without invalidating or otherwise affecting the remainder of this Addendum or the Lease, (b) the remainder of this Addendum shall not be affected thereby, and (c) it is also the intention of the parties to this Addendum that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Addendum a clause or provision similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

8. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Resident or Residents**
(*All residents must sign*)

*GrantSody*
_____
_____
_____

**Owner or Owner's Representative**
(*Signs below*)

*JoAnna Bizarro*
_____
**Date of Signing Addendum**
<u>08/21/2017</u>

© 2017, National Apartment Association, Inc. - 3/2017, Kentucky

 **PHOTO, VIDEO, AND STATEMENT RELEASE ADDENDUM** 

1. **DWELLING UNIT DESCRIPTION.** Unit No. 5820-8-P,
   5820-8 Prince William Street
   *(street address)* in _____Louisville_____
   *(city)*, Kentucky, _____40207_____ *(zip code)*.

2. **LEASE CONTRACT DESCRIPTION.**
   Lease Contract date: August 21, 2017
   Owner's name: Jamestown CRA- B1, LLC
   _____
   _____
   _____

   Residents *(list all residents)*:
   Allegheny Construction Specialties
   _____
   _____
   _____

   Occupants *(list all occupants)*:
   Ruben Deluna, Joel Nussbaum, Jared Bobb
   _____
   _____

   This document shall serve as an addendum ("the Addendum") that is hereby incorporated into and made part of the Apartment Lease Contract (the "Lease") between Resident and Owner ("our" or "us"). **Where the terms of the Lease and this Addendum may conflict, the terms of this Addendum shall control.**

3. **PURPOSE OF ADDENDUM.** By signing this Addendum, you, without payment or other consideration, agree to grant us permission to use your likeness in photographs, videos and/or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

   A. CONSENT FOR MINOR OCCUPANTS. By signing this Addendum, if any minor occupants are named above, you further certify that you are the parent, or legal guardian of the minor occupant(s) named above, and you, without payment or other consideration, agree to grant us permission to use their likeness in photographs, videos and/ or other electronic and/or digital reproductions, including voice, in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. For purposes of this addendum, photographs, videos, written comments, statements, and other digital reproductions will hereinafter be collectively referred to as "media."

4. **PHOTO AND VIDEO RELEASE.** You hereby grant us and our agents and affiliates (collectively, the "Released Parties") permission and a license to take, use, reuse, and publish the likeness of you and any minor occupants in all photographs or other electronic and/or digital media in any and all of our publications, including, without limitation, any website entries, advertising websites, and any other marketing materials. You understand and agree that these materials will become the property of the Released Parties and will not be returned. You agree to irrevocably authorize the Released Parties to edit, alter, copy, exhibit, publish, or distribute this media for any lawful purpose whatsoever

including, without limitation, promotional and advertising uses. You waive the right to inspect or approve the finished product, including any written or electronic copy, wherein your likeness appears now or in the future. In addition, you waive any right to payment, royalties, or any other compensation arising or related to the use of the media.

5. **CONSENT TO USE YOUR NAME, LIKENESS, WRITTEN COMMENTS, AND STATEMENTS.** You are expressly agreeing to allow us to post your name, picture, written comments, and statements, and/or the names, pictures, written comments, and statements of any minor occupants in any and all of our publications, including, without limitation, any website entries, advertising websites, social media websites, and any other marketing materials. You hereby grant the Released Parties permission and a license to use, reproduce, and publish any media on its website, social media platforms, or in other marketing-related materials, whether in electronic or print form.

6. **RELEASE OF LIABILITY.** You hereby release, hold harmless, and forever discharge us from any claims or causes of actions including, without limitation, any and all claims for libel or violation of any right of publicity or privacy, related to our use of the media in any and all of our publications, including any website entries, advertising websites, social media websites, and any other marketing material so long as the claim or cause of action does not result from our intentional misconduct or gross negligence. This consent and release shall be binding upon you and your heirs, legal representatives and assigns.

7. **REVOCATION.** You have the right to revoke your consent to our use of your name, picture, video, voice, written comments, or statement, and/or the name, picture, video, voice, written comments, or statement of any minor occupants, by written notice to us.

8. **SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:

   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____
   _____

08212017093730KY11081850

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000040 of 000094

| Resident or Residents<br>*(All residents must sign)* | Owner or Owner's Representative *(signs below)* |
|---|---|
| *Grant Study* | *JoAnn Biado* |
| | **Date of Signing Addendum** |
| | 08/21/2017 |

Allegheny Construction Specialties
© 2017, National Apartment Association, Inc. - 2/2017, Kentucky

08212017093731KY11081850

Page 2 of 2

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000041 of 000094

# Lease Addendum for Appliances

This is an addendum to the Lease Contract for Apt. No. __5820-8-P__ in the __Jamestown CRA- B1, LLC__
_____ (legal name of community) located in _____ __Louisville__ ,
____ __KY____ (City, State).

1. **Permission:** You (as residents) have permission from us (as owner) to install and use personal appliances in the dwelling unit described above, subject to the conditions in this addendum.

Please remember that we do not select your appliance(s), install it, maintain it, or use it. You are in the best position to prevent damage caused by: (1) a defective appliance (2) appliance accident; or (3) improper installation, maintenance or use of appliance.

2. **Condition:** If your appliance is in disrepair, it can cause problems and damage to your unit and other units, as well as damage to your personal property and personal property of residents in other units. For these reasons, your right to install and use personal appliances in your unit is subject to the following conditions. You automatically agree to the conditions when connecting or using any personal appliance in your unit.

3. **Installation:** You should be especially careful in your choice of appliances and in its installation, maintenance and use—just as if it were in your own home. You and all other residents, occupants and guests in your unit must follow manufacturer's instructions for the appliance installation, maintenance and use. We recommend that any major appliance be professionally installed. All safety switches and sensors must be fully operational at all times.

4. **Responsibility for damage:** You agree to assume strict liability for all damage to your unit and to other units, to personal property in your unit and in other units if the appliance fails to operate properly and otherwise causes damage. You will be responsible for all costs incurred for repairs or unit damages, as well as damage to personal property in your unit and other units. We reserve the right to inspect your appliance if there are any disputes into the cause of the damage. The owner's insurance will not cover such damages.

5. **Insurance:** At all times you must carry renter's insurance that provides insurance coverage for damage to your personal belongings. It must also provide coverage for any potential liability due to your fault for damage caused by your appliance to other units and to personal property of others. You must verify with your agent that such coverages are included in your policy and must furnish us a copy of the policy upon our request.

6. You agree to complete Schedule A (attached) that indicates what appliances are being installed at lease signing and/or require that you notify us when any appliance is being installed on the Schedule A. Schedule A is the Appliance Installation Log.

**Resident or Residents** *(all residents must sign)*

*Grant Serdy*
_____

_____

_____

**Owner or Owner's Representative** *(Signs below)*

*JoAnna Dicarlo*
_____

**Date of Lease Contract**

_____ __08/21/2017__ _____



☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000043 of 000094

# Schedule A

# Appliance Installation Log

| Date install & Apt # | Type of Appliance | Name of Installation Contractor or Owner-Installed | Resident signature |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

06/11/2013

## LEASE ADDENDUM
## LIABILITY INSURANCE REQUIRED OF RESIDENT

1. **Addendum.** This is an addendum to the NAA Lease Contract for
Apt. No. __5820-8-P__ in the __Jamestown at__
__St. Matthews__

Apartments in __Louisville__ (city)
__KY__ __40207__ (state).
The effective date of this Addendum is
__08/21/2017__ .

2. **Acknowledgment Concerning Insurance or Damage Waiver.**
You acknowledge that we do not maintain insurance to protect you against personal injury, loss or damage to your personal property or belongings, or to cover your own liability for injury, loss or damage you (or your occupants or guests) may cause others. You also acknowledge that by not maintaining your own policy of personal liability insurance, you may be responsible to others (including us) for the full cost of any injury, loss or damage caused by your actions or the actions of your occupants or guests, including but not limited to fire damage. You understand that paragraph 8 of the Lease Contract requires you to maintain a liability insurance policy, which provides limits of liability to third parties in an amount not less than $100,000 per occurrence. You will ensure that the liability insurance policy covers all leaseholders.  You will ensure that the liability insurance policy identifies IRT Management, LLC, P.O. Box 979011, Miami, FL 33197-9011 as a "Party of Interest" or "Interested Party" (or similar language as may be available) where the "Party of Interest" or "Interested Party" must be notified within ten (10) days in the event the insurance company cancels or non-renews your policy. Failure to include IRT Management, LLC as the "Party or Interest" or "Interested Party" with the above-listed address will constitute a breach of this Lease Contract. You understand and agree to maintain at all times during the Term of the Lease Contract and any renewal periods, a policy of personal liability insurance with this limit and otherwise satisfying the requirements listed below, at your sole expense.

3. **Required Policy.** You are required to purchase and maintain personal liability insurance covering you, your occupants and guests, for personal injury and property damage any of you cause to third-parties (including damages to our property), with the minimum policy coverage amount set forth in paragraph 2 above, from a carrier with an AM Best rating of A-VII or better, authorized to issue such insurance in (__KY__). The Carrier is required to provide notice to us within 10 days of any cancellation, nonrenewal, or material change in your coverage. We retain the right to hold you responsible for any loss in excess of your insurance coverage.

If you choose not to purchase or are unable to secure satisfactory personal liability insurance coverage, you have the option to obtain insurance coverage under a group liability insurance policy issued by an insurance carrier we have partnered with.  As a tenant of this property, you automatically qualify for this coverage with no underwriting or lengthy application. Participation in this program allows you to conveniently pay the insurance charges with your monthly rent.

**Please initial one of the options below indicating how you will meet the insurance requirement.**

___ I have purchased an annual term renter's insurance policy satisfying the requirements of the Lease Contract and this Addendum from the carrier of my choice and have provided a copy or other satisfactory evidence to the leasing representative.

___ I have **not** purchased an annual term policy satisfying the requirements of the Lease Contract and/or this Addendum and agree to participate in the group insurance program that meets the Lease Contract's insurance requirements. I understand that I will be billed the $__14.50__ monthly charge with my rent to cover the costs of **securing personal liability coverage in an amount of $100,000 and personal property coverage in an amount of $10,000.** The insurance company will issue and send a certificate of insurance to me that will fully describe the limits, conditions and terms of the coverage provided. Brochures providing a general description of the group insurance program and insurance carrier are available to me for review. Written notice is required to cancel participation in the group insurance program.

4. **No Solicitation.** Unless otherwise acknowledged in writing, you acknowledge that we have made no solicitations, guarantees, representations, or promises whatsoever concerning any insurance or services provided by any insurance company. You were and are free to contract for the required insurance with the provider of your choosing so long as that provider comports with the requirements of paragraph 3 above.

5. **Subrogation Allowed.** You and we agree that subrogation is allowed by all parties and that this agreement supersedes any language to the contrary in the Lease Contract. Accordingly, our insurance carrier may sue you for losses it pays as a result of your negligence, and your insurance carrier may sue us for losses it pays as a result of our negligence.

6. **Your Insurance Coverage.** By signing this Addendum, you acknowledge that you have purchased (or will purchase) the insurance described in paragraphs 2 and 3 or agreed to participate in the group insurance program described in paragraph 3, and that you will provide written proof of this insurance to on-site staff prior to taking possession of the apartment. You further acknowledge that you will keep this insurance policy in-force for the entire term of the lease. If any material terms of your insurance policy change, you agree to promptly provide proof of the modified policy terms to the on-site staff. For the purposes of this paragraph, either the written

☑ This document was executed via the NAA E-signature System - ID: 120571728

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000004 of 000094

policy itself or the declaration page to the policy shall constitute written proof.

7. **Default.** Unless otherwise prohibited by law, any default under the terms of this Addendum shall be deemed an immediate, material and incurable default under the terms of the Lease Contract, and we shall be entitled to exercise all rights and remedies under the law. If you fail to pay the insurance charge or if you allow your outside policy to expire or cancel, you will be in default under the terms of your lease. If you fail to provide written proof of insurance as required by paragraph 6, we reserve the right to procure liability-only coverage to address the deficiency and you agree to pay us for the cost of such insurance, at the current rate. The monthly insurance charge is due in full each month with your rental payment. The insurance carrier will issue a policy to you via mail, naming you as the certificate holder or as the insured party. You will also receive a policy in the mail as evidence of your enrollment into the program. We may continue to charge

you for such insurance coverage until such time as you provide proof of insurance pursuant to paragraph 6.

8. **Miscellaneous**. Except as specifically stated in this Addendum, all other terms and conditions of the Lease Contract shall remain unchanged. In the event of any conflict between the terms of this Addendum and the terms of the Lease Contract, the terms of this Addendum shall control.

9. **Special Provisions:**_____
_____
_____

**IMPORTANT DISCLOSURES – READ CAREFULLY BEFORE SIGNING**

**1. The insurance required by the Lease Contract is not required by any law. Your obligation to provide insurance stems solely from the Lease Contract.**
**2. The insurance required by the Lease is not an attempt to limit the Owner's liability for its own negligence or your liability for your own negligence.**
**3. IRT Insurance Advisors, LLC, a licensed affiliate of the property manager and Owner, may receive compensation on policies issued by some insurance companies for administrative, brokerage or marketing support.**
**4. The insurance required by the Lease Contract is not in lieu of, or in any way a component of, the security deposit required by the Lease Contract.**
**5. You understand that every term of the agreement between you and the Owner is set forth in the Lease Contract, any addenda thereto, and in the Rules and Regulations which collectively constitute the entire agreement between you and the Owner. There are no other terms except those which may be implied by law.**
**6. You agree that you have not received any oral representations from Owner or any representative of Owner, which are inconsistent with or not contained in the Lease Contract, the addenda attached to the Lease Contract, or in the Rules and Regulations. If you have received any such oral representations, you agree that you did not rely on them to decide to enter in the Lease Contract or this Addendum.**
**7. You understand that any liability-only insurance coverage you obtain, including any personal liability insurance coverage obtained under a group liability insurance policy pursuant to Section 7 above issued by an insurance carrier we have partnered with, will only cover you for your own liability for injury, loss or damage caused by you (or, in some cases, your occupants or guests) to others (i.e., third parties) and DOES NOT INCLUDE COVERAGE FOR PERSONAL INJURY, LOSS OR DAMAGE TO YOU OR YOUR PERSONAL PROPERTY OR BELONGING.**
**8. YOU ALSO UNDERSTAND THAT THIS LIABILITY-ONLY INSURANCE PURCHASED ON YOUR BEHALF PURSUANT TO SECTION 7 IS LIMITED IN SCOPE AND MAY NOT FULLY PROTECT YOUR INTERESTS.**
**9. If you have an annual renter's insurance policy and decide to switch to the monthly pay option, please compare the terms of coverage between the two policies, as not all policies are the same and coverage may differ.**

**By signing below, you acknowledge and agree that you understand and agree to the terms of this Addendum.**

**Resident or Residents**
[All residents must sign here]
*GrantSordy*
_____
_____
_____

Owner or Owner's Representative
[Sign here]
*JoAnna Bicardo*
_____

Date of Lease Contract
 08/21/2017
_____

# E-SIGNATURE CERTIFICATE
*This certificate details the actions recorded during the signing of this Document.*



**DOCUMENT INFORMATION**

| | |
|---|---|
| Status | Signed |
| Document ID | 120571728 |
| Created | 08/21/17 |
| Completed | 08/21/17 |
| Total Pages | 37 |
| Forms Included | Lead Hazard Disclosure Addendum, Apartment Lease Form, Animal Addendum, All-In-One Utility Addendum, Bed Bug Addendum, Mold Information and Prevention Addendum, Asbestos Addendum, Lease Contract Buy-Out Agreement, Community Policies, Rules, & Regulations, Surety Bond Addendum, Addendum for Rent Concession, Crime/Drug Free Housing Addendum, Short-Term Subletting or Rental Prohibited, Package Acceptance Addendum, Photo, Video, and Statement Release Addendum, Appliance Addendum, Liability Insurance Required of Resident |

**OWNER INFORMATION**

| | |
|---|---|
| Owner Representative | JoAnna Dicarlo |
| Date Signed | 08/21/2017 02:55:48 PM CDT |
| key | e05f0b30f52f3fffc51759c-93a57e1ac |

**PARTIES**

**Grant Serdy**
signer key: b1260060c7847182a8cb5316e9a06a77
IP address: 10.100.10.152
signing method: Blue Moon eSignature Services
verified email: mjordan@allconspec.com
authentication method:
date signed: 08/21/2017 02:52:04 PM CDT
browser: Mozilla/5.0 (Windows NT 6.1; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/60.0.3112.101 Safari/537.36

*Grant Serdy*
*GS*

**JoAnna Dicarlo**
signer key: e05f0b30f52f3fffc51759c93a57e1ac
IP address:
signing method: Blue Moon eSignature Services
verified email: pm.jamestown@raitresidential.com
authentication method:
date signed: 08/21/2017 02:55:48 PM CDT
browser:

*JoAnna Dicarlo*
*JD*

DOCUMENT AUDIT

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000046 of 000094

**DOCUMENT AUDIT CONTINUED**

| | | |
|---|---|---|
| 1 | 08/21/17 02:45:11 PM CDT | Grant Serdy accepted Consumer Disclosure |
| 2 | 08/21/17 02:46:01 PM CDT | Grant Serdy initialed Lead Hazard Disclosure Addendum |
| 3 | 08/21/17 02:46:03 PM CDT | Grant Serdy initialed Lead Hazard Disclosure Addendum |
| 4 | 08/21/17 02:46:05 PM CDT | Grant Serdy signed Lead Hazard Disclosure Addendum |
| 5 | 08/21/17 02:46:07 PM CDT | Grant Serdy dated Lead Hazard Disclosure Addendum |
| 6 | 08/21/17 02:47:48 PM CDT | Grant Serdy signed Apartment Lease Form |
| 7 | 08/21/17 02:48:16 PM CDT | Grant Serdy signed Animal Addendum |
| 8 | 08/21/17 02:48:44 PM CDT | Grant Serdy signed All-In-One Utility Addendum |
| 9 | 08/21/17 02:48:45 PM CDT | Grant Serdy dated All-In-One Utility Addendum |
| 10 | 08/21/17 02:49:18 PM CDT | Grant Serdy signed Bed Bug Addendum |
| 11 | 08/21/17 02:49:26 PM CDT | Grant Serdy signed Mold Information and Prevention Addendum |
| 12 | 08/21/17 02:49:31 PM CDT | Grant Serdy signed Asbestos Addendum |
| 13 | 08/21/17 02:49:32 PM CDT | Grant Serdy dated Asbestos Addendum |
| 14 | 08/21/17 02:49:38 PM CDT | Grant Serdy signed Lease Contract Buy-Out Agreement |
| 15 | 08/21/17 02:49:48 PM CDT | Grant Serdy signed Community Policies, Rules, & Regulations |
| 16 | 08/21/17 02:49:49 PM CDT | Grant Serdy dated Community Policies, Rules, & Regulations |
| 17 | 08/21/17 02:49:55 PM CDT | Grant Serdy signed Surety Bond Addendum |
| 18 | 08/21/17 02:50:21 PM CDT | Grant Serdy signed Addendum for Rent Concession |
| 19 | 08/21/17 02:50:43 PM CDT | Grant Serdy signed Crime/Drug Free Housing Addendum |
| 20 | 08/21/17 02:50:44 PM CDT | Grant Serdy dated Crime/Drug Free Housing Addendum |
| 21 | 08/21/17 02:51:00 PM CDT | Grant Serdy signed Short-Term Subletting or Rental Prohibited |
| 22 | 08/21/17 02:51:07 PM CDT | Grant Serdy signed Package Acceptance Addendum |
| 23 | 08/21/17 02:51:13 PM CDT | Grant Serdy signed Photo, Video, and Statement Release Addendum |
| 24 | 08/21/17 02:51:20 PM CDT | Grant Serdy signed Appliance Addendum |
| 25 | 08/21/17 02:51:37 PM CDT | Grant Serdy initialed Liability Insurance Required of Resident |
| 26 | 08/21/17 02:51:46 PM CDT | Grant Serdy signed Liability Insurance Required of Resident |
| 27 | 08/21/17 02:52:04 PM CDT | Grant Serdy submitted signed documents |
| 28 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo initialed Lead Hazard Disclosure Addendum |
| 29 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Lead Hazard Disclosure Addendum |
| 30 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated Lead Hazard Disclosure Addendum |
| 31 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Apartment Lease Form |
| 32 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Animal Addendum |
| 33 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed All-In-One Utility Addendum |
| 34 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated All-In-One Utility Addendum . |
| 35 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Bed Bug Addendum |
| 36 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated Bed Bug Addendum |
| 37 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Mold Information and Prevention Addendum |
| 38 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Asbestos Addendum |
| 39 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated Asbestos Addendum |
| 40 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Lease Contract Buy-Out Agreement |
| 41 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Community Policies, Rules, & Regulations |
| 42 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated Community Policies, Rules, & Regulations |
| 43 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Surety Bond Addendum |
| 44 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Addendum for Rent Concession |
| 45 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Crime/Drug Free Housing Addendum |
| 46 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated Crime/Drug Free Housing Addendum |
| 47 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated Short-Term Subletting or Rental Prohibited |

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000047 of 000094

**DOCUMENT AUDIT CONTINUED**

| | | |
|---|---|---|
| 48 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Short-Term Subletting or Rental Prohibited |
| 49 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated Package Acceptance Addendum |
| 50 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Package Acceptance Addendum |
| 51 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Photo, Video, and Statement Release Addendum |
| 52 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo dated Photo, Video, and Statement Release Addendum |
| 53 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Appliance Addendum |
| 54 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo signed Liability Insurance Required of Resident |
| 55 | 08/21/17 02:55:48 PM CDT | JoAnna Dicarlo submitted signed documents |

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000048 of 000094

# EXHIBIT 2

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000049 of 000094



**Lexington**
**I N S U R A N C E**
Member of AIG

### *LEXINGTON* INSURANCE COMPANY
### ADMINISTRATIVE OFFICES: 99 HIGH STREET, BOSTON, MA, 02110
#### (hereinafter called the "Company")

### MANUSCRIPT DOMESTIC PROPERTY
### POLICY DECLARATIONS

**Policy Number:**  025032406                    **Renewal of:**  025032406

**Item 1.**     **Named Insured and Address:**

INDEPENDENCE REALTY TRUST
2929 ARCH STREET
PHILADELPHIA, PA 19104

**Item 2.**     **Policy Period:**

From: 05/15/2017              To: 05/15/2018
(At 12:01 A.M. Standard Time at the address of the Named Insured shown above.)

**Item 3.**     **Limit of Liability:** $ 10,000,000     **Part of** $ 10,000,000          **Excess of:** $
(Maximum Limit of Liability in any one **Occurrence**)

**Item 4.**     **Premium:**
Total Premium:                $ 1,165,466
Terrorism Premium:            $ 30,000 (included in Total Premium above)
(Any Terrorism coverage provided under this Policy will be by endorsement)
Minimum Earned Premium:   $ 291,367

**Item 5.**     **Perils:**
ALL RISKS OF DIRECT PHYSICAL LOSS OR DAMAGE INCLUDING FLOOD, EARTH
MOVEMENT AND EQUIPMENT BREAKDOWN/BOILER & MACHINERY AND AS FURTHER
DESCRIBED IN THE APPROVED POLICY FORM

**Item 6.**     **Description of Property Covered:**
REAL AND PERSONAL PROPERTY; MACHINERY AND EQUIPMENT; FURNITURE &
FIXTURES; IMPROVEMENTS AND BETTERMENT'S; INVENTORY; STOCK; EDP
HARDWARE, MEDIA AND DATA; BUSINESS INCOME – GROSS EARNING / EXTRA
EXPENSE AND AS FURTHER DESCRIBED IN THE POLICY FORM

**Coinsurance:** NOT APPLICABLE

**Item 7.**     **Mortgagee Clause:**   Loss, if any, shall be payable to:
PER CERTIFICATES ON FILE WITH THE COMPANY

**Item 8.**     **Forms Attached:**   SEE ATTACHED FORMS SCHEDULE

_____
Authorized Representative

| PR8370 (10/15) | ©2015 American International Group, Inc. All Rights Reserved. | Page 1 of 1 |

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000050 of 000094

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG). The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy. You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000051 of 000094

*LEXINGTON* **INSURANCE COMPANY**
**ADMINISTRATIVE OFFICES: 99 HIGH STREET, BOSTON, MA, 02110**
**(hereinafter called the "Company")**

### MANUSCRIPT DOMESTIC PROPERTY POLICY

### SECTION I – COVERAGES AND LIMITS OF LIABILITY

Terms which appear in boldface type have special meaning.  See Section VIII. POLICY DEFINITIONS.

A.  NAMED INSURED:  First Named Insured and/or its affiliated and subsidiary companies and/or corporations as now exist or may hereafter be constituted or acquired including their interests as may appear in partnerships or joint ventures which the Insured is legally obligated to insure.

B.  MORTGAGEES, LOSS PAYEES, AND ADDITIONAL INSUREDS:  Per Certificates on File with the Company.

C.  COVERAGE TERRITORY:  Coverage under this Policy applies to **Occurrences** within the United States, its territories and possessions, Puerto Rico, and Canada, including their respective coastal waters.

D.  LIMIT OF LIABILITY (**"Policy Limit"**):  This Company's maximum liability in any one **Occurrence** as a result of all covered loss or damage regardless of the number of **Locations**, coverages, or perils insured under this Policy shall not exceed:

  $ 10,000,000

E.  SUBLIMITS OF LIABILITY:  Sublimits of Liability stated below are subject to and not in addition to the **Policy Limit** shown in Paragraph D., above.  These Sublimits of Liability and the specified limits of liability contained in the forms, endorsements and extensions attached, if any, are per **Occurrence** unless otherwise indicated.

  **If the words, NOT COVERED are shown, instead of a limit, sublimit amount or number of days, or if a specified amount or number of days is not shown corresponding to any coverage or Covered Cause of Loss, then no coverage is provided for that coverage or Covered Cause of Loss.**

  1.  **Earth Movement:**

    a.  $ 10,000,000      Annual Aggregate

    Subject to the Annual Aggregate Limit for all **Earth Movement** shown in Subparagraph E.1.a. above:

    b.  $ SEE ENDT #009   Annual Aggregate for all **Earth Movement** in all of the following states combined: California, Alaska, Hawaii, and Puerto Rico

    c.  $ 10,000,000      Annual Aggregate for Pacific Northwest Earthquake Zone Counties (See Section VIII – Policy Definitions, Subparagraph E.1.)

    d.  $ 10,000,000      Annual Aggregate for New Madrid Earthquake Zone Counties (See Section VIII – Policy Definitions, Subparagraph E.2.)

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000053 of 000094

2. **Flood**:

    a. $ 10,000,000        Annual Aggregate

    b. $ 1,000,000         Subject to the Annual Aggregate Limit for all **Flood** shown in Subparagraph E.2.a. above, the Annual Aggregate as respects **Flood** for **Locations** wholly or partially within Special Flood Hazard Areas (SFHA), areas of 100-year flooding as defined by the Federal Emergency Management Agency (FEMA).

3. Named Storm:             $ 10,000,000 Regardless of the number of Coverages, **Locations** or Perils involved including, but not limited to, all **Flood** (however caused), wind, wind gusts, storm surges, tornados, cyclones, hail, or rain, the maximum amount the Company will pay per **Occurrence** as respects all covered Loss or Damage arising out of a Named Storm (a storm that has been declared by the National Weather Service to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression). In the event covered Loss or Damage by **Flood** arises out of a Named Storm, the maximum amount the Company will pay per **Occurrence** for all such Loss or Damage by **Flood** shall be the Sublimits of Liability for **Flood** as shown in Subparagraphs E.2.a. and E.2.b. above. However, if **Flood** is not covered, the maximum amount the Company will pay per **Occurrence** for all such Loss or Damage by Named Storm shall exclude Loss or Damage by **Flood**.

4. Debris Removal: The Company's total liability for Debris Removal per **Occurrence** for all Insured **Locations** sustaining covered direct physical loss or damage payable under this Policy shall not exceed the lesser of:

    a. 25% of the amount of covered direct physical loss or damage payable for all Insured **Locations**; or

    b. $ 500,000

5. Accounts Receivable:        $ 1,000,000

6. Civil or Military Authority:    30 Days, but in no event will the Company pay more than $ NOT APPLICABLE

7. Contingent Time Element:    $ SEE ENDT #009

8. Demolition & Increased Cost of Construction: (See Section VI – Additional Coverages, Paragraph C.)

    a. Demolition Coverage A:    INCLUDED
    b. Demolition Coverage B:    $ 5,000,000
    c. Demolition Coverage C:    $ 5,000,000

9. **Electronic Data and Media**:    $ 2,500,000

10. **Equipment Breakdown**:    $ 10,000,000

11. Spoilage:        $ 250,000

12. Errors and Omissions:    $ 1,000,000, Subject to all other sublimits contained herein.

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000054 of 000094

| | | |
|---|---|---|
| 13. Extended Period of Indemnity: | 365 Days | |
| 14. Extra Expense: | $ 2,500,000 | |
| **15. Fine Arts:** | $ 500,000 | |
| 16. Fire Brigade Charges: | $ 500,000 | |
| 17. Ingress/Egress Coverage: | 30 Days, but in no event will the Company pay more than $ NOT APPLICABLE | |
| 18. Leasehold Interest: | $ 1,000,000 | |
| 19. Limited Pollution Coverage: | $ 250,000  Annual Aggregate | |
| **20. Miscellaneous Unnamed Locations:** | $ 2,500,000, Subject to all other sublimits contained herein. | |
| 21. Newly Acquired Property: | 90 Days, but in no event will the Company pay more than $ 10,000,000, Subject to all other sublimits contained herein. | |
| 22. Ordinary Payroll: | 180 Days | |
| 23. Professional Fees: | $ 1,000,000 | |
| 24. Service Interruption: | $ 2,500,000, A qualifying period of 24 hours applies to this coverage. | |
| 25. Transit: | $ 1,000,000 Per Conveyance<br>$ 1,000,000 Per **Occurrence** | |
| **26. Valuable Papers and Records:** | $ 500,000 | |

F.   MAXIMUM AMOUNT PAYABLE:   In the event of covered loss hereunder, liability of the Company shall be limited to the least of the following:

1.   The actual adjusted amount of loss, less applicable deductible(s),

2.   As respects each **Location** insured by this Policy, <u>one-hundred (100%) percent</u> of the total combined stated values for all categories of Insured Property (e.g. building, contents) and other covered exposures (e.g., time element, extra expense, rental loss) shown for that **Location** on the latest Statement of Values or other documentation on file with the Company, or

3.   The limit of liability or applicable sublimit of liability shown in this Policy or endorsed onto this Policy.

G. DEDUCTIBLE:   Each claim for loss or damage under this Policy shall be subject to a per **Occurrence** deductible amount of $ 100,000, unless a specific deductible shown below applies:

1.   **Flood:**

   a.   $ 100,000 Per **Occurrence**, except as follows in Subparagraph G.1.b.:

   b.   NOT APPLICABLE % of Total Insurable Values (TIV) at the time of the loss at each **Location** involved in the loss or damage, subject to a minimum of $ 500,000 any one **Occurrence** as respects **Locations** wholly or partially within Special Flood Hazard Areas

(SFHA), areas of 100-year flooding as defined by the Federal Emergency Management Agency (FEMA).

2. **Earth Movement**:

   a. $ 100,000 Per **Occurrence**, except as follows in Subparagraph G.2.b, G.2.c., or G.2.d.:

   b. NOT COVERED % of Total Insurable Values at the time of the loss at each **Location** involved in the loss or damage, subject to a minimum of $ NOT COVERED any one **Occurrence** as respects **Locations** in California, Hawaii, Alaska, and Puerto Rico;

   c. 2 % of Total Insurable Values at the time of the loss at each **Location** involved in the loss or damage, subject to a minimum of $ 100,000 any one **Occurrence** as respects **Locations** in the Pacific Northwest Earthquake Zone Counties (See Section VIII – Policy Definitions, Subparagraph E.1.);

   d. 2 % of Total Insurable Values at the time of the loss at each **Location** involved in the loss or damage, subject to a minimum of $ 100,000 any one **Occurrence** as respects **Locations** in the New Madrid Earthquake Zone Counties (See Section VIII – Policy Definitions, Subparagraph E.2.

3. **Windstorm** or **Hail**:

   a. $ 100,000 Per **Occurrence** except as follows in Subparagraph G.3.b.:

   b. SEE ENDT #010 % of Total Insurable Values at the time of the loss at each **Location** involved in the loss or damage arising out of a Named Storm (a storm that has been declared by the National Weather Service to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm, or Tropical Depression), regardless of the number of Coverages, **Locations** or Perils involved (including, but not limited to, all **Flood**, wind, wind gusts, storm surges, tornados, cyclones, hail, or rain) and subject to a minimum deductible of $ SEE ENDT #010 any one **Occurrence.**

4. Time Element:  NOT APPLICABLE Days

The following two paragraphs apply to Subparagraphs G.1. through G.4, inclusive:

In each case of loss or damage covered by this Policy, the Company shall not be liable unless the Insured sustains loss or damage in a single **Occurrence** greater than any applicable deductible described herein and then, if this is a quota share Policy, only for the Company's share in excess of such deductible.   When this Policy covers more than one **Location**, the deductible shall apply against the total loss or damage covered by this Policy in any one **Occurrence**, unless otherwise stated in this Paragraph G.

If two or more deductible amounts provided in this Policy apply to a single **Occurrence**, the total to be deducted shall not exceed the largest deductible applicable unless otherwise stated in this Policy.  However, if:

1. The Time Element deductible and another deductible apply to a single **Occurrence**, then the Company shall apply both deductibles to the **Occurrence**; and

2. Covered Loss or Damage by **Flood** arises out of a Named Storm, then the Company shall apply the **Flood** deductible set forth in Subparagraph G.1. or the Named Storm deductible set forth in Subparagraph G.3.b., whichever is greater.

<div align="center">SECTION II – COVERED CAUSES OF LOSS</div>

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000055 of 000094

A. PERILS INSURED: This Policy insures against all risks of direct physical loss or damage to Insured Property, except as excluded.

B. PERILS EXCLUDED:

1. The Company does not insure for loss or damage caused directly or indirectly by any of the following.  Such loss or damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss or damage.  These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area:

   a. Nuclear reaction or nuclear radiation or radioactive contamination from any cause, all whether direct or indirect, controlled or uncontrolled, proximate or remote, or is contributed to or aggravated by a Covered Cause of Loss.  However:

      i. If fire not otherwise excluded ensues, the Company shall be liable for direct physical loss or damage by such ensuing fire, but not including any loss or damage due to nuclear reaction, nuclear radiation, or radioactive contamination; and

      ii. This Policy does insure against loss or damage caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the Insured premises, provided that, at the time of such loss or damage, there is neither a nuclear reactor nor any new or used nuclear fuel on the Insured premises.

   b. i. War, hostile or warlike action in time of peace or war, whether or not declared, including action in hindering, combating, or defending against an actual, impending, or expected attack:

      (1) By any government or sovereign power (de jure or de facto) or by any authority maintaining or using military, naval, or air forces; or

      (2) By military, naval, or air forces; or

      (3) By an agent of any such government, power, authority, or force;

      ii. Any weapon of war employing atomic fission or radioactive force, whether in time of peace or war, whether or not its discharge was accidental; or

      iii. Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering combating, or defending against such **Occurrence**, seizure or destruction;

      Including any consequence of Subparagraphs b.i., b.ii., or b.iii. above.

   c. Any fraudulent or dishonest act or acts, intended to result in financial gain, committed alone or in collusion with others: by any proprietor, partner, director, trustee, officer or employee of the Insured, or by any party to whom the property may have been entrusted (other than a carrier for hire).

      However, a willful act of destruction by an employee of the Insured, or others listed above without the knowledge of the Insured is covered.

   d. Asbestos material removal, except asbestos that itself incurs direct physical loss or damage caused by a **Defined Peril** at the Insured **Location**.

   e. The actual, alleged or threatened release, discharge, escape or dispersal of **Pollutants or Contaminants**, all whether direct or indirect, proximate or remote or in whole or in part

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000057 of 000094

caused by, contributed to or aggravated by any Covered Cause of Loss under this Policy.

However, this exclusion shall not apply to direct physical loss or damage to Insured Property arising out of seepage, contamination, or pollution caused by a **Defined Peril** at the Insured **Location**.

f.   Faulty workmanship, material, construction, installation or design from any cause; all unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, this Policy will cover only such ensuing loss or damage.

g.   Loss attributable to manufacturing or processing operations which result in damage to stock or materials while such stock or materials are being processed, manufactured, tested or otherwise being worked upon; all unless physical damage not otherwise excluded by this Policy ensues, in which event, this Policy shall cover only such ensuing damage.

h.   Deterioration, depletion, rust, corrosion, erosion, wet or dry rot, decay, evaporation, leakage, wear and tear, animal, insect or vermin damage, inherent vice or latent defect, shrinkage or change in color, flavor, texture or finish, extremes or changes of temperature damage or changes in relative humidity damage, all whether atmospheric or not; all unless physical damage not otherwise excluded by this Policy ensues, in which event, this Policy shall cover only such ensuing damage.

i.   Settling, cracking, shrinking, bulging, or expansion of pavements, foundations, walls, floors, or ceilings; all unless physical damage not otherwise excluded by this Policy ensues, in which event, this Policy will cover only such ensuing damage.

j.   Lack of incoming electricity, fuel, water, gas, steam, refrigerant, or outgoing sewerage, or incoming or outgoing data or telecommunications, all of which are caused by an **Occurrence** away from the **Location**(s) insured under this Policy, unless specifically provided herein and only to the extent provided herein.

k.   Costs, expenses, fines or penalties incurred or sustained by or imposed on the Insured at the order of any government agency, court or other authority arising from any cause whatsoever.

l.   i.   Any functioning or malfunctioning of the internet or similar facility, or of any intranet or private network or similar facility,

    ii.   Any corruption, destruction, distortion, erasure or other loss or damage to data, software, or any kind of programming or instruction set,

    iii.   Loss of use or functionality, whether partial or entire, of data, coding, program, software, any computer or computer system or other device dependent upon any microchip or embedded logic, and any ensuing inability or failure of the Insured to conduct business, as a result thereof.

    This exclusion shall not apply to any ensuing physical damage, not otherwise excluded, which itself results from a **Defined Peril** at the Insured **Location**.

m.   Error or omission in **Electronic Data and Media** machine programming or instructions, including, loss attributable to program design constraints, networking compatibility and original business applications.

n.   The failure of any computer, data processing equipment, media microchip, operating systems, microprocessors (computer chip), integrated circuit or similar device, or any

computer software, whether the property of the Insured or not, and whether occurring before, during or after the year 2000 that results from the inability to:

i.   correctly recognize any date as its true calendar date;

ii.  capture, save, or retain, and/or correctly manipulate, interpret or process any data or information or command or instruction as a result of treating any date otherwise than its true calendar date; and/or

iii. capture, save, retain or correctly process any data as a result of the operation of any command which has been programmed into any computer software, being a command which causes the loss of data or the inability to capture, save, retain or correctly process such data on or after any date.

It is further understood that the Insurer will not pay for the repair of modification of any part of an electronic data processing system or its related equipment, to correct deficiencies or features of logic or operation.

It is further understood that the Insurer will not pay for damage or consequential loss arising from the failure, inadequacy, or malfunction of any advice, consultation, design, evaluation, inspection, installation, maintenance, repair or supervision done by the Insured or for the Insured or by or for others to determine, rectify or test, any potential or actual failure, malfunction or inadequacy described in a. above.

Such Damage or Consequential Loss described in a., b., or c. above, is excluded regardless of any other cause that contributed concurrently or in any other sequence.

This exclusion shall not apply to any subsequent damage or consequential loss, not otherwise excluded, which itself results from a **Defined Peril** at the Insured **Location.**

o.  **Fungus, Mold(s), Mildew, Spores or Yeast;** or any spores or toxins created or produced by or emanating from such **Fungus, Mold(s), Mildew, Spores or Yeast.**

p.  Hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel, or an electrical insulation breakdown test of any type of electrical equipment, unless direct physical loss or damage not otherwise excluded by this Policy ensues, in which event, this Policy will cover only such ensuing loss or damage.

q.  Loss or damage arising out of:

i.   Building or any part of a building that is in danger of falling down or caving in,

ii.  Any part of a building that has separated from another part of the building, or

iii. A building or any part of a building that is standing which shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

However, the Company does cover loss or damage arising out of **Collapse.**

r.  **Equipment Breakdown** to vehicles or any equipment on vehicles, draglines, or excavation or construction equipment.

s.  Loss or damage arising out of any peril for which the words NOT COVERED or for which an amount is not shown in Section I. Subparagraph E.

2.  The Company does not insure for loss or damage caused by any of the following:

a.  Delay, loss of market, or loss of use.

b. Indirect, remote, or consequential loss or damage.

c. Mysterious disappearance or loss or shortage disclosed on taking inventory or any unexplained loss.

d. Voluntary parting with title or possession of any property, including voluntary parting which is the result of larceny, false pretenses, or any other similar act.

### SECTION III – INSURED PROPERTY

A. INSURED PROPERTY:  Unless otherwise excluded, this Policy covers the following property while on the described **Locations** and within 1,000 feet thereof:

1. Real property, including new buildings and additions under construction at an Insured **Location**, and personal property in which the Insured has an insurable interest;

2. Improvements and betterments to buildings or structures in which the Insured has an insurable interest.  Such improvements and betterments shall be considered real property;

3. Personal property, other than motor vehicles, of officers and employees of the Insured;

4. Personal property of others in the care, custody and control of the Insured, which the Insured is under obligation to keep insured for physical loss or damage of the type insured against under this Policy;

5. Contractor's and vendor's interests in property covered to the extent of the Insured's liability imposed by law or assumed by written contract prior to the date of direct physical loss or damage.  However, such interests will not extend to any time element coverage provided by this Policy.

B. PROPERTY EXCLUDED: This Policy does not insure against loss or damage to:

1. Currency, money, notes, securities, stamps, furs, jewelry, precious metals, precious stones, and semi-precious stones.  This exclusion does not apply to precious metals and precious stones used by the Insured for industrial purposes;

2. **Land**, land values, any substance in or on **Land**, or any alteration to the natural condition of the **Land**;

3. Water, except water which is normally contained within any type of tank, piping system or other process equipment;

4. Standing timber, growing crops, plants, lawns, trees, shrubs, or animals;

5. Drainage systems, pavements or roadways;

6. Vehicles licensed for highway use, watercraft, aircraft, and railroad rolling stock;

7. Property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers;

8. Property in transit, except expressly as provided elsewhere in this Policy;

9. Underground mines or mining shafts, any mining equipment or mining property located below the surface of the ground;

10. Offshore oil rigs, platforms and property contained therein or thereon;

11. Satellites and spacecraft while on the launch pad, or after time of launch;

12. Dams, dikes, bridges, tunnels, reservoirs and canals;

13. Docks, piers and wharves;

14. Transmission and distribution lines of every type and description; except when located on the Insured premises or within one-thousand (1000) feet thereof;

15. Personal property in the care, custody, and control of the Insured when the Insured is acting as a bailee, a warehouseman, or a carrier for hire.

## SECTION IV – VALUATION

Unless otherwise endorsed hereon, the property, as described below, will be valued as follows:

A. For all property other than property specifically described in Subparagraph B. through M., inclusive, below:  Adjustment of loss or damage shall be valued at the cost to repair or replace (whichever is less) at the time and place of the loss with materials of like kind and quality, without deduction for depreciation and/or obsolescence.  The Insured may elect to rebuild on another site, provided that, such rebuilding does not increase the amount of loss or damage that would otherwise be payable to rebuild at the same site.  Property that is not repaired or replaced within two (2) years after the date of loss (unless such requirement is waived by the Company in writing) will be valued at Actual Cash Value at the time and place of the loss.

B. Stock in process will be valued at the cost of raw materials and labor expended plus the proper proportion of overhead charges.

C. Finished goods manufactured by the Insured will be valued at the regular cash selling price at the location where the loss occurs, less all discounts and charges to which the merchandise would have been subject had no loss occurred.

D. Raw materials, supplies and other merchandise not manufactured by the Insured will be valued at the replacement cost.

E. **Valuable Papers and Records** will be valued at the cost to replace or restore the property with like kind and quality including the cost to research, gather and assemble information.  If not replaced, the Company will only pay the blank value of the papers or records.

F. **Electronic Data and Media** will be valued at the cost to replace or restore the property with like kind and quality including the cost to research, gather and assemble information.   If not replaced, the Company will only pay the value of the blank media.

G. Jigs and fixtures, dies, small tools, patterns, employees' personal property and personal property of third parties, the replacement cost if replacement cost values have been reported to the Company and if actually replaced; otherwise the actual cash value with proper deduction for depreciation and obsolescence; [but not to exceed the cost to repair or replace the property with material of like kind and quality].

H. Leasehold improvements and betterments will be valued as follows;

1. If repaired or replaced at the expense of the Insured within two (2) years after the date of the loss, the cost to repair or replace the damaged improvements and betterments;

2. If not repaired or replaced within two (2) years after the date of the loss, a proportion of the Insured's original cost:

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000060 of 000094

The Company will determine the proportionate value as follows:

a. Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

b. Divide the amount determined in Subparagraph a. above by the number of days from the installation of improvements to the expiration of the lease.

If the Insured's lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure; or

3. Nothing if others pay for repairs or replacement.

I. **Fine Arts** will be valued as follows:

1. If there is no Agreed Value on file with the Company, then the lesser of:

a. The cost to repair or replace the **fine art**, or

b. The appraised value which will be determined as of the time of the loss.

2. If there is an Agreed Value on file with the Company, then the Agreed Value on file with the Company.

J. Accounts Receivable will be valued at the amount owed the Insured which the Insured is unable to collect from customers, and shall include:

1. Any collection expenses over and above the normal collection costs;

2. Interest charges on any loan to offset impaired collections pending repayment of such sums that cannot be collected; and

3. Other reasonable and necessary expenses incurred by the Insured to recreate Accounts Receivable Records.

Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts shall be deducted in determining the recovery hereunder.

After payment of loss by the Company, all amounts recovered by the Insured on Accounts Receivable for which the Insured has been paid will belong to and will be paid to the Company by the Insured up to the total amount of loss paid by this Company. All recoveries in excess of such amounts will belong to the Insured.

In the event it is possible to reconstruct the Insured's Accounts Receivable Records after they have been physically lost or damaged, so that no shortage in collection of Accounts Receivable is sustained, the Company shall only be liable for the costs of the material and the time required to reconstruct such records, with the exercise of due diligence and dispatch, but only to the extent that such amounts are not covered by any other insurance.

K. Property for Sale: If, at the time of the loss, any real property is being offered for sale, the loss or damage to such property will be valued at the lesser of:

1. The cost to repair or replace the damaged property, or

2. The price at which the property is offered for sale less the market value of the **Land**.

L. Property in Transit: In case of loss, the basis of adjustment shall be:

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000061 of 000094

1. Property shipped to or for the account of the Insured shall be valued at the actual invoice to the Insured, together with such costs and charges as may have accrued and become legally due on such property;

2. Property which has been sold by the Insured and has been shipped to or for account of the purchaser (if covered hereunder) is valued at the amount of the Insured's selling invoice, including prepaid or advanced freight;

3. Property of others not under invoice shall be valued at the actual market value at the point of destination on the date of the **Occurrence**, less any charges saved which would have become due and payable upon delivery at destination; or

4. Property of the Insured not under invoice shall be valued in accordance with the valuation provisions of this Policy applying at the location from which such property is being transported, less any charges saved which would have become due and payable upon delivery at such destination.

M. Contractor's equipment shall be valued at actual cash value, unless an agreed value applies.

With respect to Subparagraph A. through M., inclusive, unless otherwise specifically stated, the Company will compute the valuations at the time and place of the loss.

## SECTION V – TIME ELEMENT COVERAGE
## GROSS EARNINGS

This Policy is extended to cover the actual loss sustained by the Insured during the Period of Interruption directly resulting from a Covered Cause of Loss to Insured Property.

A. ACTUAL LOSS SUSTAINED:  In the event the Insured is prevented from producing goods or from continuing its business operations or services and is unable:

1. To make up lost production within a reasonable period of time (not to be limited to the period during which production is interrupted), or

2. To continue business operations or services,

all through the use of any property or service owned or controlled by the Insured, or obtainable from other sources, whether the property or service is at an Insured **Location** or through working extra time or overtime at any other substitute location(s), including any other location(s) acquired for the purpose, then the Company shall be liable, subject to all other conditions of this Policy not inconsistent herewith for the actual loss sustained of the following during the Period of Interruption:

1. GROSS EARNINGS less all charges and expenses which do not necessarily continue during the interruption of production or suspension of business operations or services.  For the purpose of this coverage, GROSS EARNINGS means:

   a. For manufacturing operations:  The net sales value of production less the cost of all raw stock, materials and supplies utilized in such production; or

   b. For mercantile or non-manufacturing operations:  The total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured;

   c. Plus all other earnings derived from the operation of the business.

In determining net sales, in the event of loss hereunder, for mercantile or non-manufacturing operations, any amount recovered under Property Damage policies for loss or damage to or destruction of merchandise shall be included as though the merchandise had been sold to the Insured's regular customers.

In determining the amount of loss payable under this coverage, due consideration shall be given to the experience of the business before the Period of Interruption and the probable experience thereafter had no loss occurred, and to the continuation of only those normal charges and expenses that would have existed had no interruption of production or suspension of business operations or services occurred.

There is no coverage for any portion of the Insured's Ordinary Payroll expense unless a specified number of days for Ordinary Payroll is shown in Section I.E.22. In such case, the Company will pay Ordinary Payroll for that number of days only. Ordinary Payroll means the entire payroll expense for all employees of the Insured except officers, executives, department managers, employees under contract, and other essential employees.

2. EXPENSE TO REDUCE LOSS: Expenses, over and above normal operating expenses, necessarily incurred by the Insured in making up lost production or in reducing loss otherwise payable under this coverage are covered hereunder, but in no event shall this Company be liable for an amount greater than that for which it would have been liable had the Insured been unable to make up any lost production or to continue any business operations or services.

B. PERIOD OF INTERRUPTION: In determining the amount payable under this coverage, the Period of Interruption shall be:

1. The period from the time of direct physical loss or damage insured against by this Policy to the time when, with the exercise of due diligence and dispatch, either:

   a. normal operations resume, or

   b. physically damaged buildings and equipment could be repaired or replaced and made ready for operations under the same or equivalent physical and operating conditions that existed prior to such loss or damage,

   whichever is less. Such period of time shall not be cut short by the expiration or earlier termination date of the Policy.

2. In addition, if applicable, such time as may be required with the exercise of due diligence and dispatch:

   a. To restore stock in process to the same state of manufacture in which it stood at the time of the initial interruption of production or suspension of business operations or services; or

   b. To replace physically damaged or destroyed mercantile stock necessary to resume operations.

   c. To replace raw materials and supplies in order to continue operations.

   However, the inability to procure destroyed mercantile stock or suitable raw materials and supplies to replace similar stock or materials and supplies physically damaged or destroyed shall not increase the Period of Interruption.

3. For Property under construction: The time period between the anticipated date of substantial completion had no covered loss occurred and the actual date of completion. In

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000063 of 000094

calculating the amount of loss, due consideration will be given to the actual experience of the business compiled after substantial completion and start-up.

The Period of Interruption does not include any additional time:

1.  Required for restaffing or retraining employees, or

2.  Due to the Insured's inability to resume operations for reasons other than those enumerated in B.2.a. through B.2.c., inclusive, above, or

3.  Required for making change(s) to the buildings, structures, or equipment for any reason except as provided in the Demolition and Increased Cost of Construction coverage, if such coverage is provided by this Policy.

C.  ADDITIONAL TIME ELEMENT COVERAGES

1.  EXTRA EXPENSE:  This Policy is extended to cover the loss sustained by the Insured for Extra Expense during the Period of Interruption resulting from direct physical loss or damage from a Covered Cause of Loss to Insured Property utilized by the Insured.  Extra Expense means:

    a.  The reasonable and necessary Extra Expense incurred to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and

    b.  The reasonable and necessary extra costs of temporarily using property or facilities of the Insured or others.

    The Insured agrees to use any suitable property or service owned or controlled by the Insured or obtainable from other sources in reducing the Business Income and Extra Expense incurred under this Policy.

2.  RENTAL VALUE:  As respects Insured Property held for rental to others, this Policy is extended to cover the loss sustained during the Period of Interruption but not exceeding the reduction in Rental Value less charges and expenses which do not necessarily continue.

    Rental Value means the sum of:

    a.  The total anticipated gross rental income from tenant occupancy of the described property as furnished and equipped by the Insured including taxes, rent based on percentage of sales, and other charges paid by tenants in respect of the leased premises; and

    b.  The amount of all charges which, by the terms of a written lease, are the legal obligation of the tenant(s) and which would otherwise be obligations of the Insured; and

    c.  The fair rental value of any portion of such property which is occupied by the Insured.

    Due consideration will be given to the historic rental expenses prior to the loss and the probable expenses thereafter.

3.  ROYALTIES:  This Policy is extended to cover loss of income sustained by the Insured under a royalty, licensing fee, or commission agreement between the Insured and another party during the Period of Interruption arising out of direct physical loss or damage by a Covered Cause of Loss during the term of this Policy to real or personal property of such other party.

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000064 of 000094

4.  SOFT COSTS: For Property under Construction, this Policy is extended to cover Soft Costs incurred by the Insured during Period of Interruption (described in Section V., Paragraph B. above). Such Soft Costs must be attributable to the loss.

The Company will pay reasonable and necessary Soft Costs over and above those costs which would have been incurred by the Insured during the Period of Interruption had no loss occurred. Soft Costs means:

a.  The amount of actual interim or construction financing interest, including loan fees and other one time charges incurred to negotiate a new construction loan and/or extend the existing one;

b.  Realty taxes and ground rent if any;

c.  Advertising and promotional expenses;

d.  Cost of additional commissions;

e.  Architects, surveyors, legal, consulting engineers, or other fees not otherwise covered under this Policy;

f.  Project administration expense, but not including development fees;

g.  Insurance premiums; and

h.  Finder's fee refunds.

5.  CONTINGENT TIME ELEMENT: If direct physical loss or damage to the real or personal property of a direct supplier or direct customer of the Insured is damaged by a Covered Cause of Loss under this Policy, and such damage:

a.  wholly or partially prevents any direct supplier to the Insured from supplying their goods and/or services to the Insured, or

b.  wholly or partially prevents any direct customer of the Insured from accepting the Insured's goods and/or services;

then this Policy is extended to cover the actual loss sustained by the Insured during the Period of Interruption with respect to such real or personal property. The property of the supplier or customer which sustains loss or damage must be of the type of property which would be Insured Property under this Policy.

This coverage applies to the Insured's direct suppliers or direct customers located in the COVERAGE TERRITORY.

6.  INTERRUPTION BY CIVIL OR MILITARY AUTHORITY: This Policy is extended to cover the actual loss sustained during the period of time when access to the Insured's real or personal property is prohibited by an order of civil or military authority, provided that such order is a direct result of a Covered Cause of Loss to real property not insured hereunder. Such period of time begins with the effective date of the order of civil or military authority and ends when the order expires, but no later than the number of days shown in Section I., Subparagraph E.6. In no event shall the Company pay more than the Sublimit shown in Section I., Subparagraph E.6.

7.  INGRESS & EGRESS: This Policy is extended to cover the actual loss sustained during the period of time when ingress to or egress from the Insured's real or personal property is prohibited as a direct result of a Covered Cause of Loss to real property not insured

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000065 of 000094

hereunder. Such period of time begins on the date that ingress to or egress from real or personal property is prohibited and ends when ingress or egress is no longer prohibited, but no later than the number of days shown in Section I., Subparagraph E.17. In no event shall the Company pay more than the Sublimit shown in Section I., Subparagraph E.17.

8. EXTENDED PERIOD OF INDEMNITY: Coverage is provided for such additional length of time as is required to restore the Insured's business to the condition that would have existed had no loss occurred, commencing with the later of the following dates:

   a. the date on which the liability of the Company for loss or damage would otherwise terminate; or

   b. the earliest date on which either normal operations resume, or repair, replacement, or rebuilding of the property that has been damaged is actually completed;

   but in no event for a period of time exceeding the number of days specified in Section I., Subparagraph E.13. starting with later of a. or b. above. This Extended Period of Indemnity does not apply to any Additional Time Element Coverages.

With respect to Section V., Subparagraphs C.6. and C.7., if a Covered Cause of Loss results in coverage under both Additional Time Element Coverages, the Company will only pay for loss under one of the two Additional Time Element Coverages, whichever the First Named Insured selects.

D. ADDITIONAL EXCLUSIONS: Section V – Time Element Coverage does not cover:

   1. IDLE PERIODS - Any loss during any period in which goods would not have been produced, or business operations or services would not have been maintained, for any reason other than direct physical loss or damage from a Covered Cause of Loss to which this coverage applies;

   2. REMOTE LOSS –

      a. Any increase in loss due to the suspension, cancellation, or lapse of any lease, contract, license or order,

      b. Any loss due to fines or damages for breach of contract or for late or non-completion of orders or penalties of whatever nature, or

      c. Any increase in loss due to interference at the Insured's premises by strikers or other persons with rebuilding, repairing, or replacing the property damaged or destroyed, or with the resumption or continuation of business, or with the re-occupancy of the premises,

      Nor shall the Company be liable for any other consequential or remote loss, other than as specifically provided in this Section V;

   3. FINISHED PRODUCTS - Any loss resulting from loss or damage to finished products manufactured by the Insured nor for the time required for their reproduction;

   4. TRANSIT - Any loss resulting from loss or damage to property in transit.

## SECTION VI – ADDITIONAL COVERAGES

The following additional coverages are subject to the terms and conditions of this Policy, including, the deductibles and sublimits of liability corresponding to each such additional coverage shown in Section I. These sublimits are part of, and not in addition to sublimits and limits of liability of this

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000066 of 000094

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000067 of 000094

Policy, including, but not limited to, the **Earth Movement**, **Flood**, or Named Storm Sublimits of Liability provided herein, if applicable .

A. ACCOUNTS RECEIVABLE:  This Policy covers any shortage in the collection of Accounts Receivable directly resulting from direct physical loss or damage insured by this Policy to Accounts Receivable Records.

The Company shall be liable for:

1. Any collection expenses over and above the normal collection costs.

2. Interest charges on any loan to offset impaired collections pending repayment of such sums that cannot be collected.

3. Other reasonable and necessary expenses incurred by the Insured to recreate Accounts Receivable Records.

Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts shall be deducted in determining the recovery hereunder.

All amounts recovered by the Insured on Accounts Receivable outstanding at the time of such loss or damage shall belong and be paid to the Company by the Insured up to a total not exceeding the amount of loss paid hereunder, but all recoveries exceeding that amount shall be for and belong to the Insured.

In the event it is possible to reconstruct the Insured's Accounts Receivable Records after they have been physically lost or damaged, so that no shortage in collection of Accounts Receivable is sustained, the Company shall be liable only for the cost of blank Accounts Receivable Records and the time required, with the exercise of due diligence and dispatch, to reestablish and/or reconstruct such Accounts Receivable Records, but only so far as not covered by any other insurance.

This extension of coverage does not apply to loss due to:

1. Bookkeeping, accounting or billing errors and omissions; and

2. Alteration, falsification, manipulation, concealment, destruction, or disposal of Accounts Receivable Records committed to conceal the wrong giving, taking, obtaining or withholding of money, securities or other property, but only to the extent of such wrongful giving, taking, obtaining or withholding.

B. DEBRIS REMOVAL:  This Policy covers the necessary and reasonable expense of removal from the Insured **Locations** of debris of Insured Property remaining as a result of direct physical loss or damage insured against under this Policy when the Insured gives written notice of such direct physical loss or damage to the Company, no later than 180 days after the loss.  There is no liability for the expense of removing contaminated or polluted uninsured property, nor the Pollutant or Contaminant therein or thereon, whether or not the contamination results from an insured event.

C. DEMOLITION AND INCREASED COST OF CONSTRUCTION:  In the event of direct physical loss or damage covered under this Policy that results in the enforcement of any law, ordinance, governmental directive or standard in effect at the time of loss or damage regulating the construction, repair or use and occupancy of the property, the Company shall pay:

1. Under Demolition Coverage A:  For the loss in value of the undamaged portion of the building as a consequence of enforcement of an ordinance or law that requires demolition of undamaged parts of the same building;

2. Under Demolition Coverage B:  For the cost to demolish and clear the site of undamaged parts of the same building, as a consequence of enforcement of an ordinance or law that requires demolition of such undamaged property;

3. Under Demolition Coverage C:  For the increased cost of repair or replacement of the damaged building and undamaged part of the same building, limited to the cost that would have been incurred in order to comply with the minimum requirements of such law or ordinance regulating the repair or replacement of the damaged building.  However, this Company shall not be liable for any such increased cost of construction unless the damaged building is actually rebuilt or replaced;

The Company shall not be liable for any cost of demolition or increased cost of replacement, repair, debris removal or loss of use necessitated by the enforcement of any law or ordinance regulating any form of contamination or pollution.

D. ELECTRONIC DATA AND MEDIA:  This Policy is extended to cover direct physical loss or damage to **Electronic Data and Media.**

E. ERRORS OR OMISSIONS:  This Policy is extended to cover direct physical loss or damage at **Locations** within the Coverage Territory that are owned, leased or operated by the Insured, if such loss or damage is not payable under this Policy solely due to;

1. Any error or unintentional omission in the description of the address of the property whether made at the inception of the policy period or subsequent thereto; or

2. Failure through any error or unintentional omission to:

   a. Include any **Location** of the Insured at the inception of the Policy; or

   b. Report any newly acquired location before the period of automatic coverage provided under this Policy for Newly acquired location(s) expires.

With respect to Subparagraphs 1. and 2. above, this Errors or Omissions Additional Coverage does not allow the Insured or its representative to correct any value shown in the Statement of Values after a covered loss.

This Policy covers such direct physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this additional coverage that any error or unintentional omission be reported by the Insured to the Company when discovered.

There is no coverage under this Paragraph for loss or damage which is covered under Newly Acquired Property or Miscellaneous Unnamed **Locations** provisions of this Policy.

F. FINE ARTS:  This Policy is extended to cover direct physical loss or damage to **fine arts**. However, no coverage is provided for:

1. Breakage of art, glass, windows, statuary, sculptures, marble, glassware, porcelain, bric-a-brac, antique furniture; antique jewelry or similar fragile articles, unless such breakage is caused by a **Defined Peril** at the Insured **Location**; or

2. Loss or damage as a result of restoring, repairing, or retouching processes.

G. FIRE BRIGADE CHARGES AND EXTINGUISHING EXPENSES:  This Policy covers the following expenses resulting from a Covered Cause of Loss:

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000068 of 000094

 1. Fire brigade charges and any extinguishing expenses which the Insured incurs;

2. Loss and disposal of fire extinguishing materials expended.

There is no coverage for any costs incurred as a result of a false alarm.

H. LEASEHOLD IMPROVEMENTS & BETTERMENTS: This Policy is extended to cover the value of undamaged tenant's improvements and betterments when the Insured's lease is cancelled by the Insured tenant or lessor; acting under a valid condition of the lease due to direct physical loss or damage to building or personal property caused by or resulting from a Covered Cause of Loss at an Insured **Location.** No sublimit of liability applies to this additional coverage, but in no event, will the Company be liable for an amount in excess of the applicable sublimit of liability specified for the Leasehold Interest, if any.

I. LEASEHOLD INTEREST: If Insured Property is: (1) rendered wholly or partially untenantable by a Covered Cause of Loss during the Policy period and (2) the Insured's lease is canceled by a party, other than the Named Insured, or an entity with any common ownership of the Named Insured, in accordance with the conditions of the lease or as a result of a statutory requirement of the appropriate jurisdiction in which the damaged or destroyed Insured Property is located, then this Policy is extended to cover **The Interest of the Insured as Lessee** or **The Interest of the Insured as Lessor**, whichever is applicable, but only for the first three months succeeding the date of the loss and the **Net Lease Interest** shall be paid for the remaining months of the unexpired lease.

Recovery under this additional coverage shall be the pro rata proportion from the date of loss to expiration date of the lease (to be paid without discount) on the Insured's interest in:

1. The amount of bonus paid by the Insured for the acquisition of the lease not recoverable under the terms of the lease;

2. Improvements and betterments to real property which are not covered under any other section of this Policy; and

3. The amount of advance rental paid by the Insured and not recoverable under the terms of the lease.

Definitions: The following terms, wherever used in this section shall mean:

1. **The Interest of the Insured as Lessee** is defined as:

   a. the excess of the rental value of similar premises over the actual rental payable by the lessee (including any maintenance or operating charges paid by the lessee) during the unexpired term of the lease; and

   b. the rental income earned by the Insured from sublease agreements, to the extent not covered under any other section of this Policy, over and above the rental expenses specified in the lease between the Insured and the lessor.

2. **The Interest of the Insured as Lessor** is defined as the difference between the rents payable to the lessor under the terms of the lease in effect at the time of loss and the actual rent collectible by the lessor during the unexpired term of the lease provided the lease is canceled by the lessee, to the extent not covered under any other section of this Policy.

3. **Net Lease Interest** is defined as that sum, which placed at 6% interest compounded annually will be equivalent to **The Interest of the Insured as Lessee or Lessor**.



25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000069 of 000094

The Company shall not be liable for any increase of loss which may be occasioned by the suspension, lapse or cancellation of any license or by the Named Insured exercising any option to cancel the lease.  Furthermore, the Named Insured shall use due diligence including all things reasonably practicable to diminish loss under this additional coverage.

J.  LIMITED POLLUTION COVERAGE:   This Policy is extended to cover the reasonable and necessary additional expense incurred to remove, dispose of, or clean-up the actual presence of **Pollutants or Contaminants** from **Land** or water at an Insured **Location** when such **Land** or water is contaminated or polluted due to a Covered Cause of Loss at the Insured **Location**.   There will be no coverage unless such expenses are reported to the Company within 180 days after the date of such Covered Cause of Loss.

K.  NEWLY ACQUIRED PROPERTY: This Policy covers real or personal property of the type insured under this Policy that is rented, leased, or purchased by the Insured after the inception date of this Policy.   Coverage under this additional coverage ceases at the earlier of the following dates:

1.  Ninety (90) days from the date of acquisition or lease of such property or such other number of days shown in Section I for Newly Acquired Property, if applicable, or

2.  When the newly acquired location is bound by the Company; or

3.  The Company notifies the Insured that it will not bind the newly acquired location.

There is no coverage for any property that is partially or wholly insured under any other insurance.

There is no coverage under this Paragraph for loss or damage which is covered under the Error or Omissions or Miscellaneous Unnamed **Locations** provisions of this Policy.

L.  PAIRS OR SETS:  If two or more components or parts are necessary for a whole or complete product, then this Policy covers reduction in value of insured components or parts of products due to direct physical loss or damage insured against by this Policy to the other insured components or parts of such products.

No sublimit of liability applies to this additional coverage.

M.  PROFESSIONAL FEES:  This Policy is extended to include reasonable and necessary expenses incurred by the Insured for preparing and certifying particulars or details of the insured's business in order to determine the amount of loss payable under this policy.   This Policy is extended to include reasonable and necessary fees charged by the Property Manager for handling the claim.

There shall be no coverage under this policy for expenses incurred by the Insured in utilizing the services of Attorneys, Public Adjusters, Insurance Agents or Brokers, or any of their subsidiary, related or associated entities.   This Policy also excludes any fees or costs for consultation on coverage or negotiation of claims, and the costs or expenses of overhead or operating expenses of any Insured, including salaries of such Insured's employees.

N.  PROPERTY REMOVED FROM INSURED LOCATIONS:  This Policy covers direct physical loss or damage to personal property of the Insured by a Covered Cause of Loss at any **Location** within the Coverage Territory when removed from the Insured **Locations** for the purpose of being repaired or serviced, excluding:

1.  Personal property insured under another Policy or floater;

2.  Personal property excluded under this Policy; or

3. Personal property removed from the Insured **Locations** for normal storage or processing or preparation for sale or delivery.

O. SERVICE INTERRUPTION: This Policy is extended to cover physical loss or damage to Insured Property and/or Time Element Coverage arising from a Covered Cause of Loss to: (1) incoming electrical, gas, water, or telecommunication equipment or outgoing sewer or (2) electrical, telecommunication, fuel, water, steam, refrigeration, or other service transmission lines, all situated outside the Insured **Locations**.

There shall be no loss payable under this Additional Coverage unless the interruption exceeds the qualifying period shown in Section I., Subparagraph E.24. In such case, the loss shall be measured from date and time of the loss. With respect to any Time Element Coverage provided herein, the Period of Interruption ends when: (1) incoming electrical, gas, water, or telecommunication equipment or outgoing sewer or (2) electrical, telecommunication, fuel, water, steam, refrigeration, or other service transmission lines is restored.

The Sublimit set forth in Section I., Subparagraph E.24. applies to all loss or damage to Insured Property and Time Element Coverage combined arising out of one Service Interruption. None of the Additional Time Element Coverages set forth in Section V., Paragraph C. apply to the Time Element Coverage provided herein.

P. SPOILAGE: This Policy is extended to cover spoilage as a direct result of a Covered Cause of Loss. The Company shall be liable for direct physical loss or damage to:

1. **Perishable goods** due to spoilage; or

2. **Perishable goods** due to contamination from the release of refrigerant including, but not limited to, ammonia.

If the Insured is unable to replace the **perishable goods** before its anticipated sale, payment will be determined on the basis of the sales price of the **perishable goods** at the time of the loss, less discounts and expenses that otherwise would have applied. Otherwise payment will be determined in accordance with Section IV – Valuation of this Policy.

**Perishable goods** means personal property:

1. Maintained under controlled conditions for its preservation, and

2. Susceptible to loss or damage if the controlled conditions change.

Q. TRANSIT: This Policy is extended to cover personal property, not otherwise excluded by this Policy, while such property is in transit.

It is agreed that coverage under this extension shall include the following:

1. Personal property shipped to customers on F.O.B., C & F, or similar terms. The Insured's contingent interest in such shipments is admitted.

2. The interest of the Insured in, and legal liability for personal property of others in the actual or constructive custody of the Insured.

3. Personal property of others sold by the Insured which the Insured has agreed prior to loss to insure during course of delivery.

It is agreed that the following additional exclusions apply to coverage as provided under this additional coverage;

1.  Samples in the custody of salespersons or selling agents.

2.  Property insured under import or export ocean cargo policies.

3.  Waterborne shipments via the Panama Canal or waterborne to and from the United States territories or possessions, Alaska, Puerto Rico, and Hawaii.

4.  Shipments made by air unless via regularly scheduled airlines.

5.  Property shipped by mail.

6.  Property of others, including the Insured's legal liability therefor, hauled on vehicles owned, leased, or operated by the Insured when acting as a common or contract carrier as defined by the Interstate Commerce Commission Regulations or other state regulatory agencies.

7.  Any transporting vehicle or conveyance.

This additional coverage attaches from the time the property leaves the original point of shipment for the commencement of transit and covers thereafter continuously in the due course of transit within the Coverage Territory until delivered at destination.

Coverage on export shipments not insured under ocean cargo policies does not extend beyond the time when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies does not attach until after discharge from overseas vessels or aircraft.

This additional coverage does not cover or apply to delay, loss of market, or any Time Element coverage.

Permission is granted to the Insured without prejudice to this insurance to accept the ordinary bills of lading used by carriers, including released and/or undervalued bills of lading and/or shipping or messenger receipts. The Insured may waive subrogation against railroads under sidetrack agreements, but the Insured shall not enter into any special agreement with carriers releasing them from their common law or statutory liability.

R.  VALUABLE PAPERS AND RECORDS:  This Policy is extended to cover **Valuable Papers and Records.**

## SECTION VII – CONDITIONS

A.  ABANDONMENT:  There can be no abandonment to the Company of any property.

B.  ADJUSTMENT OF LOSSES and FIRST NAMED INSURED CLAUSE:  Loss or damage shall be adjusted with and payable to the First Named Insured, subject to any certificates of insurance on file with the Company which require payment to a loss payee or mortgagee.

If this Policy insures more than one entity, the First Named Insured is authorized to act on behalf of all other Insureds with respect to their rights, obligations, and duties under this Policy. Payment of loss or return premium under this Policy to the First Named Insured shall satisfy the Company's obligations with respect to all Insureds.

C.  APPRAISAL:  If the Company and the Insured disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss.  In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If the appraisers cannot agree on an umpire, either may request that selection be made by a judge of a court having jurisdiction.  The appraisers will state separately the replacement cost and actual cash value of the property and amount of loss.  If they fail to agree, they will

submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, it is without prejudice to the Company's rights under the terms and conditions of the Policy and the Company's right to deny the claim.

D. ASSIGNED ADJUSTER: It is hereby agreed that the following shall be designated as the ACCOUNT CLAIM ADJUSTER for all claims reported under this policy provided that he/she agrees to be subject to and fully comply with the Lexington Insurance Company's "Claim Handling Guidelines for Independent Adjusters Protocol". The ACCOUNT CLAIM ADJUSTER may not re-assign any claim(s) without the prior approval of the Company.

Lexington Insurance Company reserves the right to associate a Lexington/AIG staff adjuster with the ACCOUNT CLAIM ADJUSTER as respects any claim or claims. Lexington retains the right to terminate the below named ACCOUNT CLAIM ADJUSTER for lack of compliance with the aforementioned Guidelines Protocol or for lack of performance at the discretion of the company. In such event, or in the event that the below named ACCOUNT CLAIM ADJUSTER becomes unwilling or unable to perform, a replacement ACCOUNT CLAIM ADJUSTER will be selected by the mutual agreement of the Company and Named Insured.

Adjuster Name: NOT APPLICABLE

Adjusting Firm: NOT APPLICABLE

E. ASSIGNMENT: The Insured may not assign this Policy without the Company's prior written consent.

F. BRANDS AND LABELS: If branded or labeled merchandise covered by this Policy is physically damaged and the Company elects to take all or any part of such merchandise at the value established by the terms of this Policy, the Insured may, at their own expense, stamp "SALVAGE" on the merchandise or its containers, or may remove or obliterate the brands or labels, if such stamp, removal or obliteration will not physically damage the merchandise, but the Insured must re-label the merchandise or containers in compliance with the requirements of law.

G. CANCELLATION:

1. This Policy can be canceled by the First Named Insured by providing the Company with:

    a. An advanced written request for cancellation stating when the cancellation shall be effective, and

    b. The original Policy or a lost policyholder release signed by the First Named Insured or its legal representative.

2. This Policy may be canceled by the Company by giving to the Insured at least NINETY (90) days written notice of cancellation or in the case of non-payment of premium, at least ten (10) days' written notice of cancellation. Such notice may be accompanied with the unearned premium, or if not included, the Company shall return the unearned premium upon demand by the First Named Insured.

3. The cancellation will be effective even if the Company has not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

4. If this Policy is canceled, the Company will send the First Named Insured any premium refund due. If the Company cancels, the refund will be pro rata. If the First Named Insured cancels, earned premium will be calculated in accordance with the customary short-rate table and procedure, subject to the Minimum Earned Premium shown on the Declarations. The cancellation will be effective even if the Company has not made or offered a refund.

H.   CONTROL OF DAMAGED MERCHANDISE:  The Insured, exercising reasonable discretion, shall be the sole judge as to whether the goods involved in any loss under this Policy are fit for normal intended use or consumption.  No goods so deemed by the Insured to be unfit for consumption shall be sold or otherwise disposed of except by the Insured or with the Insured's consent, but the Insured shall allow this Company any salvage obtained by the Insured on any sale or other disposition of such goods.  The Insured shall have full right to the possession of and retain control of all goods involved in any loss under this Policy.

I.    CURRENCY:   Any amount of money specified in the Policy, including Limits of Liability, Deductibles and Premiums shall be considered to be in the currency of the country in which the property is located.  However, if the risk is located in a country other than the United States or Canada, then the Limits of Liability, Deductibles and Premiums specified shall be in United States funds.

J.   DIVISIBLE CONTRACT:  Subject to Condition L., if the **Locations** described in this Policy include two or more buildings or the contents of two or more buildings, the breach of any condition of this Policy in respect to any one or more of the buildings insured or containing the Insured Property, shall not prejudice the right to recover for direct physical loss or damage occurring in any building insured or containing the Insured Property where, at the time of such loss or damage, a breach of condition does not exist.

K.   INSPECTION AND AUDIT: The Company, at all reasonable times during this Policy period, shall be permitted but not obligated to inspect the property insured by this Policy. Neither the Company's right to make inspections nor the making thereof nor any report thereon shall constitute any undertaking by the Company, on behalf of or for the benefit of the Insured or others, to determine or warrant that such property is safe or healthful or that they comply with any law, rule or regulation.

The Company may also examine and audit the Insured's books and records at any reasonable time during the Policy period and within one year after the Policy termination, as long as such examination and audit relate to the subject matter of this Policy.

L.   MISREPRESENTATION AND FRAUD: This entire Policy shall be void if, whether before or after a loss, the Insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein, or in case of any fraud, or false swearing by the Insured relating thereto.

M.  OTHER INSURANCE/EXCESS INSURANCE/UNDERLYING INSURANCE:  In the event there is other insurance covering loss or damage insured under this Policy, then this Policy shall apply only as excess and in no event as contributory insurance (unless this Policy is specifically written to be contributory insurance), and then only after all other insurance has been exhausted, whether or not such insurance is collectible.  Permission is granted for the Insured to purchase Excess Insurance over the limits provided by this Policy, and underlying insurance on all or any part of the deductibles of this Policy.

N.  PROTECTION AND PRESERVATION OF PROPERTY:

In case of actual or imminent direct physical loss or damage by a Covered Cause of Loss, the expenses incurred by the Insured in taking reasonable and necessary actions for the temporary protection and preservation of Insured Property hereunder shall be added to the total direct physical loss or damage otherwise recoverable under this Policy, but shall be subject to the applicable deductible, sublimit of liability and the **Policy Limit.**

O. REINSTATEMENT OF LIMITS: Except for any Covered Cause of Loss which is subject to an annual aggregate limit or sublimit of liability, payment of a claim will not reduce the amount payable under this Policy for any subsequent covered loss.

P. REQUIREMENTS IN CASE OF LOSS: The Insured shall:

1. Give prompt written notice of any loss or damage to the Company,

2. Promptly contact the applicable authority having jurisdiction in the event a law has been broken, and promptly file a written report with such authority,

3. Protect the property from further loss or damage,

4. Separate the damaged and undamaged personal property,

5. Maintain such property in the best possible order, and

6. Furnish a complete inventory of the lost, destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed,

7. Furnish all other documents or insurance policies that the Company may reasonably require,

8. Allow the Company to access and inspect any of the damaged or undamaged property, and

9. Submit to examination under oath at such times as may be reasonably required about any matter relating to this insurance or any claim;

Within sixty (60) days after the Company's request, the Insured shall provide the Company with a proof of loss, signed and sworn to by the Insured, stating the knowledge and belief of the Insured as to the following:

1. The time and origin of the loss,

2. The interest of the Insured and of all others in the property,

3. The value of each item thereof determined in accordance with the Valuation Provisions of this Policy and the amount of loss thereto and all encumbrances thereon,

4. All other contracts of insurance, whether collectible or not, covering any of said property, and

5. Any changes in the title, use, occupation, location, possession or exposures of said property subsequent to the issuance of this Policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss whether or not it then stood on leased ground.

Q. REVIEW OF VALUES: The Insured shall provide this Company at Policy inception and each subsequent anniversary date of this Policy, a Statement of Values which consists of the current 100% Property and Time Element values for all Insured **Locations.**

Such values shall be reported separately for each **Location,** with separate figures shown for each type of coverage at each **Location.** The property values shall be shown on a Replacement

Cost Basis for property which is covered on a Replacement Cost Basis and on an Actual Cash Value basis for other property. The value of stock and supplies to be included in the property values shall be in accordance with the Valuation clause contained in this Policy and shall be based on the approximate average of the stock and supplies on hand during the twelve months immediately preceding the annual review of values.  Time Element values (if applicable) shall be forwarded in accordance with the terms of the applicable Time Element provisions.

Upon inception and at each anniversary date of this Policy, the Annual Premium shall be due and payable to the Company.  Receipt of said Statement of Values by this Company shall be considered as authorization by the Insured for premiums under this Policy to be calculated.

The premium for this Policy is based upon the Statement of Values on file with the Company, or attached to this Policy.

R.  SALVAGE AND RECOVERIES: All salvages, recoveries, and payments, excluding proceeds from subrogation and underlying insurance recovered or received prior to a loss settlement under this Policy, shall reduce the loss accordingly.

S.  SERVICE OF SUIT:  In the event of the Company's failure to pay any amount claimed to be due hereunder, the Company, at the Insured's request, will submit to the jurisdiction of a court of competent jurisdiction within the United States.  Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.  It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, Massachusetts, 02110 or his or her representative, and that in any suit instituted against the Company upon this Policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office as the Company's true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by the Insured or on the Insured's behalf or any beneficiary hereunder arising out of this Policy of insurance and hereby designate the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

T.  SETTLEMENT OF CLAIMS:  The amount of loss for which the Company may be liable shall be payable within thirty (30) days after proof of loss, as herein required, is received and accepted by the Company and ascertainment of the amount of loss is made either by agreement between the First Named Insured and the Company or an amount is determined by binding Appraisal in accordance with the provisions of this Policy.

The Company shall have the option to take all, or any part of the property at the agreed or appraised value, or to repair, rebuild or replace the property physically lost or damaged with other of like kind and quality, within a reasonable time, on giving notice of its intention so to do within sixty (60) days after receipt of the proof of loss herein required.

U.  SUBROGATION:  The Company may require from the Insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by the Company, but the Company shall not acquire any rights of recovery which the Insured has expressly waived in writing prior to loss nor shall such waiver in writing affect the Insured's rights under this Policy.

Any recovery as a result of subrogation proceedings arising out of an **Occurrence**, after expenses incurred in such subrogation proceedings are deducted, shall accrue to the Insured in the proportion that the deductible amount and/or any provable uninsured loss amount bears to the entire provable loss amount.

The Insured will cooperate with the Company and, upon the Company's request and expense will:

1.  Attend hearings and trials;

2.  Assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses, and conducting suits.

V.  SUIT AGAINST COMPANY: No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this Policy, nor unless the same be commenced within twenty four (24) months next after the date of the loss, provided however, that if under the laws of the jurisdiction in which the property is located such time limitation is invalid, then any such claims shall be void unless such action, suit or proceedings is commenced within the shortest limit of time permitted by the laws of such jurisdiction.

W.  SUSPENSION:   Upon the discovery of a dangerous condition with respect to **Equipment Breakdown** to any Insured Property under this Policy, any representative of the Company may immediately suspend the insurance against loss from an Accident to such property or part thereof by giving written notice mailed or delivered to the Insured at the address of the Insured as specified in Section I, or at the location of such property. The insurance so suspended may be reinstated by the Company, but only by an endorsement issued to form a part of this Policy. The Insured shall be allowed the return of the unearned portion of the premium paid for such suspended insurance, pro-rata for the period of suspension.

X.  TERRITORIAL LIMITATIONS:   Payment of loss under this Policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

Y.  TITLES OF PARAGRAPHS: The titles of the various paragraphs of this form (and of endorsements included in this Policy) are solely for reference and shall not in any way affect the provisions to which they relate.

Z.  VACANCY: The Insured has permission to cease business operations or to have any insured building remain vacant or unoccupied, provided that, fire protection, security and alarm services are maintained and written notice is given to the Company prior to the one-hundred twentieth (120th) consecutive day of cessation of business operations, vacancy or lack of occupancy. The insured building is considered vacant or unoccupied when it does not contain adequate Insured Property to conduct customary business operations, but this provision shall not apply to any time period when customary business operations are suspended due to circumstances that are usual to such business operations.

### SECTION VIII –POLICY DEFINITIONS

A.  **Aircraft or Vehicle Impact** means only physical contact of an aircraft, spacecraft, self-propelled missile, or objects falling therefrom, or vehicle or an object thrown up by a vehicle.

B.  **Collapse** means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

C. **Defined Peril** means Fire; Lightning; **Explosion; Windstorm; Hail; Smoke; Aircraft or Vehicle Impact; Riot, Strike or Civil Commotion; Vandalism and Malicious Mischief; Collapse** (unless otherwise excluded under Section II – Perils Excluded, Subparagraph B.1.q.); or **Leakage From Fire Protection Equipment.**

D. **Earth Movement** means any natural or manmade:

   1. Earthquake, including any earth sinking, rising or shifting related to such event;

   2. Landslide, including any earth sinking, rising or shifting related to such event;

   3. Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   4. Earth sinking rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface;

   5. Shocks, tremors, mudslide, mud flow, rock falls, volcanic eruption, sinkhole collapse, subsidence;

   and includes tsunami.

E. **Earth Movement Counties:** As referenced in this Policy, designated Earthquake Zones shall be defined as all **Locations** situated within the States or Counties as specified below:

   1. **Pacific Northwest Earthquake Zone Counties**

      **Washington:** Clallum, Jefferson, King, Kitsap, Mason, Pierce, San Juan, Skagit, Snohomish, Thurston and Whatcom

   2. **New Madrid Earthquake Zone Counties**

      **Arkansas:** Clay, Craighead, Crittenden, Cross, Greene, Jackson, Lawrence, Randolph, Sharp, Mississippi, Poinsett

      **Illinois:** Alexander, Massac, Pulaski, Union, Williamson, Johnson, Pope, Saline, Jackson, Franklin, Perry, Hardin, Randolph, Monroe, St Clair, Washington, Clinton, Bond Madison, Jefferson

      **Indiana:** Posey, Vanderburgh, Gibson, Warrick, Pike

      **Kentucky:** Ballard, Carlisle, Fulton, Graves, Hickman, Livingston, McCracken, Marshall, Calloway

      **Mississippi:** Desoto, Tunica, Marshall, Tate, Coahoma, Bolivar

      **Missouri:** Bollinger, Butler, Cape Girardeau, Dunklin, Mississippi, New Madrid, Pemiscot, Scott, Stoddard, St. Louis, St Francois, St Charles, Jefferson, Franklin, Warren, Washington, Iron, Wayne,, Reynolds, Madison, St Genevieve and Perry

      **Tennessee:** Crockett, Dyer, Haywood, Lake, Lauderdale, Obion, Shelby, Tipton, Gibson, Madison, Fayette, Hardeman

F. **Electronic Data and Media** means data, messages, information, coding, programs, instructions or any other software stored on electronic, electromechanical, electromagnetic data processing

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000078 of 000094

or electronically controlled production equipment and distributed by means of a computer network or is produced in a format for use with a computer.

G. **Equipment Breakdown** means direct physical damage to Insured Property that is the direct result of an Accident.  Accident means a fortuitous event that causes direct physical loss or damage to Insured Property.  The event must be one of the following:

1. Mechanical breakdown, including rupture or bursting caused by centrifugal force;

2. Artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires;

3. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by the Insured, or operated under the control of the Insured;

4. Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or

5. Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment

H. **Explosion**: Explosion does not include loss or damage occasioned by or incident to explosion in or of the following equipment owned, operated or controlled by the Insured;

1. Steam boiler, steam turbines, steam engines, and steam pipes interconnecting any of the foregoing;

2. Moving or rotating machinery or parts thereof when such direct loss or damage is caused by centrifugal force or mechanical breakdown;

3. Combustion gas turbines;

4. Any products manufactured by the Insured or other property attached thereto or forming or to form a part thereof undergoing pressure tests to the extent of the loss to such property.

Explosion will include loss or damage arising or resulting from;

1. The explosion of accumulated combustible gases or unconsumed fuel within the furnace of a boiler or pressure vessel, other than combustion gas turbines, or within the flues or passages which conduct the gases of combustion therefrom;

2. A combustion explosion outside of any equipment excluded above even though such combustion explosion may have been the direct result of the explosion or such excluded equipment.

The following are not explosions within the intent or meaning of this definition;

1. Electric arcing or any coincident rupture of electrical equipment due to such arcing;

2. Bursting or rupture caused by freezing;

3. Sonic shock waves, generally known as Sonic Boom;

4. Bursting, rupture or collapse of any safety disc, rupture diaphragm or fusible link.

I. **Fine Arts** means paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit, excluding automobiles, coins,

stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money and securities.

**Fine Arts** does not mean and does not include any item which would qualify as **Valuable Papers and Records**.

J. **Flood** means, whether natural or manmade, **Flood** waters, surface water, waves, tide or tidal water, overflow or rupture of a dam, levy, dike, or other surface containment structure, storm surge, the rising, overflowing or breaking of boundaries of natural or manmade bodies of water, or the spray from any of the foregoing, all whether driven by wind or not. A tsunami shall not be considered a **Flood**.

K. **Fungus, Mold(S), Mildew, Spores Or Yeast:**

Fungus includes, but is not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including mold(s), rusts, mildews, smuts and mushrooms;

Mold includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and fungi that produce mold(s);

Spore means any dormant or reproductive body produced by or arising or emanating out of any fungus, mold(s), mildew, plants, organisms or microorganisms,

L. **Land** means land except land for which values are reported and premiums are charged hereunder, such as dikes, levees, and other surface containment structures. Surface containment structures are not land to a depth of six inches below such surface containment structures.

M. **Leakage From Fire Protection Equipment** means direct physical loss or damage from:

1. Water or other substances discharged from within any part of the **Fire Protection Equipment** for the Insured **Location** or for any adjoining **Locations**;

2. Collapse or fall of tanks forming a part of the **Fire Protection Equipment** or the component parts or supports of such tanks.

The term **Fire Protection Equipment** includes tanks, water mains, hydrants, or valves, and any other equipment whether used solely for fire protection or jointly for fire protection and for other purposes, but does not include;

1. Branch piping from a joint system where such branches are used entirely for purposes other than fire protection;

2. Any underground water mains or appurtenances located outside of the Insured **Location** and forming a part of the public water distribution system;

3. Any pond or reservoir in which the water is impounded by a dam.

N. **Location** means the location as specified in the Statement of Values, but if not so specified, location means any building, yard, dock, wharf, pier or bulkhead or any group of the foregoing bounded on all sides by public streets, clear **Land** space or open waterways, each not less than fifty feet wide. Any bridge or tunnel crossing such street, space or waterway shall render such separation inoperative for the purpose of this definition.

O. **Miscellaneous Unnamed Location(s)** means a location that has not been included in the Statement of Values on file with the Company and has not been reported to the Company as may be required in the Policy provisions elsewhere.

There is no coverage under this Paragraph for loss or damage which is covered under the Error or Omissions or Newly Acquired Property provisions of this Policy.

P.  **Occurrence** means any one loss, disaster, casualty, incident or series of losses, disasters, casualties or incidents, not otherwise excluded by this Policy and arising out of a single event or originating cause and includes all resultant or concomitant insured losses.  The **occurrence** must occur during the policy period.

If more than one event for **Windstorm, Hail,** Named Storm, **Riot, Strike or Civil Commotion, Vandalism and Malicious Mischief, Earth Movement, Flood** or Terrorism covered by this Policy occurs within any period of seventy-two (72) hours during the term of this Policy, such covered events shall be deemed to be a single **Occurrence.**  When filing proof of loss, the Insured may elect the moment at which the 72 hour period shall be deemed to have commenced, which shall not be earlier than the time when the first loss occurs to the Insured Property.

Q.  **Pollutants or Contaminants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste, which after its release can cause or threaten damage to human health or human welfare or causes or threatens damage, deterioration, loss of value, marketability or loss of use to property insured hereunder, including, but not limited to, bacteria, virus, or hazardous substances as listed in the Federal Water, Pollution Control Act , Clean Air Act, Resource Conservation and Recovery Act of 1976, and Toxic Substances Control Act or as designated by the U. S. Environmental Protection Agency. Waste includes materials to be recycled, reconditioned or reclaimed.

R.  **Riot, Strike or Civil Commotion** means riot and civil commotion including;

1.  Acts of striking employees while occupying the Insured **Location**; and

2.  Pilferage or looting occurring at the time and place of a riot or civil commotion.

S.  **Smoke** means loss or damage ensuing from a sudden and accidental release of **Smoke.**  The peril of **Smoke** does not include loss or damage caused by **Smoke** from agricultural smudging or industrial operations.

T.  **Valuable Papers and Records** means documents that are written, printed, or otherwise inscribed.  These include:

1.  Books, manuscripts, abstracts, maps and drawings; film and other photographically produced records, such as slides and microfilm;

2.  Legal and financial agreements such as deeds and mortgages;

3.  Addressograph plates; and

4.  Any electrically produced data such as printouts, punched cards, tapes or discs.

**Valuable Papers and Records** does not mean money and securities and converted data, programs or instructions used in data processing operations, including the materials on which the data is stored.

**Valuable Papers and Records** does not mean and does not include any item which would qualify as **Fine Arts.**

U.  **Vandalism and Malicious Mischief** means willful and malicious damage to, or destruction of, Insured Property.  **Vandalism and Malicious Mischief** does not include loss or damage caused by or resulting from theft, except for real property loss or damage caused by the breaking or exiting of burglars.

V. **Windstorm** or **Hail:** Direct action of wind or by the direct action of hail, whether accompanied by wind or not, but no liability is assumed under these perils for:

1. Loss or damage caused by or resulting from frost or cold weather, ice (other than hail), snow or sleet, whether driven by wind or not;

2. Loss or damage to the interior of any building or structure, or the property inside the building or structure, caused by rain, snow, or dust, whether driven by wind or not, unless the building or structure first sustains wind or hail damage to its roof or walls through which the rain, snow, sand or dust enters;

3. Loss or damage caused when weight of snow, rainwater, ice or sleet is a contributing factor to the fall or collapse of a building or structure or any part thereof.

Secretary

President

ENDORSEMENT #001

**This endorsement, effective 12:01 AM,** 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## TERRORISM PREMIUM CHARGE ENDORSEMENT WITH EXCLUSION FOR BIOLOGICAL AND/OR CHEMICAL TERRORISM

This endorsement modifies insurance provided by the Policy:

The **terrorism** charge is $ 30,000 and is included in the Policy Premium shown on the Declarations Page of this Policy.  Notwithstanding anything to the contrary in this Policy, **terrorism** which causes direct physical loss or damage to property is covered.

However, the **Company** does not insure for loss or damage caused directly or indirectly by **biological and/or chemical terrorism** whether controlled or uncontrolled, proximate or remote, sudden or over any length of time, or which is contributed to or aggravated by any other event, cause, or peril. Such loss or damage is excluded regardless of any other event, cause, or peril contributing concurrently or in any sequence to the loss or damage.

The following definitions apply to this Policy:

1.  **Company** means the insurer as shown in the attachment clause of this endorsement.

2.  **Biological and/or chemical terrorism** means the dispersal, discharge, or release of pathogenic, toxic, poisonous, or damaging biological or chemical agents or substances in an act(s) of **terrorism.**

3.  **Terrorism** means the use or threatened use of force or violence against a person or property, or commission of an act dangerous to human life or property, or commission of an act that interferes with or disrupts an electronic or communication system, undertaken by any person or group, whether or not acting on behalf of or in any connection with any organization, government, power, authority or military force, when the effect is to intimidate, coerce or harm:

    a.  A government;

    b.  The civilian population of a country, state or community; or

    c.  Disrupt the economy of a country, state or community.

    So long as the Terrorism Risk Insurance Act of 2002, and any revisions or amendments thereto is in effect (the "Act"), **terrorism** includes a certified act of terrorism defined by Section 102. Definitions of the Act.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

©2015 American International Group, Inc.                   Page 1 of 1
All Rights Reserved.

ENDORSEMENT #002

**This endorsement, effective 12:01 AM, 05/15/2017**
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## WAR AND TERRORISM EXCLUSION ENDORSEMENT
### (Applies to locations outside the United States of America, its territories and possessions)

This endorsement modifies insurance provided by the Policy:

Notwithstanding any provision to the contrary within this insurance or any endorsement thereto, it is agreed that this insurance excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

1. War, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or

2. Any act of terrorism.

   For the purpose of this endorsement an act of terrorism means an act including, but not limited to, the use of force or violence and/or the threat thereof, of any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or similar purposes including the intention to influence any government and/or to put the public, or any section of the public, in fear.

This endorsement also excludes loss, damage, cost or expense of whatsoever nature directly or indirectly caused by, resulting from or in connection with any action taken in controlling, preventing, suppressing or in any way relating to 1. and/or 2. above.

If the Underwriters allege that by reason of this exclusion, any loss, damage, cost or expense is not covered by this insurance the burden of proving the contrary shall be upon the Assured.

In the event any portion of this endorsement is found to be invalid or unenforceable, the remainder shall remain in full force and effect.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000085 of 000094

**ENDORSEMENT #003**

**This endorsement, effective 12:01 AM,** 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## ANTI-STACKING ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

The following condition is added to the Policy:

If this insurance and any other insurance issued to the Insured by the Company or any entity that the Company controls, is controlled by or is under common control with applies to the same loss, claim, suit, occurrence or accident, whichever is applicable, then:

1.     The maximum limit of liability, or

2.     The maximum sublimit of liability with respect to a specific coverage or specific Covered Cause of Loss or peril;

under all insurance available from the above entities in the aggregate will not exceed the highest applicable limit of liability or highest applicable sublimit of liability available under any one policy.

However, this condition does not apply to any other insurance issued to the Insured by the Company or any entity that the Company controls, is controlled by or is under common control with which is specifically written to be primary to, in excess of, or quota share with the Policy to which this endorsement is attached.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000086 of 000094

### ENDORSEMENT #004

**This endorsement, effective 12:01 AM,** 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## ECONOMIC SANCTIONS ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

The Insurer shall not be deemed to provide cover and the Insurer shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Insurer, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union or the United States of America.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

ENDORSEMENT #005

**This endorsement, effective 12:01 AM**, 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## MOLD / FUNGUS EXCLUSION
(with direct result of covered loss exception)

This endorsement modifies insurance provided by the Policy:

In consideration of the premium charged, it is hereby understood and agreed that this Policy is amended as follows.

The Company shall not be liable for any loss or damage in the form of, caused by, arising out of, contributed to, or resulting from fungus, mold(s), mildew or yeast; or any spores or toxins created or produced by or emanating from such fungus, mold(s), mildew or yeast;

   (a) fungus includes, but is not limited to, any of the plants or organisms belonging to the major group fungi, lacking chlorophyll, and including mold(s), rusts, mildews, smuts and mushrooms;

   (b) mold(s) includes, but is not limited to, any superficial growth produced on damp or decaying organic matter or on living organisms, and fungi that produce mold(s);

   (c) spores means any dormant or reproductive body produced by or arising or emanating out of any fungus, mold(s), mildew, plants, organisms or microorganisms,

regardless of any other cause or event that contributes concurrently or in any sequence to such loss.

This exclusion shall not apply to any loss or damage in the form of, caused by, contributed to or resulting from fungus, mold(s), mildew or yeast, or any spores or toxins created or produced by or emanating from such fungus, mold(s), mildew or yeast which the Insured establishes is a direct result of a Covered Loss not otherwise excluded by the Policy, provided that such fungus, mold(s), mildew or yeast loss or damage is reported to the Company within twelve months from the expiration date of the Policy.

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

ENDORSEMENT #006

**This endorsement, effective 12:01 AM**, 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## HIGH HAZARD WIND ZONES ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

The following definitions are added to the **DEFINITIONS** section:

1.   **Tier 1 High Hazard Wind Zones (Texas to North Carolina, Hawaii, Puerto Rico and U.S. Virgin Islands)** means the following wind zones:

| TIER 1 HIGH HAZARD WIND ZONES (TEXAS TO NORTH CAROLINA, HAWAII, PUERTO RICO AND U.S. VIRGIN ISLANDS) | |
|---|---|
| **State** | **Geographic Areas** |
| Alabama | Counties: Baldwin, Mobile |
| Georgia | Counties: Bryan, Camden, Chatham, Glynn, Liberty, McIntosh |
| Hawaii | Entire State |
| Louisiana | Parishes: Assumption, Calcasieu, Cameron, Iberia, Jefferson, Lafourche, Livingston, Orleans, Plaquemines, St. Bernard, St. Charles, St. James, St. John the Baptist, St. Martin (South), St. Mary, St. Tammany, Tangipahoa, Terrebonne, Vermilion |
| Mississippi | Counties: Hancock, Harrison, Jackson |
| North Carolina | Counties: Beaufort, Bertie, Brunswick, Camden, Carteret, Chowan, Columbus, Craven, Currituck, Dare, Hyde, Jones, New Hanover, Onslow, Pamlico, Pasquotank, Pender, Perquimans, Tyrell, Washington |
| Puerto Rico | Entire Territory |
| South Carolina | Counties: Beaufort, Berkeley, Charleston, Colleton, Dorchester, Georgetown, Hampton, Horry, Jasper |
| Texas | Counties: Aransas, Brazoria, Calhoun, Cameron, Chambers, Galveston, Harris, Jackson, Jefferson, Kenedy, Kleberg, Liberty, Matagorda, Newton, Nueces, Orange, Refugio, San Patricio, Victoria, Willacy |
| U.S. Virgin Islands | Entire Territory |

2.   **Tier 1 High Hazard Wind Zones (Virginia to Maine)** means the following wind zones:

| TIER 1 HIGH HAZARD WIND ZONES (VIRGINIA TO MAINE) | |
|---|---|
| **State** | **Geographic Areas** |
| Connecticut | Counties: Fairfield, Middlesex, New Haven, New London |
| Delaware | Counties: Sussex |
| Maine | Counties: Androscoggin, Cumberland, Hancock, Knox, Lincoln, Sagadahoc, Waldo, Washington, York |
| Maryland | Counties: Calvert, Charles, Dorchester, St. Mary's, Somerset, Wicomico, Worcester |
| Massachusetts | Counties: Barnstable, Bristol, Dukes, Essex, Nantucket, Norfolk, Plymouth, Suffolk |

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000088 of 000094

| New Hampshire | Counties: Rockingham, Strafford |
| New Jersey | Counties: Atlantic, Bergen, Cape May, Cumberland, Essex, Hudson, Middlesex, Monmouth, Ocean, Union |
| New York | Counties: Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk, Westchester |
| Rhode Island | Counties: Bristol, Kent, Newport, Providence, Washington |
| Virginia | Counties: Accomack, Charles City, Gloucester, Isle of Wight, James City, Lancaster, Mathews, Middlesex, New Kent, Northampton, Northumberland, Prince George, Surry, Sussex, York, Westmoreland Independent Cities: Chesapeake, Hampton, Newport News, Norfolk, Poquoson, Portsmouth, Suffolk, Virginia Beach, Williamsburg |

3.    **Tier 1 High Hazard Wind Zones (Florida)** means the following wind zones:

| TIER 1 HIGH HAZARD WIND ZONES (FLORIDA) | |
| --- | --- |
| **State** | **Geographic Areas** |
| Florida | Entire State |

All other terms and conditions of the Policy remain the same.

_____
Authorized Representative

©2017 American International Group, Inc.
All Rights Reserved.

ENDORSEMENT #007

**This endorsement, effective 12:01 AM**, 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## CANCELLATION - ADDITIONAL PROVISIONS

This endorsement modifies insurance provided by the Policy:

The Policy is amended as respects cancellation. The following additional provisions shall apply with respect to the cancellation provisions of this Policy:

If this Policy covers any location or locations in "Tier 1 wind zone(s)" as defined in this Policy, and the Policy is cancelled at the request of the Insured, the following provision will apply:

If the Policy was in effect at any time during the period from June 1st to November 30th, the amount of premium we will return upon the Insured's cancellation of the Policy will be a percentage of the total premium, determined as follows:

1 Year Policy

| Number of Days Policy In Force | Percentage of Premium to Be Returned |
|---|---|
| 1 to 180 | 20% |
| 181 to 210 | 15% |
| 211 to 240 | 10% |
| 241 to 270 | 7.5% |
| 271 to 300 | 5.0% |
| 301 to 330 | 2.5% |
| 331 to 365 | 0.0% |

If a coverage or location is added to or deleted from the Policy, each type of coverage or such location(s) shall be underwritten separately and the rate will be determined based upon the characteristics of the risk.

If a location within a "Tier 1 wind zone" is added to or deleted from the Policy, and coverage for that location existed at any time during the period from June 1st to November 30th, the premium to be returned for that location upon the Insured's cancellation of the Policy will be determined in accordance with the above table.

If a location is not within a "Tier 1 wind zone" and is added to or deleted from the Policy, normal pro rata or short rate factors shall apply as provided by the Policy.

All other terms and conditions of the Policy remain the same.



_____
Authorized Representative

          ©2007 American International Group, Inc.
All Rights Reserved.

ENDORSEMENT #008

**This endorsement, effective 12:01 AM**, 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## SERVICE OF SUIT ENDORSEMENT
## TO
## LEXINGTON MANUSCRIPT DOMESTIC PROPERTY POLICY
## FORM PR8371 (Ed. 02/12)

This endorsement modifies insurance provided by the Policy.

Subparagraph S. of **SECTION VII – CONDITIONS** is deleted in its entirety and replaced with the following:

S. SERVICE OF SUIT: In the event of the Company's failure to pay any amount claimed to be due hereunder, the Company, at the Insured's request, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 99 High Street, Boston, Massachusetts, 02110 or his or her representative, and that in any suit instituted against the Company upon this Policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successors in office as the Company's true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by the Insured or on the Insured's behalf or any beneficiary hereunder arising out of this Policy of insurance and hereby designate the above named Counsel as the person to whom the said officer is authorized to mail such process or a true copy thereof.

All other terms and conditions of the Policy remain the same.



Authorized Representative

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000091 of 000094

ENDORSEMENT #009

**This endorsement, effective 12:01 AM**, 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## SUBLIMITS ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

In consideration of the premium charged, PR8371 (02/12) Manuscript Domestic Property Policy, Section I - Coverages and Limits of Liability, E. Sublimits of Liability, is amended to include the following:

E. SUBLIMITS OF LIABILITY:

**1. Earth Movement**

| | |
|---|---|
| b. Not Covered | Per **Occurrence** and Annual Aggregate for the peril of **Earth Movement** in California Alaska, Hawaii and/or Puerto Rico, & Canada. |
| 7.  $ 1,000,000 | Per Occurrence for Contingent Time Element (Direct Suppliers only) |
| 27. NOT COVERED | Per **Occurrence** and Annual Aggregate for Biological and Chemical Terrorism |
| 28. $ 100,000 | Per **Occurrence** and Annual Aggregate for **Mold / Fungus** Resultant Damage (coverage for ensuing **mold / fungus** as a result of a covered peril) |
| 29. $ 2,500,000 | Per **Occurrence** for Outdoor Property – $250,000 max per item |

All other terms and conditions of the Policy remain the same



Authorized Representative

**ENDORSEMENT #010**

**This endorsement, effective 12:01 AM**, 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## DEDUCTIBLES ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

In consideration of the premium charged, PR8371 (02/12) Manuscript Domestic Property Policy, Section I - Coverages and Limits of Liability, G. DEDUCTIBLE, is amended to include the following:

G. DEDUCTIBLE:

3. **Windstorm** or **Hail:**

b.   1% Per unit, applied separately to, each "Unit of Insurance" involved in the loss at the time of the loss at each **Location** involved in the loss or damage, subject to a minimum of $250,000 any one **Occurrence**, as respects **Locations** in Oklahoma;

c.   3% Per unit, applied separately to, each "Unit of Insurance" involved in the loss at the time of the loss at each **Location** involved in the loss or damage arising out of a Named Storm (a storm that has been declared by the National Weather Service to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm or Tropical Depression) in Tier 1 Counties, regardless of the number of Coverages, **Locations** or Perils involved (including but not limited to, all **Flood,** wind, wind gusts, storm surges, tornados, cyclones, **Hail** or rain) and subject to a minimum deductible of $250,000 any one **Occurrence** except;

d.   5% Per unit, applied separately to, each "Unit of Insurance" involved in the loss at the time of the loss at each **Location** involved in the loss or damage arising out of a Named Storm (a storm that has been declared by the National Weather Service to be a Hurricane, Typhoon, Tropical Cyclone, Tropical Storm or Tropical Depression) in Florida, regardless of the number of Coverages, **Locations** or Perils involved (including but not limited to, all **Flood,** wind, wind gusts, storm surges, tornados, cyclones, **Hail** or rain) and subject to a minimum deductible of $250,000 any one **Occurrence;**

5. **Equipment Breakdown:**

a.   $100,000 Per **Occurrence.**

All other terms and conditions of the Policy remain the same.

Authorized Representative

**ENDORSEMENT #011**

**This endorsement, effective 12:01 AM**, 05/15/2017
**Forms a part of Policy No.:** 025032406
**Issued to:** INDEPENDENCE REALTY TRUST
**By:** LEXINGTON INSURANCE COMPANY

## AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided by the Policy:

In consideration of the premium charged, it is agreed that the following is made part of the Policy:

- 140% Margin Clause to apply

- The following constitute a "Unit of Insurance"

  a.  Each separate building or structure;

  b.  The contents of each separate building or structure; and

  c.  For each involved location, the combined total values for Time Element (Business Interruption, Tuition Fees, Extra Expense, Additional Living Expenses, Rents, Rental Values and Leasehold Interest).

All other terms and conditions of the Policy remain the same.



Authorized Representative

MANUSCRIPT

©2017 American International Group, Inc.
All Rights Reserved.

Page 1 of 1

25EAC03F-ED2D-4C0E-828F-4D975EC651E3 : 000094 of 000094